IN THE UNITED STATES DISTRICT COURTSOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TYLER ERDMAN, ) | |
| ) | |
| Plaintiff, ) | Case No.: **20-cv-4162** |
| ) | |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| ADAM VICTOR and ) | |
| THE BOARD OF MANAGERS OF ) | |
| MANHATTAN PLACE CONDOMINIUM ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

Plaintiff *pro se*, Tyler Erdman, for his Complaint against defendants, Adam H. Victor ("Victor") and the Board (the "Board") of Managers of Manhattan Place Condominium ("MPC") respectfully alleges as follows:

## NATURE OF THE ACTION

1. This action seeks redress for certain defamatory statements made by defendants to unit owners of Manhattan Place Condominium and others.

2. Plaintiff had worked for Adam Victor, MPC's President of the Board until the summer of 2013. During that time he witnessed Victor stealing from MPC, and efforts to sexually harass, discriminate against and traffic a female employee, who was Plaintiff's girlfriend at the time, Yevgenia Khatskevich ("Khatskevich").

3. Plaintiff assisted her in bringing suit against Victor and MPC in 2014. When the lawsuit commenced, Victor took efforts to hide the litigation from MPC.

1

4. Victor's own personal attorneys represented MPC without its knowledge for years, as he enacted a five-point plan to retaliate against Khatskevich, and Plaintiff for assisting her. Audio recordings detail Defendants' plans to force her to drop her suit by isolating her, defaming her, running up her legal costs, and threatening her health, safety and residency. Defendants enacted their plan by, among other things, suing Plaintiff in New York and Delaware.

5. In 2019, unit owners learned Victor was representing them without their knowledge, and they took action to force him to resign as President.

6. Victor and the Board of Managers defamed Plaintiff in order to discredit him and the information he possessed about Victor's improprieties and the Board's inaction.

7. Specifically, Defendant Victor, as a member of the Board, sent a letter on May 31, 2019 to the hundreds of unit owners, falsely stating that Plaintiff attempted to extort MPC in an "extortionate money grab", and had perjured himself by stating he worked for MPC as well as making allegations about Victor's theft of funds from MPC and it's insurance company.

8. When Plaintiff confronted the Board about their defamatory statements about Plaintiff, seeking retraction, MPC's attorney stated he would get instruction from the Board after June 2019 Board elections occurred. In fact, the Board never responded.

9. The Board on multiple occasions has continued to defame Plaintiff, falsely stating to unit owners that Plaintiff was a criminal who had stolen documents from Victor, and that Plaintiff had perjured himself to make false allegations against Defendants.

10. Specifically, in early July 2019, the new President of the Board, Amos Tamam falsely told unit owners that Khtaskeich would soon be deported because of criminal acts the Plaintiff had committed with her to steal documents from Victor. Tamam explained that her deportation would cause her and Plaintiff's claims against MPC to be dismissed.

11. While Defendant's made their defamatory statements Plaintiff was in contact with multiple unit owners and certain Board members to discuss Victor's misconduct and settle Plaintiff's claims against MPC.

12. As a result of the defamatory statements, Plaintiffs opportunity to settle claims with MPC has effectively been destroyed.

13. This action seeks redress for defamatory statements made by Adam Victor and the Board of Managers of Manhattan Place Condominium.

## PARTIES

14. Plaintiff Tyler Erdman is an individual residing in and a citizen of the State of Connecticut.

15. Defendant Adam H. Victor is an individual who resides in this District and is a citizen of the State of New York.

16. Defendant the Board of Managers of Manhattan Place Condominium operates in this District.

## JURISDICTION AND VENUE

17. Plaintiff is a citizen of the State of Connecticut for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

18. Defendants operate in or are citizens of the State of New York for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

19. This Court has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds Seventy Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

20. Defendants are each subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 with proper venue pursuant to 28 U.S.C. § 1391 as defendants are residents of or operate a property in this district and the events giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

**Plaintiff witnessed Victor's illegal conduct first-hand**

21. Adam Victor had been the President of the Board of Managers of Manhattan Place Condominium for decades.

22. During Victor's tenure as President, he selected the other directors of the Board and MPC's manager, giving him free rein over the building and its finances which he used to steal from MPC and its insurers.

23. Victor exposed his employees to a litany of criminal conduct.

24. In the aftermath of Hurricane Sandy, Victor used his neat-dictatorial control of MPC to loot it and it's insurance companies of more than $1 million in a variety of ways:

    a. Victor directed MPC to hire his own company's employees, including Plaintiff. Victor would instruct employees to do some minor work for MPC related to Hurricane Sandy. Victor would then tell them that he and his companies would not be paying them. They were instead told to bill MPC for the work they performed, and mark it up to include the pay he would usually give them. They would be instructed to bill multiple months of payments that they would normally receive from Victor into a single bill to MPC so there would be fewer transactions for MPC to notice.

    b. Victor hired his former mistress as an interior designer, paying her tens of thousands of dollars. During their affair Victor had paid for her to go to school for interior design and up to that point had never worked on any large project, let alone a multi-million dollar one.

    c. Victor billed MPC and it's insurance company for expenses he and his companies incurred from everything to tens of thousands in car service bills to printer ink.

    d. Victor would attempt to direct contacts to his own business contacts in which he wanted to build a relationship with.

25. During Plaintiff's employment, Victor made multiple illegal donations to political candidates in excess of the legal limits. In order to hide his illegal contributions Victor made the payments in the names of straw donors, either directly himself or by reimbursing the straw donors.

26. Victor tried to enlist the plaintiff to take part in this scheme. Plaintiff declined, later reporting it to the FEC and FBI. Victor attempted to threaten witnesses, even his own daughter to lie to federal authorities to derail their investigation. The FEC saw through his attempts, fining him tens of thousands of dollars. The FBI also investigated Victor, leading to him pleading guilty to a felony[1] and serving out a term of house arrest at MPC.

27. Victor hid his felony conviction from unit owners and board members at MPC. Even having MPC employees write to his judge in support, telling them a false story of why the letters were needed.

**Victor's human trafficking operation**

28. Victor's conduct took a more sinister turn when he hired Khatskevich, a Kazakhstani immigrant. Victor undertook efforts to traffic her, making it nearly impossible for her to escape his sphere of influence, and sexual advances.

29. Victor tried to force her into a sexual relationship, offering to leave his wife in an attempt to make it palatable for her. Even offering his son, Adam E. Victor as an alternative.

30. Victor acquired a H1-B visa for Khatskevich, trying to force her to be dependent on him financially, and so he could threaten her with deportation if she didn't comply.

31. Victor was required to pay her a set wage as a condition of the visa. He and his accountant, Leonard Abruzzo,[2] planned a series of financial transactions to make it

---

[1] https://www.justice.gov/opa/pr/new-york-businessman-pleads-guilty-making-illegal-campaign-contributions-candidates-us

[2] Abbruzo Accounting had previously aiding Victor in trafficking an Australian immigrant using a similar scheme.

appear like she was getting paid that wage while in reality she was paid little to nothing. Victor kept her cash poor, and dependent on a credit card he turned on and off at will so she couldn't afford to leave.

32. Victor assigned Khatskevich to work on the MPC rebuilding project in an effort to groom her to go to interior design school as his former mistress did.

33. MPC was billed for and paid for Khatskevich's time through one of Victor's companies. Victor claimed he used the proceeds from MPC to pay for Khatskevich's H1-B visa application.

34. Khatskevich and Plaintiff began dating, and Plaintiff learned of the depths Victor had sunk to try and get his way with Khatskevich.

35. Victor constantly harassed her at MPC. When she reached her breaking point, he began to threaten her with deportation. Claiming one phone call to the Senator he donated to illegally and her life would be over.

36. The government granted Khatskevich a T visa[3] and later a green card, to protect her from Victor and MPC, as a victim of human trafficking.

**Defendants enacts their five point plan of retaliation**

37. Plaintiff assisted Khatskeivich in escaping Victor, and later bringing suit against Defendants in 2014. The suit aimed to enforce her rights under the New York City Human Rights Law

---

[3] A T visa is a type of visa allowing certain victims of human trafficking to remain and work in the United States, typically if they agree to assist law enforcement in testifying against the perpetrators.

7

38. Victor had threatened that if Khatskevich brought suit he would use his considerable wealth and influence to try to ruin her, who he described as "nothing more than a desperate Kazakhstani immigrant."

39. On audio recording, Victor outlined his five-point plan to retaliate and force her to drop her suit, planning to isolate her, defame her, run up her legal costs, and threaten her health, safety and residency.

40. Victor sued Khatsekvich in an effort he outlined on audio recordings that he hoped would force Khatsekvich's attorneys to drop her as a client.

41. Plaintiff and Khatsevich had taken efforts to hide their relationship from Victor, and Plaintiff's efforts to assist her. Victor described in detail his retaliatory scheme to one of his employees, Khatskevich's then roommate Nazym Toktassynova so that she could convey the threats to Khatskevich.

42. When Victor learned that Plaintiff was helping Khatskevich, he planned to retaliate against Plaintiff as well, telling Toktassynova:

"What Tyler doesn't realize is that I'm gonna sue him for aiding and abetting, for breaking into my computer, um, for all types of things, and so he's gonna be sued. So he's gonna have to spend, you know, a hundred thousand dollars in legal fees to defend himself. And I'm gonna sue him for my reputation- a hundred million dollars."

43. Victor made good on his threat suing Plaintiff in New York, alleging he stole documents, engaged in unfair competition, and aided and abetted Khatskevich's purported breach of fiduciary duty. The claims were largely dismissed and Plaintiff brought counterclaims against MPC, Victor and Victor's companies. Victor then sued Plaintiff in Delaware for

defamation, alleging millions in damages. Victor withdrew the action after Plaintiff moved to dismiss it.

44. Victor outlined on audio recordings how he hoped that attacking Plaintiff would isolate Khatskevich and leave her homeless. He explained his plan to defame Khatskevich in an effort to discredit her claims. Victor openly stated that he would make up a claim about prostitution, knowing it was false:

> [S]o now Tyler's parents are gonna say, 'What the fuck are you doing, Tyler? You're making us give you money, you stand in exposure of basically getting a judgment against you that bankrupts you, because you have to declare personal bankruptcy, for a woman who was a prostitute.' We know she wasn't a prostitute, but this is gonna be war. And so, I think that Tyler's parents are gonna cut him off, throw him out of the house where Eve is, and say, 'Either get rid of the girl, or we're basically kicking you out of your uncle's apartment.' So, I think what's gonna happen, Tyler's gonna lose the apartment, unless he dumps Eve, unless he cuts off - because that's the only way we're gonna basically settle with Tyler. We're gonna basically say 'we'll settle with you if you throw her out.' And so she's gonna be, so she's not gonna have any place to stay then.

45. With litigation not enough to satisfy Victor's appetite for revenge, Victor contacted an Assistant US Attorney to attempt to have him prosecute Plaintiff and Khatskevich for "stealing" documents from him. They declined to sign on to Victor's retaliatory campaign.

46. Victor strangely told employees that he had worked for the CIA or FBI, it wasn't clear which, to gather intelligence on North Korea using his companies as a front. Victor took Khatskevich and other employees to functions with people he claimed were North Korean officials.

47. Victor threatened employees with action from government agencies, such as having them followed, or "sent home in a box".

48. Victor contacted ICE falsely claiming that Plaintiff and Khatskevich stole records from his computer. He tried to play up his contact with the AUSA to make it sound serious. He claimed that Khatskevich caused a serious breach of national security, namely detailing threats he made to her. As a result he claimed that she should be deported.[4]

49. Victor was known by those close to him to be a serial liar and prone to legal threats. As a result many in his orbit had recorded their interactions with him to protect themselves. Plaintiff is aware that at a minimum that likely includes:

    a. Plaintiff and fellow employees;

    b. Victor's household staff such as Agnes, his housekeeper;

    c. His own children, namely Alia whom he threatened with litigation if she didn't lie for him during the FEC investigation;

    d. MPC employees such as Greg DeJong, the super of the building;

    e. His fellow MPC Board members; and

    f. Unit owners

**Victor hides the suits against MPC**

50. When Khatskevich sued Victor and MPC, Victor undertook to hide the suit's existence from MPC. Rather than notify the Board and Unit owners about the lawsuit filed against them, Victor hid it, having a long line of his own personal attorneys represent MPC without its knowledge for years. Often Victor's attorneys took positions detrimental to MPC's interests.

---

[4] Victor under oath denied that he contacted ICE regarding Khateskevich, and denied the existence of documents.. Later a third party provided a copy of the email Victor sent to ICE.

10

51. Victor intensified his efforts to discredit Khatskevich, and Plaintiff to avoid responsibility for his actions. Hoping that he could make the litigations disappear through a years-long campaign to try to have law enforcement target Khatskevich and Plaintiff, with the goal of having Khatskevich deported and forced to drop her suit before MPC discovered it.

52. Victor's plan failed. Ultimately, Toktassynova began an independent action against him, alleging, among other things, sexual harassment. His charter flight operator, Pegasus Elite Aviation, brought an action against him for serially harassing its female employees. His lawyers sued him as well, for failure to pay legal fees he racked up. Several years after the lawsuits began, Victor sought to have MPC's insurer pay for his defense.

53. Victor's attorneys represented MPC, often against its interests from 2014 until 2019.

54. When Plaintiff made settlement offers to MPC, Victor and his attorneys never communicated them to MPC.

55. Victor even hired his own criminal defense attorney to represent MPC for a time.

56. When Victor's five-point plan didn't prove as successful as planned, Victor made claims to MPC's insurance policy to pay his own personal attorneys.

57. Upon information and belief, the insurance company was unaware that they were subsidizing the defense of Victor's companies.

**Unit owners discover Victor's misconduct**

58. Elections had not been held at MPC for over two decades, as Victor took steps to prevent a quorum and election from taking place that could disrupt his carefully constructed control of the condominium.

59. Eventually Victor's stranglehold broke when unit owners demanded he resign, after they learned about his criminal conviction and other allegations of misconduct against him. When they discovered MPC was a defendant in multiple lawsuits for years without being informed, it gave new urgency to their efforts to have Victor deposed. This triggered Victor to take steps to try to avoid accountability.

60. At that point, Plaintiff was contacted by unit owners and subsequently spoke with unit owners, board members, and potential new board members about Victor's improprieties and how they could settle Plaintiff's claims against MPC.

61. When Victor was faced with evidence of his misconduct, he and MPC took efforts to continue their five-point plan of retaliation. Seeking to discredit Plaintiff was necessary to keep unit owners from discovering the truth of Plaintiff's allegations.

**Never settle**

62. Victor and Defendants efforts to defame and discredit Plaintiff were vital components of Victor's personal defense.

63. Victor, on recordings, stated that he would never settle with Plaintiff.

64. Victor had been using MPC's insurance policy to pay for his personal defense.

65. Victor had promised MPC's managing agent that he would indemnify the building, so that the agent could feel comfortable keeping things under wraps. That promise quickly disappeared as MPC hired their own attorneys.

66. Victor then tried to use indemnification as leverage, promising to indemnify only if kept in control of the litigation[5]. After years of throwing MPC's legal position under the bus, it was a tempting offer.

67. Victor had to resort to hiring a personal attorney, separate from his MPC insurance paid one defending him as President of the Board to continue receiving coverage.

68. Victor had his MPC-funded attorney do the heavy lifting while his personal attorney signed me too on the end of their coattails.

69. As MPC got their own separate representation, Victor found himself sharing the insurance coverage.

70. If MPC were to settle with Plaintiff, the money for Victor's defense would fund the offense against him.

71. Convincing the Board to not so much as have a settlement meeting with Plaintiff was paramount to Victor's attempt to offload his cost of defending the actions against him on to MPC's insurer.

**Defendants defame Plaintiff**

72. Victor started a campaign of intimidation to stop unit owners at MPC from talking with Plaintiff. He sent cease and desist letters to numerous unit owners and board members, alleging that they were defaming him. Later, as he grew increasingly desperate, he harassed unit owners and Board members with subpoenas, ultimately escalating to multiple lawsuits against unit owners and the Board.

---

[5] Victor also wanted to maintain a fourth floor storage unit where he kept bullets, bulletproof vests, baseball cards, overalls and velcro laced shoes. MPC has since sued Victor in an attempt to evict him.

73. On April 18th, 2019 Victor moved to have the Plaintiff enjoined from having contact with the Board or MPC unit owners. MPC did not object to Victor's motion. On May 23rd, 2019 Victor got an order banning the Plaintiff from communicating with the Board.

74. Days later, on or around May 31st, Victor circulated a Letter (the "MPC Letter") to the hundreds of unit owners, which he signed as a member of the Board. Victor defamed plaintiff in an attempt to avoid being held accountable for his actions.

75. That letter stated:

> "Additionally, I have been accused of using building funds to defend two lawsuits against me, my companies, and MPC, by two people--boyfriend and girlfriend--both falsely claiming to have been "employees" of MPC in 2012-2013. Neither were ever employees of MPC. MPC was named in these lawsuits as an extortionate money grab. Nonetheless, while I was President, I have funded 100% of the costs of defending these lawsuits. Our Independent Audits have shown that, while I have been President, MPC has never paid any legal fees for these or any other lawsuits I have been involved in."

76. The "boyfriend" and "girlfriend" referred to are Plaintiff and Khatskevich.

77. The MPC Letter falsely stated that Plaintiff has been engaging in extortionate conduct against MPC.

78. The MPC Letter also falsely stated that Plaintiff had committed perjury in those pending actions by claiming that he was an employee of MPC.

79. Defendants made these statements to unit owners with actual malice knowing full well they were false.

80. The MPC Letter also underscored the significant liability Victor had encumbered MPC and its unit owners with.

81. Victor and MPC distributed these defamatory statements to unit owners, in an attempt to misinform unit owners about:

    a. Victor's theft of building funds;

    b. Victor and the Board's mismanagement and ineptitude;

    c. The Board's negligent supervision of Victor, allowing him to skim funds at will;

    d. Victor and the Board's large-scale insurance fraud;

    e. Victor and the Board's liability for the sexual harassment and retaliation claims in an action pending against them;

    f. Victor's breach of his fiduciary duty to the Board by (i) failing to notify them of the various New York City Human Rights Law and legal fee actions against them; and (ii) hiring his own personal attorneys to represent MPC without MPC's knowledge;

    g. Victor and MPC being sued by their former attorney for hundreds of thousands of dollars of unpaid bills; and

    h. Victor's felony conviction and house-arrest inside of MPC.

82. After receiving the order banning the Board's communications with Plaintiff and the chilling effect of Victor's threats, Defendants knew that letting Victor's statements go unanswered would cause damage to the Plaintiff.

83. Upon learning of the MPC Letter, on June 10, 2019 MPC's attorney was contacted and informed that the letter was defamatory and that a meeting of the parties should be arranged to avoid a defamation action.

84. MPC's attorney stated that a new Board election was about to be held and that "Once that occurs, I will discuss these issues with the new board members and see if we can try and resolve this matter".

85. When a new Board was elected on June 18th 2019, Victor successfully worked to convince them that they should further his defamation of the Plaintiff and Khatskevich, and let MPC continue to operate according to his retaliatory five-point plan.

**Meet the new board, same as the old board**

86. Defendants had long tried to have Khatskevich deported in an attempt to force her to drop her claims. When they learned Khatskevich was designated a victim of human trafficking, Defendants sought to force disclosure of Khatskevich's T visa application in the speculative hope to find something they could report to immigration authorities or otherwise use against her. MPC's attorney, Gary Ehlrich, told the court he hadn't made many discovery requests, but this one was important to his client.

87. Amos Tamam and Avi Ganatra, newly elected Board members put in charge of MPC's litigation, latched on to the five-point plan to defame Plaintiff. The Board began to tell unit owners in or around the beginning of July 2019 that unit owners shouldn't be concerned about litigation against MPC because it would soon disappear.

88. Tamam, Ganatra, and the Board defamed plaintiff stating that:

    a. Plaintiff stole documents from Victor in conjunction with Khatskevich.
    b. Plaintiff had distributed stolen information to unit owners.
    c. Plaintiff had committed perjury.

    d. Plaintiff extorted MPC.

89. The Board, specifically its new President, Amos Tamam, in early July 2019, explained to unit owners that they would soon have Khatskevich deported and as a result her case dropped.

90. Tamam and the Board falsely told unit owners that Plaintiff and Khatskevich had committed criminal acts in obtaining documents from Victor and that would be grounds for Khatskevich's deportation.

91. Defendant MPC made these statements with actual malice to further their own goals and retaliate against Plaintiff.

92. Unfortunately for defendants, their fishing expedition was recognized as such, and the Judge denied their application for Khatskevich's T-visa application to avoid giving them further opportunity to retaliate against Khatskevich.

93. The new Board since their election on June 18th, 2019 to the current day, followed Victor's five-point plan to the letter.

94. Defendants continued their defamatory conduct in order to discredit any information unit owners presented to MPC, and to deny any request for information unit owners are legally entitled to that would vindicate Plaintiff. Ensuring that they could hide or discredit any information about their own misconduct.

95. Defendants through their maliciously constructed plot to defame Plaintiff have destroyed Plaintiff's reputation among unit owners, killing any chance of settlement between the parties.

96. Defendants' unwillingness to correct their defamatory statements and efforts to hide the truth from unit owners further compound the damages from their defamatory statements.

**DAMAGES**

97. At the time Defendants slandered Mr. Erdman to MPC unit owners, Erdman was in the process of trying to negotiate a settlement with MPC.

98. Defendants slanderous misrepresentations destroyed any possibility of a settlement of Plaintiffs claims against MPC.

99. As such, Plaintiff is damaged in excess of junctional limits.

### FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS (Defamation - New York common law and Connecticut General Statutes Title 52 § 52-237)

100. Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

101. Victor, on his own behalf and as a member of the Board sent the MPC Letter to more than 400 MPC unit owners falsely claiming that Plaintiff:

   a. Falsely claimed to be an MPC employee (a predicate for Plaintiff's action against MPC under the New York City Human Rights Law)

   b. Commenced suit against Victor and MPC as part of "an extortionate money grab."

102. Defendants then compounded these defamatory statements by falsely telling unit owners that Plaintiff had: (i) stolen documents from Victor; (ii) distributed stolen information to unit owners; (iii) committed perjury; and (iv) extorted MPC.

103. Defendants made these false allegations with actual malice. Victor knew Plaintiff worked for MPC as he did so at Victor's own direction. MPC knew Plaintiff worked for MPC as it paid Plaintiff for his work for MPC at Victor's direction. Further, Victor and MPC are both in possession of documents showing that Plaintiff worked for MPC.

104. Similarly, Victor was aware at the time that told MPC unit owners that Plaintiff had stolen documents from Victor that his statement was false. MPC evinced reckless disregard of the truth of those statements when it repeated them to unit owners.

105. Defendants' statements qualify as defamation *per se* in that they state Erdman was involved in a crime.

106. Since Defendants' statements constitute defamation *per se*, special damages are not required.

107. Nevertheless, as a result of Defendants' defamatory statements, Plaintiff has lost the opportunity of settling his action against MPC.

108. Moreover, Erdman has suffered and will continue to suffer damages as a result of harm to his reputation as a result of Defendants' defamatory statements.

109. By reason of the foregoing, Plaintiff is entitled to an amount damages in excess of $75,000 in an amount to be determined.

WHEREFORE, Plaintiff Tyler Erdman demand judgment against defendants Adam Victor and the Board of Managers of Manhattan Place Condominium as follows:

1. On the first and sole cause of action for actual damages in an amount to be determined at trial, but in any event exceeding $75,000, and for punitive damages; and
2. For such other and further relief as the Court deems appropriate, together with reasonable costs and disbursements of this action.

Dated: May 29, 2020

/s/ Tyler I. Erdman
Tyler I. Erdman
Telephone: (917) 301-0401
Email: tyler@erdman.it
20 Old Farm Road
Weston, CT 06883

*Plaintiff Pro Se*