# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

TYLER ERDMAN,                                    )
                                                 )
            Plaintiff,                           )        Case No.: 1:20-cv-04162-LGS
                                                 )
v.                                               )
                                                 )        JURY TRIAL DEMANDED
ADAM VICTOR and                                  )
THE BOARD OF MANAGERS OF                         )
MANHATTAN PLACE CONDOMINIUM                      )
                                                 )
            Defendants.                          )
_____)

## AMENDED COMPLAINT

Plaintiff *pro se*, Tyler Erdman, for his Amended Complaint against defendants, Adam H.

Victor ("Victor") and the Board (the "Board") of Managers of Manhattan Place Condominium

("MPC") respectfully alleges as follows:

## NATURE OF THE ACTION

1.  This action seeks redress for certain defamatory statements made by defendants to unit
    owners of MPC and others.

2.  Plaintiff had worked for several years for Adam Victor, MPC's President of the Board
    until the summer of 2013. During that time he witnessed Victor stealing from MPC, and
    Victor's ongoing harassment and trafficking of a female employee, who was Plaintiff's
    girlfriend at the time, Yevgenia Khatskevich ("Khatskevich").

3.  Plaintiff assisted Khatskevich in bringing suit against Victor and MPC in 2014. Although
    MPC was a defendant, Victor hid the litigation from MPC's unit owners.

1

4. Victor arranged for his own attorneys to represent MPC for years, as he pursued a five-point plan to retaliate against Khatskevich, and Plaintiff for assisting her. Audio recordings detail Defendants' plans to force her to drop her suit by isolating her, defaming her, running up her legal costs, and threatening her health, safety and residency. Defendants enacted their plan by, among other things, suing Plaintiff in New York and Delaware.

5. In 2019, MPC unit owners discovered Victor's hidden lawsuits, and they took action to force Board elections and oust Victor.

6. Victor and the Board of Managers defamed Plaintiff in order to discredit him and the information he possessed about the improprieties Victor and the Board committed.

7. Specifically, Defendant Victor, as a member of the Board, sent a letter on May 31, 2019 to the hundreds of unit owners, falsely stating that Plaintiff was engaged in an "extortionate money grab", and had perjured himself by stating he worked for MPC and by making allegations about Victor's theft of funds from MPC and it's insurance company.

8. Plaintiff confronted the Board about their defamatory statements about Plaintiff, seeking a retraction. MPC's attorney stated he would get instruction from the Board after the June 2019 Board elections occurred. In fact, the Board never responded.

9. The Board has continued to defame Plaintiff, falsely stating to unit owners that Plaintiff was a criminal who had stolen documents from Victor, and that Plaintiff had perjured himself to make false allegations against Defendants.

2

10. Specifically, in early July 2019, the new President of the Board, Amos Tamam, falsely told unit owners that Khatskevich would soon be deported because of criminal acts the Plaintiff had committed with her to steal documents from Victor. Tamam explained that her deportation would cause her and Plaintiff's claims against MPC to be dismissed.

11. Prior to the defamatory letter being sent, Plaintiff was in contact with multiple unit owners and certain Board members to discuss Victor's misconduct and settle Plaintiff's claims against MPC. MPC's attorney had even asked certain unit owners if they would be willing to help mediate such a settlement once the new Board was in place.

12. As a result of the defamatory letter and follow up statements, Plaintiffs opportunity to settle claims with MPC has effectively been destroyed.

13. This action seeks redress for defamatory statements made by Adam Victor and the Board of Managers of Manhattan Place Condominium.

## **PARTIES**

14. Plaintiff Tyler Erdman is an individual residing in and a citizen of the State of Connecticut.

15. Defendant Adam H. Victor is an individual who resides in this District and is a citizen of the State of New York.

16. Defendant the Board of Managers of Manhattan Place Condominium operates in this District.

## JURISDICTION AND VENUE

17. This action is within the Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds Seventy Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

18. Defendants are each subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 with proper venue pursuant to 28 U.S.C. § 1391 as defendants are residents of, or operate a property, in this district and the events giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### Plaintiff witnessed Victor's illegal conduct first-hand

19. Adam Victor had been the President of the Board of Managers of Manhattan Place Condominium for decades.

20. During Victor's tenure as President, he selected the other members of the Board and MPC's manager, giving him free rein over the building and its finances which he used to steal from MPC and its insurers.

21. Victor exposed employees to a litany of criminal conduct.

22. In the aftermath of Hurricane Sandy, Victor used his near-dictatorial control of MPC to loot it and its insurance companies in a variety of ways:

   a.  Victor directed MPC to employ his own companies' employees, including Plaintiff. Victor instructed his various employees to do certain minor tasks for

4

MPC. Victor then told them that he would no longer be paying them. They were instead told to bill MPC for the work they performed, the bulk of which was for Victor or his companies. The employees were further instructed to bill multiple months of payments into a single bill to MPC so there would be fewer transactions for MPC to notice.

b.  Upon information and belief MPC then billed its insurance company for a portion of the amounts paid to Victor's employees. The balance was borne by MPC's unit owners.

c.  MPC hired Victor's former mistress as an interior designer, paying her approximately $84,093.08. During their affair Victor had paid for her to go to school for interior design and up to that point she had never worked on any large project, let alone a multi-million dollar one. The Board is currently undertaking an effort to redo her work after just a few years because of deficiencies.

d.  In another instance, a man named Heinrich Kirschner worked for one of Victor's companies. He was paid $2,000 per month. Victor had instructed him to help MPC prepare for Hurricane Sandy by bringing sand bags from Syracuse to Manhattan. Kirchner his first check for $2,000 was drafted by MPC the day before Hurricane Sandy hit Manhattan. MPC continued writing those checks monthly for nearly two years, totaling $42,068.26. Upon information and belief Kirschner did little to no work for MPC after the Hurricane, but continued to provide services to Victor's company while his wage was paid by MPC.

5

e.  Victor billed MPC, and MPC its insurance company for expenses he and his companies incurred, such as employee time, car service, printer ink and steak dinners. Payments from MPC to Victor's company, Gas Alternative Systems, Inc., totalled at least $32,842.98.

f.  Victor compelled MPC to retain his own business contacts with whom he wanted to build relationships.

23. During Plaintiff's employment, Victor made multiple illegal donations to political candidates in excess of the legal limits. In order to hide his illegal contributions Victor made the payments in the names of straw donors, either directly himself, or by reimbursing the straw donors.

24. Victor tried to enlist Plaintiff to take part in this scheme, he declined. After Plaintiff reported Victor's illegal conduct to the FEC and FBI, Victor threatened witnesses, including even his own daughter, to coerce them to lie to federal authorities to derail their investigation. Several of Victor's employees submitted perjurious affidavits to the FEC, which ultimately fined him tens of thousands of dollars. The FBI also investigated Victor, leading to him pleading guilty to a felony[1] and serving out a term of house arrest at MPC.

25. Victor hid his felony conviction from unit owners and the Board. Victor even arranged for an MPC employee to write to the Court in support of his request for a lenient sentence, telling them a false story of why the letters were needed.

26. Victor even asked the Court to allow him to travel within MPC during his house arrest because he acted like a Super for unit owners.

---

[1]
https://www.justice.gov/opa/pr/new-york-businessman-pleads-guilty-making-illegal-campaign-contributions-candidates-us

27. Victor being granted the ability to move within the building directed the fitness center to install his prefered gym equipment for his use during his house arrest. He also instructed staff to limit their electronic communications with him that might reveal him breaking the terms of his confinement.

## Victor's human trafficking operation

28. Victor's conduct took a more sinister turn when he hired Khatskevich, a Kazakhstani immigrant. Victor undertook efforts to traffic her, making it nearly impossible for her to escape his sphere of influence, and sexual advances.

29. Victor tried to force her into a sexual relationship, offering to leave his wife in an attempt to make it palatable for her. Even offering his son, Adam E. Victor as a husband to give his scheme a patina of legitimacy.

30. Victor acquired an H1-B visa for Khatskevich, trying to force her to be dependent on him financially, and so he could threaten her with deportation if she didn't comply.

31. As a condition of the visa, Victor was required to pay her a set wage. He and his accountant, Leonard Abruzzo,[2] planned a series of financial transactions to make it appear that she was getting paid that wage while in reality she was paid little to nothing. Victor kept her cash-poor, and dependent on a credit card he turned on and off at will so she couldn't afford to leave.

32. Victor assigned Khatskevich to work on the MPC rebuilding project in an effort to groom her to go to interior design school as his former mistress did.

---

[2] Abbruzo Accounting had previously aided Victor in trafficking Aaron Daley, an Australian immigrant using a similar scheme.

33. MPC was billed for and paid for Khatskevich's time through one of Victor's companies. Victor claimed he used the proceeds from MPC to pay for Khatskevich's H1-B visa application.

34. Victor constantly harassed Khatskevich at MPC. In one instance, an MPC employee James Kellog was in Victor's office with Plaintiff, Victor and Khatskevich. Victor instructed Kellog not to rape Khatskevich unless it was filmed to be put on YouTube so it they could "make some money".

35. When she repeatedly refused his lecherous advances, he threatened her with deportation, claiming he could end her life with one phone call.

36. Despite Victor's lobbying for her deportation, the government granted Khatskevich a T visa[3] and later a green card, to protect her from Victor and MPC, as a victim of human trafficking.

**Defendants enact their five-point plan of retaliation**

37. Plaintiff assisted Khatskevich in escaping Victor, and later bringing suit against Defendants in 2014. The suit aimed to enforce her rights under the New York City Human Rights Law.

38. Victor had threatened that if Khatskevich brought suit he would use his considerable wealth and influence to try to ruin her, court papers filed by Victor and MPC stated that she was "nothing more than a desperate Kazakhstani immigrant."

---

[3] A T visa is a type of visa allowing certain victims of human trafficking to remain and work in the United States, typically if they agree to assist law enforcement in testifying against the perpetrators.

39. On an audio recording Victor outlined his five-point plan to retaliate and force her to drop her suit, planning to isolate her, defame her, run up her legal costs, and threaten her safety, health, and residency.

40. Victor sued Khatsekvich in an effort he outlined on audio recordings that he hoped would force Khatsekvich's attorneys to drop her as a client.

41. Plaintiff and Khatsevich had taken efforts to hide their relationship from Victor, as well as Plaintiff's efforts to assist her. Victor described in detail his retaliatory scheme to one of his employees, Khatskevich's then-roommate, Nazym Toktassynova:

"What Tyler doesn't realize is that I'm gonna sue him for aiding and abetting, for breaking into my computer, um, for all types of things, and so he's gonna be sued. So he's gonna have to spend, you know, a hundred thousand dollars in legal fees to defend himself. And I'm gonna sue him for my reputation- a hundred million dollars."

42. Victor made good on his threat suing Plaintiff in New York, alleging he stole documents, engaged in unfair competition, and aided and abetted Khatskevich's purported breach of fiduciary duty. The claims were dismissed and Plaintiff brought counterclaims against MPC, Victor and Victor's companies. Victor then sued Plaintiff in Delaware for defamation, alleging millions in damages. Victor withdrew the action rather than respond to Plaintiff's motion to dismiss it.

43. Victor outlined on audio recordings how he hoped that attacking Plaintiff would isolate Khatskevich and leave her homeless. He explained his plan to defame Khatskevich in an

effort to discredit her claims. Victor openly stated that he would make up a claim about

prostitution, knowing it was false:

"[S]o now Tyler's parents are gonna say, 'What the fuck are you doing, Tyler? You're making us give you money, you stand in exposure of basically getting a judgment against you that bankrupts you, because you have to declare personal bankruptcy, for a woman who was a prostitute.' We know she wasn't a prostitute, but this is gonna be war. And so, I think that Tyler's parents are gonna cut him off, throw him out of the house where Eve is, and say, 'Either get rid of the girl, or we're basically kicking you out of your uncle's apartment.' So, I think what's gonna happen, Tyler's gonna lose the apartment, unless he dumps Eve, unless he cuts off - because that's the only way we're gonna basically settle with Tyler. We're gonna basically say 'we'll settle with you if you throw her out.' And so she's gonna be, so she's not gonna have any place to stay then."

44. With litigation failing to sate Victor's appetite for revenge, Victor contacted law

enforcement to attempt to have them prosecute Plaintiff and Khatskevich for "stealing"

documents from him. They declined.

45. Victor wrote government officials to unsuccessfully petition them to rewrite laws to

criminalize what he believed to be Plaintiff's actions.

46. Victor told employees that he had worked for the CIA and/or FBI. As part of that he took

Khatskevich and other employees to functions with people he claimed were North

Korean officials.

47. Victor stated that he was attempting to obtain a metal sample related to the North Korean

nuclear program for Senator Manchin of West Virginia, one of the politicians Victor pled

guilty to giving illegal campaign contributions to.

48. ███████████████████████████████████████████

███████████████████████



49. Victor had "government agents" come to his office while Plaintiff was present, to "debrief" female employees that Victor had brought to events with people Victor explained to be North Korean diplomats.

50. Victor later threatened those employees and others with action from government agencies, such as having them followed, or "sent home in a box".

51. Victor on multiple occasions has promised that the Government will verify these claims, and after several years of lobbying appear to have declined his requests.

52. Victor contacted I.C.E. falsely claiming that Plaintiff and Khatskevich had stolen records from his computer. He tried to imply his contacts with law enforcement meant that an investigation was underway. He claimed that Khatskevich caused a serious breach of national security, namely detailing threats he made to her. As a result, he claimed that she should be deported.

53. Victor was known by those close to him to be a serial liar and prone to legal threats. He is also a litigation enthusiast. Searches of court websites show 18 actions involving him listed in New York Supreme Court, state actions in at least California, Delaware, the District of Columbia, and Indiana. At the Federal level there are at least 5 cases excluding this one, and one Federal criminal case.

54. As a result of Victor's tendency to litigate and lie while doing so, many in his orbit had recorded their interactions with him to protect themselves. Plaintiff is aware that at a minimum that likely includes:

    a. Plaintiff and fellow employees;

    b. Victor's household staff such as Agnes, his housekeeper;

    c. His own children, including Alia whom he threatened with litigation if she didn't lie for him during the FEC investigation;

    d. MPC employees such as Greg DeJong, the superintendent of the building;

    e. His fellow MPC Board members; and

    f. Unit owners

**Victor hides the suits against MPC**

55. When Khatskevich sued Victor and MPC, Victor undertook to hide the suit's existence from MPC. Rather than notify the Board and Unit owners about the lawsuit filed against them, Victor hid it, having his own personal attorneys represent MPC for years.

56. Victor's attorneys represented MPC, often taking positions detrimental to MPC's own interests from 2014 until 2019.

57. Victor had at least five firms appear for MPC over the years, including his own criminal defense attorney.

58. Victor intensified his efforts to discredit Khatskevich and Plaintiff to avoid responsibility for his actions. Hoping that he could make the lawsuits disappear through a years-long unsuccessful campaign to lobby law enforcement to target Khatskevich and Plaintiff for

prosecution, with the goal of having Khatskevich deported and forced to drop her suit before he was forced to tell MPC's Board and unit owners.

59. Victor had accepted service of the litigations on MPC's behalf, in an apparent bid to keep it hidden from other members of the Board.

60. In one instance, motions were mailed as legally required to members of the MPC Board. Victor realizing this would ruin his plan, had MPC staff retrieve the mailings before they were given to the rest of the Board. Upon information and belief this effort was partially successful, except that one Board member's mailing address was outside of MPC and he was unable to intercept it.

61. To rectify this Victor's attorney assured the Board that the litigation was a nuisance suit and not to worry.

62. In another instance, a letter was sent to unit owners by a person unknown to Plaintiff. Said letter stated that Victor should resign as President of MPC based on the litigation he was embroiled in as well as incompetence.

63. Wrongfully believing that Plaintiff had sent it, Victor instructed building staff to open unit owners mailboxes and take the letter from them so unit owners would never see it, and potentially learn MPC was a defendant in various actions.

64. Victor then claims he has retained the stolen mail, so his private investigators could search for Plaintiff's fingerprints.

65. When Victor's five-point plan proved unsuccessful, Victor made claims to MPC's insurance policy which he used to pay his own personal attorneys.

66. Upon information and belief, the insurance company was unaware that they were subsidizing the defense of Victor's companies.

**Unit owners discover Victor's misconduct**

67. Elections had not been held at MPC for over two decades, as Victor took steps to prevent a quorum and election from taking place that could disrupt his carefully constructed control of the condominium.

68. Eventually Victor's stranglehold broke when unit owners demanded he resign after they learned about his criminal conviction and other allegations of misconduct against him. When they discovered MPC was a defendant in multiple lawsuits for years without being informed, it gave new urgency to their efforts to have Victor removed. This triggered Victor to take steps to try to avoid accountability.

69. At that point, Plaintiff was contacted by and subsequently spoke with unit owners, board members, and attorneys about Victor's improprieties and how they could settle Plaintiff's claims against MPC.

70. Given that Victor and his attorneys had left MPC's unit owners and Board in the dark about the litigation in which they had been in for years, Plaintiff, while adverse, was one of the best sources for them to get information from.

71. This led to multiple Board members meeting with Plaintiff to discuss the status of various litigations and potential ways of settlement. The Board also arranged for Plaintiff to give a presentation to unit owners summarizing the litigations and to present information about Victor's actions.

72. When Victor was faced with evidence of his misconduct, as President of MPC, he took efforts to continue their five-point plan of retaliation and to convince his predecessors to do the same. Seeking to discredit Plaintiff was necessary to keep unit owners from discovering the truth of Plaintiff's allegations.

**Never settle**

73. Defendants' efforts to defame and discredit Plaintiff were vital components of Victor's personal defense.

74. Victor, on recordings, stated that he would never settle with Plaintiff. Victor also stated that if he did settle it would be a ruse, and he would sue in order to force the funds to be wasted on legal fees.

75. When Plaintiff and Khatskevitch made settlement offers to MPC, Victor and his attorneys never communicated them to MPC.

76. When Victor did agree to having a settlement meeting, he sent Jeffrey Scott Shapiro, the son of Len Shapirro, one of Victor's employees who MPC hired to the tune of over $100,000 per year. Len's actions were detailed in various lawsuits, and Jeffrey had a conflict of interest whereas he would want to avoid MPC from discovering the litigations and his father's scheme.

77. Victor had been using MPC's insurance policy to pay for his personal defense.

78. Victor's attorneys who were also representing MPC had said Victor would be indemnifying the building in regards to Khtaskevich's lawsuit. Khatsekvich's and Plaintiffs lawsuits are frequently referred to interchangeably by MPC.

79. Those very attorneys, Davidoff Hutcher and Citron, later sued Victor and MPC for unpaid legal fees totaling $637,014.98.[4] MPC was forced to defend itself and Victor again used MPC's insurance to fund his defense.

80. Upon information and belief MPC's insurance also paid a settlement on Victor's behalf to that firm.

81. Convincing the Board to not even have a settlement meeting with Plaintiff was paramount to Victor's attempt to offload his cost of defending the actions against him on to MPC's insurer. This strategy leaves MPC unit owners holding the bag when the insurance exhausts and MPC has no insurance coverage for the various claims brought against it.

82. As MPC got their own separate representation in 2019 after unit owners discovered the litigation, Victor found himself sharing the insurance coverage.

83. If MPC were to settle with Plaintiff, the money Victor is using his defense would instead go to Plaintiff.

84. Victor had to resort to hiring a personal attorney, Jon Silveri, separate from Schlam Stone & Dolan, his MPC insurance paid attorneys to defend him as President of the Board to continue receiving coverage.

85. Victor has had his MPC-funded attorney do the heavy lifting for his defense while Silveri would often not even bother to show up for depositions, arguments or respond to motions.

---

[4] Davidoff Hutcher & Citron LLP v. Adam Victor & MPC 651717-2018

**Defendants defame Plaintiff**

86. Victor started a campaign of intimidation to stop unit owners at MPC from talking with Plaintiff by:

    a.   Sending cease and desist letters to numerous unit owners and Board members, alleging that they were defaming him.

    b.    Sending subpoenas to unit owners and Board members.

    c.   Beginning a series of frivolous litigations against the Board and unit owners.

87. During this time Plaintiff had been having discussions with Board members other than Victor and unit owners regarding the structure of potential settlements, particularly ones that would be within the scope of MPC's insurance coverage. Such settlement would be beneficial for unit owners and determinantal to Victor who was replying on MPC's insurance coverage to fund his defense.

88. On April 1, 2016 a member of the Board, Walter Brindak appeared in Court during a hearing in the Davidoff Hutcher & Citron action, to tell the Court the attorney representing them for months, never informed them they were a party to that action or even representing them. That attorney attempted to argue to the Court that they had never met Mr. Brindak, had never communicated with him, or could even be sure he was a Board member. MPC and Victor both found different attorneys after that event.

89. Later that day, Victor brought a suit against that Board member and others to try and stop his removal as President. Court papers filed by an attorney hired by the dissenting Board members stated that "...the Board of Managers and unit Owners of MPC have reason to believe that Mr. Victor has used his position as President of the MPC's Board of

Managers to commit serious abuses of power beyond the scope of the authority afforded him under the By-Laws."[5]

90. Victor began an effort to try and retain control of his litigation with Plaintiff, so that he could continue to defend the action to the detriment of MPC.

91. Victor tried to delay his removal so that he could leverage his resignation to get concessions from the Board. On April 15, 2019 Victor's attorneys who were also representing MPC at the time led this effort. His attorney from Schlam Stone and Dolan, offered for Victor to step down from the Board and indemnify MPC as long as they still had insurance. This would be exchanged for Victor retaining control of the defense of Plaintiff and Khatskevich lawsuits against MPC, as well as an extension of a lease for a 4th floor storage facility Victor falsely claimed to have.

92. On April 18th, 2019 Victor moved to have the Plaintiff enjoined from having contact with the Board or MPC unit owners. On May 23rd, 2019 Victor got an order banning the Plaintiff from communicating with the Board.

93. After Victor managed to prevent plaintiff from having any communication with the remainder of the Board, days later, on or around May 31st, Victor circulated a Letter (the "MPC Letter") to the hundreds of unit owners, which he signed as a member of the Board. Defendants defamed plaintiff in an attempt to avoid Victor being held accountable for his actions.

94. That letter stated:

"Additionally, I have been accused of using building funds to defend two lawsuits against me, my companies, and MPC, by two people--boyfriend and girlfriend--both falsely

---

[5]

https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=N/E6XPt8QCwrawp44hTUm A==&system=prod

claiming to have been "employees" of MPC in 2012-2013. Neither were ever employees of MPC. MPC was named in these lawsuits as an extortionate money grab. Nonetheless, while I was President, I have funded 100% of the costs of defending these lawsuits. Our Independent Audits have shown that, while I have been President, MPC has never paid any legal fees for these or any other lawsuits I have been involved in."

95. The "boyfriend" and "girlfriend" referred to are Plaintiff and Khatskevich.

96. The MPC Letter falsely stated that Plaintiff has been engaging in extortionate conduct against MPC.

97. The MPC Letter also falsely stated that Plaintiff had committed perjury in those pending actions by claiming that he was an employee of MPC.

98. Defendants made these statements to unit owners with actual malice knowing full well they were false.

99. The MPC Letter also underscored the significant liability Victor had encumbered MPC and its unit owners with.

100. Victor and MPC distributed these defamatory statements to unit owners, in an attempt to misinform unit owners about:

    a. Victor's theft of building funds;

    b. Victor and the Board's mismanagement and ineptitude;

    c. The Board's negligent supervision of Victor, allowing him to skim funds at will;

    d. Victor and the Board's large-scale insurance fraud;

    e. Victor and the Board's liability for the sexual harassment and retaliation claims in an action pending against them;

    f. Victor's breach of his fiduciary duty to the Board by (i) failing to notify them of the various New York City Human Rights Law and legal fee actions against them;

19

and (ii) hiring his own personal attorneys to represent MPC without MPC's
knowledge;

g. Victor and MPC being sued by their former attorney for hundreds of thousands of
dollars of unpaid bills; and

h. Victor's felony conviction and house-arrest served inside of MPC.

101. After receiving the order banning the Board's communications with Plaintiff and the
chilling effect of Victor's threats, Defendants knew that letting Victor's statements go
unanswered would cause damage to the Plaintiff.

102. Upon learning of the MPC Letter, on June 10, 2019 MPC's attorney was contacted
and informed that the letter was defamatory and that a meeting of the parties should be
arranged to avoid a defamation action.

103. MPC's attorney stated that a new Board election was about to be held and that "Once
that occurs, I will discuss these issues with the new board members and see if we can try
and resolve this matter".

104. When a new Board was elected on June 18th 2019, Victor successfully worked to
convince them that they should further his defamation of the Plaintiff and Khatskevich,
and let MPC continue to operate according to his retaliatory five-point plan.

**Meet the new board, same as the old board**

105.    Defendants had long tried to have Khatskevich deported in an attempt to force her to

drop her claims. When they learned Khatskevich was designated a victim of human

trafficking by the Government, Defendants sought to force disclosure of Khatskevich's T

visa application in the speculative hope to find something they could report to

immigration authorities or otherwise use against her.

106.    While arguing that motion, MPC's attorney, Gary Ehlrich, told the court he hadn't

made many discovery requests, but this one was important to his clients.

107.    Amos Tamam and Avi Ganatra, newly elected Board members put in charge of

MPC's litigation, latched on to the five-point plan to defame Plaintiff.

108.    The Board began to tell unit owners in or around the beginning of July 2019 that unit

owners shouldn't be concerned about litigation against MPC because it would soon

disappear.

109.    The Board including Tamam and Ganatra reiterated and expanded on the Board's

previous defamatory statements stating that:

a.    Plaintiff stole documents from Victor in conjunction with Khatskevich.

b.    Plaintiff had distributed stolen information to unit owners.

c.    Plaintiff had committed perjury.

d.    Plaintiff extorted MPC.

110.    The Board, specifically its new President, Amos Tamam, in early July 2019,

explained to unit owners that they would soon have Khatskevich deported and as a result

her case dropped.

21

111. Tamam and the Board falsely told unit owners that Plaintiff and Khatskevich had committed criminal acts in obtaining documents from Victor and that would be grounds for Khatskevich's deportation.

112. Victor and MPC had previously made allegations of Conversation, Unfair competition and aiding and abetting a breach of fiduciary duty against Plaintiff. Those claims were dismissed in their infancy.

113. Defendant MPC made these statements with actual malice to further their own goals and retaliate against Plaintiff, knowing that such claims had already been dismissed.

114. The new Board, since their election on June 18th, 2019 to the current day, followed Victor's five-point plan to the letter.

115. Defendants continued their defamatory conduct in order to discredit any information unit owners presented to MPC, and to deny any request for information unit owners are legally entitled to that would vindicate Plaintiff. Ensuring that they could hide or discredit any information about their own misconduct.

116. Defendants through their maliciously constructed plot to defame Plaintiff have destroyed Plaintiff's reputation among unit owners, killing any chance of settlement between the parties.

117. Defendants' unwillingness to correct their defamatory statements and efforts to hide the truth from unit owners further compound the damages from their defamatory statements.

**Deluge of Board misappropriation**

118.    MPC's board both under Victor and Tamam's leadership has enriched select board members at unit owners' expense.

119.    The Board, under Tamam, specifically has experienced a series of damaging water leaks they have tried to downplay and keep hidden from unit owners.

120.    On or around June 2020, an apartment on the 18th floor of MPC had reported damage to their ceiling and wall.

121.    Building staff investigated and found that the leak originated from a toilet in Apartment 19M, owned by Avi Ganatra, a board member.

122.    Typically, such repairs of such damage would be billed to and paid for by the owners of the unit where the leak originated.

123.    Upon information and belief, Ganatra and/or the Board ordered staff not to disclose the true source of the leak, and to repair it using MPC resources at no cost to Ganatra.

124.    In another instance Ganatra reported to the staff that he needed a plumbing valve replaced. In order to do so, an entire row of apartments needed to have their water shut off. In the normal course, the building would be required to send a notice to anyone who would be affected and require a licensed plumber to complete the work. Gantara instead had building staff immediately shut off the water without notice to other residents and have the work completed by building staff at no cost. An abnormal perk for unit owners.

125.    Even Victor realized how improper this type of practice was and previously sued his fellow Board members about similar abuses of power during his tenure.[6]

---

[6] Adam Victor v. Walter Brindak et. al. 651907/2019
https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=TzrPt47H5sgeAr6l6O3Euw==
&system=prod

23

"That assistant super was personally close with Defendant Brindak and Carullo, and, on information and belief, had provided Defendants Brindak and Carullo with free repair and maintenance work on their units."

126. When unit owners raised concerns of Ganatra getting a perk not given to other unit owners, the Board circulated a memo that was in form and substance a non-disclosure agreement to try to prevent building staff from whistleblowing.

127. During the COVID-19 related restrictions placed on MPC's fitness center they were forced to close their doors in early 2020. The fitness center is owned by a member of the MPC Board, Sandra Albo.

128. On or around August 2020, a multitude of apartments in the "G line" of MPC reported a water leak, that was found to originate from the fitness center's pool on the top floor.

129. Again staff were directed to not disclose the source of the leak and were directed to fix the resulting damage using building funds and resources. This avoided Albo from having to pay for the damage caused.

130. In response to COVID-19's effect on her business, Albo declined to apply for government assistance such as EIDL or PPP loans or have her employees go on unemployment. Instead MPC's Board voted to hire and pay her own employees. The Board once again used the backdrop of a crisis to offload its members employees onto the buildings payroll as they had with Victor and Hurricane Sandy.

131. During Victor's tenure as President, he led the Board to commence a lawsuit against a building constructed across the street from MPC, claiming $6 million in damages were caused to MPC.

132.    After bringing the action, MPC refused to participate in discovery to avoid revealing the damage was nonexistent and fabricated by Victor.

133.    That lawsuit had unforeseen consequences to the unit owners of MPC. They quickly found it hard to get mortgages due to the claims that MPC's suffered structural damage.

134.    The Board had decided in January of 2020 that they would settle their lawsuit about the fictitious structural damage. However, it was not announced to unit owners until June of 2020, during which time they suffered from depressed property values due to the difficulty of receiving financing.

135.    Upon information and belief, Tamam used the extended delay in communicating the settlement to MPC's unit owners to enrich himself.  In April 2020 Tamam purchased unit 19C, located next to apartments 19D and 19E which he already owned, for $1.275 million dollars. The purchase was made before Unit Owners were informed in June that there was no structural damage, which substantially limited the potential buyers of that apartment. Units 19D and 19E were both purchased in 2009 for $1.8 million and are nearly identical in size to 19C.


**The Board supports Victor despite their conflict**

136.    Even after Victor had hidden litigations from MPC as well as siphoning funds and other abuses of power, the current Board appears to not care. Rather it appears to have inspired their own abuses of power.

137.   Victor has been delinquent on his common charges due to MPC, since the day after the Defamatory letter was sent to Unit Owners, and an election was held. He remains in arrears to this day, in excess of $70,000

138.   Victor is evidently protesting his removal from office by no longer paying any common charges since the new Board was voted into.

139.   Victor on audio recordings had emphasised that his status on the Board and the perks that it gave him were jeopardized, he would consider leaving his family and disappearing to Paris without a trace.

140.   Since Victor began to fight to remain on the Board in 2019 to the present day, him and MPC have been in eight actions with each other. Those actions are:

    a.   Victor attempting to stop a Board meeting to vote on his removal from office.

    b.   MPC trying to evict Victor from a 4th floor storage room.

    c.   Victor suing MPC and its insurers for not providing him with insurance coverage.

    d.   Victor and MPC were sued for unpaid legal fees regarding a lawyer Victor hired on MPCs behalf, and fees in which Victor agreed to indemnify MPC for.

    e.   A foreclosure action in which MPC is seeking to foreclose on Victor's apartments due to unpaid common charges.

    f.   An action by Victor's mortgage company to foreclosure on two of Victor's apartments after he defaulted on his mortgage. MPC is a defendant because it is a creditor related to Victor's unpaid common charges.

    g.   Victor sued MPC, its Board members and unit owners for $42,000,000 for defamation and tortious interference.

26

     h.   Victor again sued MPC and its insurance companies but has yet to serve a

         complaint.

141.    The Board has called Victor's cases against them frivolous and baseless but they still

    apparently cede control of the defense of Plaintiff and Khatskevich's litigations,

    including assisting in attempts to deport Khatskevich.

142.    Both the Board and Victor have admitted that they have a "contentious relationship",

    and accused each other of lying.

143.    Amos Tamam even stated that Victor "dominated the Board of Managers and used it

    to benefit himself personally."

144.    Victor's attorneys Schlam Stone and Dolan, where representing MPC and were

    ordered by MPC to withdraw subpoenas they issued against unit owners on Victor's

    behalf.

145.    They declined and only then admitted they had a conflict and withdrew from their

    representation of MPC. Their defense to this conflict was to say they haven't prejudiced

    MPC's ability to bring cross claims against Victor.

146.    MPC even defaulted in Plaintiff and Khatskevich's actions rather than produce

    responsive documents just as Victor did. MPC had previously even stipulated to

    producing documents then ignored the Court's order.

147.    MPC has taken efforts to hide the true cost of Victor's actions against them from unit

    owners. In one instance the Board did not issue a 2019 financial statement until well into

    2020, waiting until two 2019 actions were dismissed. While brought and defended in

2019, they were left off the financial statements and their impact undisclosed to unit owners.

148.    Instead the Board only issued a report stating that insurance and litigation costs have skyrocketed, trying hard to downplay how much of that was due to Victor's actions.

149.    Despite that they have taken no real steps to hold him accountable for anything other than getting back the 4th floor storage space.

150.    Upon information and belief Victor even used his own incompetence against MPC. After Hurricane Sandy, MPC's fire alarm system was damaged and not functioning. Victor had never repaired the system. On July 1, 2020 two of Victor's suits filed against MPC, the Board and others were dismissed.

151.    On July 2, 2020 Victor retaliated. Upon information and belief Victor had spent hours to report a tip to the FDNY that MPC's fire alarm system was not functioning. Later that day the FDNY appeared in force and found that the fire alarm system was not functioning. The FDNY then fined the building a substantial sum.

152.    This strange relationship in which Victor constantly takes actions against MPC but pays little price seems to only continue so that Victor can try and deliver on his deportation efforts and hope that they encourage Plaintiff and Khatskevich to drop their actions against MPC so they could avoid actual settlement negotiations.


**DAMAGES**

153.    At the time Defendants slandered Mr. Erdman to MPC unit owners, Erdman was in the process of trying to negotiate a settlement with MPC.

154.    Defendants slanderous misrepresentations destroyed any possibility of a settlement of

Plaintiffs claims against MPC.

155.    As such, Plaintiff is damaged in excess of junctional limits.


**FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS (Defamation - New**

**York common law and Connecticut General Statutes Title 52 § 52-237)**

156.    Plaintiff repeats and realleges each of the foregoing allegations as though fully set

forth herein.

157.     Victor, on his own behalf and as a member of the Board sent the MPC Letter  to

more than 400 MPC unit owners falsely claiming that Plaintiff:

    a.   Falsely claimed to be an MPC employee (a predicate for Plaintiff's action against

        MPC under the New York City Human Rights Law)

    b.   Commenced suit against Victor and MPC as part of "an extortionate money

        grab."

158.    Defendants then compounded these defamatory statements by falsely telling unit

owners that Plaintiff had: (i) stolen documents from Victor; (ii) distributed stolen

information to unit owners; (iii) committed perjury; and (iv) extorted MPC.

159.    Defendants made these false allegations with actual malice. Victor knew Plaintiff

worked for MPC as he did so at Victor's own direction. MPC knew Plaintiff worked for

MPC as it paid Plaintiff for his work for MPC at Victor's direction. Further, Victor and

MPC are both in possession of documents showing that Plaintiff worked for MPC.

160.    Similarly, Victor was aware at the time that told MPC unit owners that Plaintiff had

stolen documents from Victor that his statement was false. MPC knew that claims they

made against Plaintiff had been dismissed nearly half a decade earlier. Defendants

evidenced reckless disregard of the truth of those statements when it repeated them to

unit owners.

161.    Defendants' statements qualify as defamation *per se* in that they state Erdman was

involved in a crime.

162.    Since Defendants' statements constitute defamation *per se*, special damages are not

required.

163.    Nevertheless, as a result of Defendants' defamatory statements, Plaintiff has lost the

opportunity of settling his action against MPC.

164.    Moreover, Erdman has suffered and will continue to suffer damages as a result of

harm to his reputation as a result of Defendants' defamatory statements.

165.    By reason of the foregoing, Plaintiff is entitled to an amount of damages in excess of

$75,000 in an amount to be determined.

WHEREFORE, Plaintiff Tyler Erdman demand judgment against defendants Adam Victor and

the Board of Managers of Manhattan Place Condominium as follows:

166.    On the first and sole cause of action for actual damages in an amount to be

determined at trial, but in any event, exceeding $75,000, and for punitive damages; and

167.    For such other and further relief as the Court deems appropriate, together with

reasonable costs and disbursements of this action.


Dated: October 26, 2020

/s/ Tyler I. Erdman
Tyler I. Erdman
Telephone: (917) 301-0401
Email: tyler@erdman.it
20 Old Farm Road
Weston, CT 06883

*Plaintiff Pro Se*

31