UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TYLER ERDMAN,                              )
                                          )
        Plaintiff,                        )        Case No.: 1:20-cv-04162-LGS
                                          )
v.                                        )
                                          )        JURY TRIAL DEMANDED
ADAM VICTOR ~~and~~                       )
~~THE BOARD OF MANAGERS OF~~              )
~~MANHATTAN PLACE CONDOMINIUM~~           )
                                          )
        ~~Defendants.~~                   )
                                          )
                                          )
        Defendant.                        )
                                          )

## <u>SECOND</u> **<u>AMENDED COMPLAINT</u>**

Plaintiff *pro se*, Tyler Erdman, for his <u>Second</u> Amended Complaint against ~~defendants~~<u>defendant</u>, Adam H. Victor ("Victor~~") and the Board (the "Board") of Managers of Manhattan Place Condominium ("MPC~~") respectfully alleges as follows:

## **<u>NATURE OF THE ACTION</u>**

1. This action seeks redress for certain defamatory statements made by ~~defendants~~<u>Victor</u> to ~~unit owners~~<u>Unit Owners</u> of <u>Manhattan Place Condominium ("</u>MPC<u>")</u> and others.

2. <u>Plaintiff had worked for several years for Adam Victor~~, MPC's~~ and entities he controlled until the Summer of 2013. One of those entities was MPC where he was</u> President of the Board ~~until the summer of 2013.~~ <u>of Managers ("the Board") for approximately two decades. MPC at Victor's direction had employed Plaintiff and other associates of Victor.</u>

1

2.3. During ~~that time~~Plaintiff's employment he witnessed Victor stealing from MPC, and Victor's ongoing harassment and trafficking of a female employee, who was Plaintiff's girlfriend at the time, Yevgenia Khatskevich ("Khatskevich").

1. ~~Plaintiff assisted Khatskevich in bringing suit against Victor and MPC in 2014. Although MPC was a defendant, Victor hid the litigation from MPC's unit owners.~~

2. ~~Victor arranged for his own attorneys to represent MPC for years, as he pursued a five-point plan to retaliate against Khatskevich, and Plaintiff for assisting her. Audio recordings detail Defendants' plans to force her to drop her suit by isolating her, defaming her, running up her legal costs, and threatening her health, safety and residency. Defendants enacted their plan by, among other things, suing Plaintiff in New York and Delaware.~~

3. ~~In 2019, MPC unit owners discovered Victor's hidden lawsuits, and they took action to force Board elections and oust Victor.~~

4. ~~Victor and the Board of Managers defamed~~ Victor obsessively tried to force Khatskevich into a sexual relationship to the point that it was intolerable even to his own family, with his own son testifying that he completely severed ties with his father because he brought up Khatskevich "one too many times."

5. Victor had told Khatskevich that the terms of her employment, and more importantly her H1-B visa, forbade her from having a boyfriend other than himself. To enforce his edict, he turned her friends into paid informants, and stalked her both in person and electronically.

6. When Victor realized that Plaintiff had a relationship with Khatskevich, he became enraged and redirected his obsession into a malicious vendetta against Plaintiff. He

explained in a recorded conversation with an employee that he planned to use his wealth and influence to attack Plaintiff in retaliation for his relationship and support of Khatskevich.

7.   Victor began a campaign to plant false allegations against Plaintiff ~~in order to discredit,~~ accusing him of criminal activity in numerous Court filings made in at least three States and the District of Columbia.

8.   Ultimately, Victor was sued in separate actions by Khatskevich and another former employee for sexual harassment. Following through on his malicious plan, Victor filed a separate action against Khatskevich and Erdman, accusing them of stealing a trove of documents. Plaintiff filed counterclaims against Victor and MPC. These actions (collectively, the "State Actions") all arose from Victor's conduct as President of the Board of Managers of MPC.

9.   Victor viewed his position as Board President and the perks in which he granted himself as instrumental to his lifestyle. He even told others if he were to lose his position he would abscond to Paris, leaving the United States and his family behind.

10. For years Victor had successfully kept Unit Owners in the dark about the State Actions and MPC's involvement in it.  He did so by having his own attorneys defend MPC and report solely to him.

11. That plan fell apart when Unit Owners discovered the State Actions and others involving Victor in early 2019.

12. Victor responded to Unit Owners by acting to prevent them from gaining any information ~~he possessed about~~regarding the ~~improprieties~~facts from any documents within MPCs control.

3.13.      Unit Owners called for an election for the first time in over a decade. On the eve of the election, Victor and the Boardmaliciously sent a letter to Unit Owners that alleged Plaintiff had committed. criminal acts of perjury and extortion.

4.14.      Specifically, Defendant Victor, as a member of the Board, sent a letter on May 31, 2019 to the hundreds of unit owners, with statements he knew to be falsely stating that Plaintiff was engaged in an "extortionate money grab", and had perjured himself by statingmaking false claims under oath that he worked for MPC and by making allegations about Victor's theft of funds from MPC and it's insurance company.

4.    Plaintiff confronted the Board about their defamatory statements about Plaintiff, seeking a retraction. MPC's attorney stated he would get instruction from the Board after the June 2019 Board elections occurred. In fact, the Board never responded.

5.    The Board has continued to defame Plaintiff, falsely stating to unit owners that Plaintiff was a criminal who had stolen documents from Victor, and that Plaintiff had perjured himself to make false allegations against Defendants.

6.    Specifically, in early July 2019, the new President of the Board, Amos Tamam, falsely told unit owners that Khatskevich would soon be deported because of criminal acts the Plaintiff had committed with her to steal documents from Victor. Tamam explained that her deportation would cause her and Plaintiff's claims against MPC to be dismissed.

7.    Prior to the defamatory letter being sent, Plaintiff was in contact with multiple unit owners and certain Board members to discuss Victor's misconduct and settle Plaintiff's claims against MPC. MPC's attorney had even asked certain unit owners if they would be willing to help mediate such a settlement once the new Board was in place.

15. Due to Victor's efforts, the Unit Owners would have every reason to believe those allegations to be true. Their main source of information for the recipients of the letter was Court dockets and Victor spent years creating a false narrative in fillings accusing Plaintiff of extortion, perjury and a litany of other criminal acts.

16. A search of the dockets would result in long explanations of Victor's accusations of criminal acts that explained how Plaintiff "went to extraordinary and illegal lengths to secure leverage over him[Victor]" as part of a complex and illegal extortion attempt. These allegations made clear that when Victor made his claims of extortion they were not mere hyperbole. It was not an instance of Victor giving an opinion that Plaintiff was engaged in meritless litigation. It was targeted to convince the readers that Plaintiff was a criminal trying to extort Victor.

17. Victor was aware that Erdman had submitted a series of sworn Affidavits in the State Actions and others that stated under oath that he was employed by MPC. Victor would know yet again, the readers of the docket would find those statements and believe them to be perjurious after receiving his letter that very clearly stated that those statements were lies. As President of the Board Victor would appear to be authoritative on the subject.

5.18.    As a result of the defamatory letter and follow up statements, PlaintiffsPlaintiff's opportunity to settle claims with MPC has effectively been destroyed. along with his reputation.

6.19.    This action seeks redress for defamatory statements made by Adam Victor and the Board of Managers of Manhattan Place Condominium.


**PARTIES**

5

7.20.      Plaintiff Tyler Erdman is an individual residing in and a citizen of the State of

Connecticut.

8.21.      Defendant Adam H. Victor is an individual who resides in this District and is a

citizen of the State of New York.

9.   Defendant the Board of Managers of Manhattan Place Condominium operates in this

District.

## JURISDICTION AND VENUE

10.22.      This action is within the Court's subject matter jurisdiction pursuant to 28 U.S.C.

§ 1332 as there exists complete diversity of citizenship between Plaintiff and

DefendantsDefendant and the amount in controversy exceeds Seventy-Five Thousand

Dollars ($75,000.00), exclusive of interest and costs.

11.23.      Defendants are eachDefendant is subject to the jurisdiction of this Court pursuant

to 28 U.S.C. § 1332 with proper venue pursuant to 28 U.S.C. § 1391 as defendants are

residents of, or operate a property, inthe defendant is a resident of this district and the

events giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### Plaintiff witnessed Victor's illegal conduct first-hand

### VICTOR'S DOMINATION OF MPC

12.24.      Adam Victor had been the President of the Board of Managers of Manhattan

Place Condominium for decades.

8.   ~~During Victor's tenure as President, he selected the other members of the Board and MPC's manager, giving him free rein over the building and its finances which he used to steal from MPC and its insurers.~~

9.   ~~Victor exposed employees to a litany of criminal conduct.~~

25. After gaining power, he conspired with his hand-picked managing agent to prevent elections from occurring by making it near-impossible for Unit Owners to achieve a quorum. In the absence of elections Victor had the power to appoint his own loyalists to the Board so that he went unchecked.

~~13.~~26.      In the aftermath of Hurricane Sandy, Victor used his near-dictatorial control of MPC to loot it and its insurance companies in a variety of ways:

   a.  Victor directed MPC to employ his own companies' employees and associates, including Plaintiff. Victor instructed his various employees to do certain minor tasks for MPC. Victor then told them that he would no longer be paying them. They were instead told to bill MPC for the work they performed, the bulk of which was for Victor or his companies. ~~The employees were further instructed to bill multiple months of payments into a single bill to MPC so there would be fewer transactions for MPC to notice.~~

   b.  Victor's former au pair was hired as an interior designer and received approximately $84,000.

   c.  An employee who was on the payroll of Victor's defunct power plant, delivered sand bags before Hurricane Sandy. He received $42,068.26..

   d.  Victor's right-hand man, a resident of Florida was put in charge of managing construction in New York while he received $7,500 per month plus expenses. He

charged MPC for travel costs, coming to New York when he would need to be there for Victor's business activities.

e.  MPC Managing Agent testified that he believed Victor was submitting fraudulent expenses as a way to remunerate himself for work he had done as an unpaid Board member. .

f.  Victor's company, Gas Alternative Systems received payments totaling at least $32,842.98, claiming expenses such as car service fees, and the cost of printer ink and steak dinners.

g.  Those amounts included charges for employee time, include "overtime" in the amount of Khastkevich's rent payment which Victor would normally make. Victor also claimed over ten thousand dollars in car service fees, allegedly incurred by her and other Victor associates during their work for the Condo.

b.h.Upon information and belief MPC then billed its insurance company for a portion of the amounts paid to Victor's employees  as well as Victor's fraudulent expenses. The balance was borne by MPC's unit owners.

c.  MPC hired Victor's former mistress as an interior designer, paying her approximately $84,093.08. During their affair Victor had paid for her to go to school for interior design and up to that point she had never worked on any large project, let alone a multi-million dollar one. The Board is currently undertaking an effort to redo her work after just a few years because of deficiencies.

d.  In another instance, a man named Heinrich Kirschner worked for one of Victor's companies. He was paid $2,000 per month. Victor had instructed him to help MPC prepare for Hurricane Sandy by bringing sand bags from Syracuse to

Manhattan. Kirchner his first check for $2,000 was drafted by MPC the day before Hurricane Sandy hit Manhattan. MPC continued writing those checks monthly for nearly two years, totaling $42,068.26. Upon information and belief Kirschner did little to no work for MPC after the Hurricane, but continued to provide services to Victor's company while his wage was paid by MPC.

    e.   Victor billed MPC, and MPC its insurance company for expenses he and his companies incurred, such as employee time, car service, printer ink and steak dinners. Payments from MPC to Victor's company, Gas Alternative Systems, Inc., totalled at least $32,842.98.

    e.   Victor compelled MPC to retain his own business contacts with whom he wanted to build relationships.

13. During Plaintiff's employment, Victor made multiple illegal donations to political candidates in excess of the legal limits. In order to hide his illegal contributions Victor made the payments in the names of straw donors, either directly himself, or by reimbursing the straw donors.

13. Victor tried to enlist Plaintiff to take part in this scheme, he declined. After Plaintiff reported Victor's illegal conduct to the FEC and FBI, Victor threatened witnesses, including even his own daughter, to coerce them to lie to federal authorities to derail their investigation. Several of Victor's employees submitted perjurious affidavits to the FEC, which ultimately fined him tens of thousands of dollars. The FBI also investigated Victor, leading to him pleading guilty to a felony[1] and serving out a term of house arrest at MPC.

---

[1] https://www.justice.gov/opa/pr/new-york-businessman-pleads-guilty-making-illegal-campaign-contributions-candidates-us

14. Victor hid his felony conviction from unit owners and the Board. Victor even arranged for an MPC employee to write to the Court in support of his request for a lenient sentence, telling them a false story of why the letters were needed.

— Victor even asked the Court to allow him to travel within MPC during his house arrest because he acted like a Super for unit owners.

15. Victor being granted the ability to move within the building directed the fitness center to install his prefered gym equipment for his use during his house arrest. He also instructed staff to limit their electronic communications with him that might reveal him breaking the terms of his confinement.

**Victor's human trafficking operation**

15. Victor's conduct took a more sinister turn when he hired Khatskevich, a Kazakhstani immigrant. Victor undertook efforts to traffic her, making it nearly impossible for her to escape his sphere of influence, and sexual advances.

15. Victor tried to force her into a sexual relationship, offering to leave his wife in an attempt to make it palatable for her. Even offering his son, Adam E. Victor as a husband to give his scheme a patina of legitimacy.

15. Victor acquired an H1-B visa for Khatskevich, trying to force her to be dependent on him financially, and so he could threaten her with deportation if she didn't comply.

15. As a condition of the visa, Victor was required to pay her a set wage. He and his accountant, Leonard Abruzzo,[2] planned a series of financial transactions to make it

---

[2] Abbruzo Accounting had previously aided Victor in trafficking Aaron Daley, an Australian immigrant using a similar scheme.

appear that she was getting paid that wage while in reality she was paid little to nothing. Victor kept her cash-poor, and dependent on a credit card he turned on and off at will so she couldn't afford to leave.

Victor assigned Khatskevich to work on the MPC rebuilding project in an effort to groom her to go to interior design school as his former mistress did.

16. MPC was billed for and paid for Khatskevich's time through one of Victor's companies. Victor claimed he used the proceeds from MPC to pay for Khatskevich's H1-B visa application.

16. Victor constantly harassed Khatskevich at MPC. In one instance, an MPC employee James Kellog was in Victor's office with Plaintiff, Victor and Khatskevich. Victor instructed Kellog not to rape Khatskevich unless it was filmed to be put on YouTube so it they could "make some money".

16. When she repeatedly refused his lecherous advances, he threatened her with deportation, claiming he could end her life with one phone call.

16. Despite Victor's lobbying for her deportation, the government granted Khatskevich a T visa[3] and later a green card, to protect her from Victor and MPC, as a victim of human trafficking.

**Defendants enact their five-point plan of retaliation**

16. Plaintiff assisted Khatskevich in escaping Victor, and later bringing suit against Defendants in 2014. The suit aimed to enforce her rights under the New York City Human Rights Law.

---

[3] A T visa is a type of visa allowing certain victims of human trafficking to remain and work in the United States, typically if they agree to assist law enforcement in testifying against the perpetrators.

17. Victor had threatened that if Khatskevich brought suit he would use his considerable wealth and influence to try to ruin her, court papers filed by Victor and MPC stated that she was "nothing more than a desperate Kazakhstani immigrant."

17. On an audio recording Victor outlined his five-point plan to retaliate and force her to drop her suit, planning to isolate her, defame her, run up her legal costs, and threaten her safety, health, and residency.

17. Victor sued Khatsekvich in an effort he outlined on audio recordings that he hoped would force Khatsekvich's attorneys to drop her as a client.

17. Plaintiff and Khatsevich had taken efforts to hide their relationship from Victor, as well as Plaintiff's efforts to assist her. Victor described in detail his retaliatory scheme to one of his employees, Khatskevich's then-roommate, Nazym Toktassynova:

## "VICTOR HIDES THE SUITS AGAINST MPC

27. Victor did his best to hide the State Actions from both MPC's Board and Unit Owners, by having his own personal attorneys represent MPC for years and report solely to him. This plan was largely successful from 2014 to 2019.

28. In early 2015, MPC's auditors were reviewing financial statements, and contacted the attorneys representing MPC in the State Action, Davidoff Hutcher and Citron ("DHC") to explain legal bills.

29. DHC responded to the Auditors with a March 26, 2015 Letter that explained the State Actions and stating the Victor has been and will continue to indemnify MPC:

> Adam Victor has been paying the legal bills associated with that case and will continue to do so. There is no loss contingency for the Company since Mr. Victor has agreed to indemnify the Company for any and all legal fees or losses.

30. Upon information and belief MPC never received a written indemnification agreement.

31. A copy of that letter was sent to MPC's treasurer at the time, Joe Carrulo. This enraged Victor who had wanted any conversations between auditors and DHC to be kept hidden from other Board members. Victor stated:

> The auditor was an idiot for sending Larry's letter to Joe Carullo. Carullo, who always complains and fights about legal fees as you know is immediately going to accuse me of having my matter paid by the building - no matter what Larry's letter says. I cannot believe this junior auditor sent the letter to anyone but Larry.

32. Upon information and belief this was the first notification that a Board Member received that indicated MPC's involvement in the State Actions.

33. Victor was asked about the State Actions at a Board meeting. He convinced the Board that the State Actions were part of an extortion attempt against him, that MPC was only tangentially involved, and they shouldn't worry because he was not only leading the defense but paying for it. Assured of indemnification the Board paid no further attention.

34. With most litigations the Board minutes would reflect regular conversations and decision making. However, Victor had control of what information was put into Board meeting minutes, and he used that to ensure that no record of that conversation

35. Later in 2015 a flyer was distributed by an unknown party to Unit Owners at MPC quoting a New York Post article about the State Actions and stating that Victor was incompetent and should be removed from the Board.

36. Since this mailing jeopardized Victor's control of information to Unit Owners, he instructed MPC staff to open Unit Owner's mailboxes and steal the flyers and deliver them to him. Victor testified that he did this so that he could search for Plaintiff's fingerprints.

37. Victor then began to make allegations that this mailing was somehow part of an extortion plot engineered by Plaintiff.

38. Upon information and belief, the Board had no other discussions about the State Actions until June of 2016, when Khatskevich moved for contempt against MPC and the motion papers were mailed to them.

39. Victor yet again instructed MPC staff to intercept the envelopes from the other Board members' mailboxes and give them to him in an effort to keep his colleagues in the dark.

40. Upon information and belief this effort was only partially successful, with at least one Board member receiving the papers.

41. Victor's attorney then sent June 15, 2016 in an email titled "Information about lawsuits against Adam Victor":

> I am writing to you because you received packages directly from a lawyer who claims to be suing Manhattan Place Condominium. Adam Victor was sued two and a half years ago in state court by Yevgeniya Khatskevich and Tyler Erdman...Nevertheless, because the Mr. Victor is the president of the Board of MPC, Mr. Victor agreed to pay all of MPC's legal bills arising from these lawsuits and agreed to indemnify MPC for any and all liability in these cases.

42. This communication was meant to mislead the Board into thinking that MPC wasn't an actual party to the lawsuit by stating that the lawyers litigating the State Actions only "claims to be suing Manhattan Place Condominium" and that it was really information about "lawsuits against Adam Victor".

43. Victor was yet again successful in framing the lawsuits as only relating to himself rather than MPC and placating the Board.

44. Since the rest of the Board was silent, Victor was able to influence financial reports to omit reference to the State Actions in order to keep Unit Owners unaware.

45. Upon information and belief the 2014 report included an explanation of Victor's indemnification since DHC was forced to disclose it to them at the time. It was omitted from reports thereafter until 2018.

46. Around that time Victor decided to report these years-old claims to MPC's insurance company to have them pay for his legal expenditures. As a result the auditors were no longer able to ignore the various actions pending against MPC.

## UNIT OWNERS DISCOVER VICTOR'S MISCONDUCT

47. As a result of Victor's secrecy, Unit Owners had few ways to find accurate information.

48. In or around March 2019 Unit Owners had begun to petition the Board to remove Victor due to what they perceived to be his discrimination against various staff members.

49. That led Unit Owners find that Victor was embroiled in a sexual harassment and discrimination suits against brought by his former employees.

50. This came as a surprise to them since they had never been told about those allegations against Victor and they only happened to find them because of a chance search of a Court docket.

51. Even more surprising to them was learning that there were multiple actions. Shortly after finding one action, they discovered the two actions involving Plaintiff and Khatskevich that not only contained similar allegations, but that MPC had been a party to them for around five years.

52. In 2019, Unit Owners' tried to get information about the State Actions from MPC's records but were stymied by Victor dictatorial control of MPC.

53. During the efforts to oust Victor from the Board, he unilaterally hired his own attorneys to be MPC's "house counsel".

54. With Unit Owners only being able to find information on Courts' dockets, they requested to review records relating to the allegations against Victor, MPC's new house counsel instructed the managing agent to refuse their request.

55. Victor instructed the resident manager, James Kellogg, and Superintendent, Greg DeJong, to remove relevant documents from MPC's files, destroying documents in the event someone came looking.

56. Unit Owners who persisted were met with escalating threats. Victor started with cease and desist notices. If that was not sufficient deterrence he followed with subpoenas and filing suits against them.

57. In the information vacuum Victor created, Unit Owners found themselves fighting for every scrap of information they could find.

58. Just in regards to Victor's indemnification agreement they would find information saying he never offered it, then another a letter would say that he, the next would say insurance was paying, followed by a lawsuit brought by Victor claiming no one is paying and MPC should indemnify him.

59. Being unable to find any information that wasn't somehow disputed somewhere along the grapevine, Unit Owners were not able to determine fact from fiction. Even Victor's felony conviction and house arrest inside MPC became a contested fact despite it being right on the Department of Justice's webpage.

60. Victor resisted Unit Owners pressure to resign, suing the Board to stop a vote to remove him as President. Victor's attorneys acting as MPC's "house counsel" appeared to defend MPC against another one of Victor's attorneys.

61. When that failed, Victor held a Board meeting on April 15, 2019 where he offered to voluntarily leave office. Victor's counsel (who also represented MPC at the time) explained that among other things Victor demanded that he be permitted to keep a storage room he had given himself, that he would need to retain "control" over the State Actions, and that he would only indemnify MPC as long as their insurance coverage was not voided. The Board did not agree to his terms and an election was organized.

62. Realizing that his tenure was coming to an end, on April 18th, 2019 Victor moved to have the Plaintiff enjoined from having contact with the Board or MPC unit owners. On May 23rd, 2019 Victor got an order banning the Plaintiff from communicating with the Board about the State Actions.

**THE LETTER**

63. With MPC unable to find information or even ask Plaintiff, Victor circulated a Letter (the "MPC Letter") on or around May 31st, to the hundreds of Unit Owners, which he signed as a member of the Board.

64. That Letter stated:

> Additionally, I have been accused of using building funds to defend two lawsuits against me, my companies, and MPC, by two people--boyfriend and girlfriend-- both falsely claiming to have been "employees" of MPC in 2012-2013. Neither were ever employees of MPC. MPC was named in these lawsuits as an extortionate money grab. Nonetheless, while I was President, I have funded 100% of the costs of defending these lawsuits. Our Independent Audits have shown that, while I have been President, MPC has never paid any legal fees for these or any other lawsuits I have been involved in.

65. The "boyfriend" and "girlfriend" referred to are Plaintiff and Khatskevich.

66. The MPC Letter falsely stated that Plaintiff has been engaging in extortionate conduct.

17

67. The MPC Letter also falsely stated that Plaintiff had falsely claimed to be an employee of MPC -- statements Plaintiff had made in sworn affidavits.

68. Victor made these statements to unit owners with malice knowing full well they were false and distributed to express Victor's ill will towards Plaintiff.

69. By Victor's design, recipients of the Letter were unable to find information regarding the State Actions and the claims made by Victor.

70. Unit Owners would have every reason to believe it was factual since correspondence from the Board to Unit Owners was a rare event. When such correspondence was sent it would be factual such as a financial report or other similar information. Since Victor was the President of MPC for approximately two decades, a letter from him would be assumed to be similar to one from the Board.

71. The MPC Letter portrayed itself to be a factual summary of issues involving MPC, going issue by issue to explain specific details and give an accounting related to them.

72. The tone of the MPC Letter was that of a factual explanation of Victor's tenure on the Board. To a reasonable reader it would appear to be a dry and calm explanation of issues devoid of fiery rhetoric or hyperbole.

73. The MPC Letter further clarified that it should be taken as fact rather than opinion: "People are entitled to their own opinions about me - but they are not entitled to their own facts."

74. Victor also stated in the Letter that he "funded 100% of the costs of defending these lawsuits" and stated that Independent Audits have shown that while he was President, MPC had never paid legal fees for the State Actions.

75. As with the other claims made, a reader would have no reason to doubt them. They are led to believe that Victor's statements would not only be truthful but they would be based on undisclosed information such as information gathered by auditors.

76. They would not know that Victor controlled the audits, or that by stating MPC never paid legal fees it was because their insurance company was.

77. While Victor did his best to eliminate any sources of information, he couldn't control information publicly filed in Court.

78. Knowing that Unit Owners believed Court documents would inherently be more reliable and truthful than statements made outside of proceedings, he sought to fill the docket with claims of extortion and other wild allegations about Plaintiff.

79. Victor's statement that Plaintiff was engaged in an "extortionate money grab" and that he had been "falsely claiming to have been "employees" of MPC in 2012-2013" were meant to be taken as a factual statements and were be supported by those same claims Victor had made in several actions as part of his malicious campaign to attack Plaintiff.

80. One such statement explained that Plaintiff's actions to extort and perjure himself "went to extraordinary and illegal lengths to secure leverage over him." These statements make clear that Victor fully meant readers to view "extortionate money grab" as a well-defined fact backed up by extensive criminal conduct, and that perjury was just another part of Plaintiff's plan.

81. A casual reader of the docket would see claims that Plaintiff was hell bent on extortion who has trespassed, hacked into computer systems, stolen, manipulated evidence, and perjured himself to do so.

## <u>MENTIONS OF EXTORTION</u>

82. Victor engaged in a years-long malicious campaign to spread false claims of Plaintiff being engaged in extortion and perjury that could later be weaponized to mislead Unit Owner and others into thinking Plaintiff was everything from a criminal mastermind to his "mildly autistic" adopted son.

83. He warned one of Plaintiff's coworkers how the judicial privilege could be used to make normally defamatory allegations privileged and then could then be spread outside of the Courtroom to damage his adversaries.

84. When she too brought suit against Victor for discrimination and sexual harassment, he implemented that plan by including allegations of prostitution while answering her complaint. The Court found it so blatant that he was forced to remove them and reanswer.

85. While arguing to keep those allegations, Victor's attorney said the quiet part said out loud:

> It's directly relevant. And it's also necessary to be in the answer because there's a person named Tyler Erdman who you know who he is - we call him a computer hacker - and he has been trying to solicit media attention to this case. Mr. Victor has been called by different media outlets and different journalists are saying Tyler Erdman is contacting them. So we need something in the public record to diffuse the allegations and their allegations aren't the only ones out there.

86. Victor knew that Plaintiff was not who he alleged him to be. Even avoiding accusations in Court claiming we "call him" a computer hacker rather than saying that he is.

87. Victor's blatant statement that his false allegations were merely meant to counter Plaintiff could not make this his plan clearer.

88. From the outset of the State Actions, Victor made sure the docket was littered with stories of Plaintiff's supposed criminal activity. Victor made sure to outline all the steps that made Plaintiff's extortion not only illegal but supported by Victor's "facts."

89. Victor's stories were always in flux, claiming Plaintiff was extorting him as part of a get rich quick scheme, or because Victor wouldn't let him date his daughter, or because Victor stopped financing a business project.

90. In one filing in the State Actions Victor claimed Plaintiff had stolen and helped others to steal information from him in order to extort him.

>    The information stolen by Defendant is extremely sensitive and valuable and would cause Plaintiffs severe irreparable harm if disclosed. This business information is being held by Defendant as part of her effort to extort an unwarranted settlement in the Related Lawsuit.

91. Victor had filed a lawsuit against Plaintiff in Delaware in an attempt to force him to retain local counsel. It claimed that Plaintiff had defamed Victor as part of an "extortion scheme" that caused Victor's lenders to increase the interest rates he was charged for loans related to his Gulfstream jets. It was voluntarily withdrawn after a motion to dismiss was filed.

92. The 16-page complaint mentioned extortion 15 times despite extortion not being a cause of action.

93. The lawsuit claimed that:

a.   Plaintiff was engaged in an "extortion scheme".

b.   Plaintiff "performed sporadic services for Plaintiffs, which is where Erdman [and Victor's other employees]  met and arranged for their plot to extort Adam Victor"

c.   That Plaintiff had assisted a coworker to secretly record Mr. Victor so that she could use the recordings so that she "could also use to later extort Mr. Victor."

    d.   Plaintiff was involved in Khatskevich's effort and "made an extortionate demand to be paid $3 million or else Ms. Khatskevich would sue Mr. Victor for sexual harassment and use her secret recordings to destroy his family."

    e.   "Mr. Erdman also either assisted or directed Ms. Khatskevich to copy thousands more of Mr. Victor's private and confidential electronic files onto flash drives in the 3 days before Mr. Khatskevich decided she had enough materials to extort Mr. Victor with and quit".

94. In a different lawsuit brought by Victor against Khatskevich in the District of Columbia, he claimed that he was defamed by a letter that she had written to the Judge presiding over his sentencing for a felony. In it she explained how Victor's actions had affected her.

95. Despite Plaintiff not being a party to the D.C. action, Victor's complaint went into extensive detail about Plaintiff's alleged extortion attempts:

    a.   "Dissatisfied with Mr. Victor's decision to stop funding his pet project, Erdman convinced Khatskevich to embark on a scheme to gather evidence against Mr. Victor and seek retribution. They met with a former attorney of Mr. Victor's entities and a friend of Erdman's...the three discussed how they could seize on Khatksevich's crass relationship with Mr. Victor to extort him into a quick and quiet payment. They began to surreptitiously gather and steal substantial and meaningful evidence against Mr. Victor in furtherance of their scheme to extort him with a hostile work environment lawsuit that Khatskevich would bring."

    b.   "Khatskevich and Erdman -- guided by Mr. Victor's former, then suspended attorney -- went to extraordinary and illegal lengths to secure leverage over him."

c.   "In October 2013, once Khatsekvich and Erdman were satisfied that they had

recorded and stolen enough leverage over Mr. Victor to extort him into a

substantial payment...That lawsuit which relied heavily on the secret recordings

that Khatksevich had manufactured --- was an attempt to secure a quick and quiet

payment from Mr. Victor that would lead [them] to riches."

d.   "With their extortion scheme facing a roadblock, [they] doubled down."

e.   "When he learned of Erdman's illegal conduct, Mr. Victor promptly shut the

project down."

96. Victor's legal filings could not be construed as hyperbole, but alleged explicit illegal

conduct, e.g. asserting Plaintiff "went to extraordinary and illegal lengths to secure

leverage over him." and describing in detail the illegal acts Plaintiff allegedly undertook

in order to effectuate his extortion attempt.

97. In response to the FEC complaint Plaintiff filed, Victor accused Plaintiff of multiple

crimes including trespassing, "hacking" and theft knowing that the response would be

posted on the FEC's website and easily discovered by Unit Owners and others.

98. In his response Victor came up with a new story explaining that:

The complaints are embedded within a much larger context...That all changed several
years ago when Mr. Victor refused to let Complainant date his daughter. Since then,
Mr. Erdman broke into Mr. Victor's apartment, hacked his computer and copied
thousands of files and emails from his computer without permission. Adam Victor
has been battling in New York state court for almost two years concerning Mr.
Erdman's theft of his computer files.

99. Since Khatskevich wasn't relevant to that complaint, Victor's story shifted. Instead of

Plaintiff being engaged in an extortionate plot because of his romance with a coworker,

he instead committed criminal acts in revenge for not being allowed the privilege of dating Victor's daughter.

100.     Ultimately, the FEC found Victor violated campaign finance laws and Victor pled guilty after the Department Of Justice brought criminal charges against him.

101.     At a deposition in the State Actions, Victor couldn't miss the opportunity to go after Plaintiff, accusing him of being "mildly autistic," a "sexual pervert," that his eyes made him  resemble the "Parkland killer," as well as accusing Plaintiff of lying in Court filings and manipulating evidence.

> And so you know, Mr Erdman has put in several affidavits in this case. And it's amazing how you started off this deposition yesterday reminding me about perjury. Let's see if you remind your client that when he has his depositions.

102.     Victor made sure the record reflected the reality that he wanted to present to Unit Owners even beyond its relationship to Plaintiff. Testifying among other things that he never agreed to indemnify MPC and that his former lawyer's letter was a lie if it claimed that he did, despite emails clearly proving that he knew of and authorized it.


## VICTOR'S DISHONESTY BEFORE COURTS

103.     Victor was known to be inclined to litigate any issue in front of him and recommend anyone around him did the same.  He is also a litigation enthusiast. Searches of court websites show 18 actions involving him listed in New York Supreme Court, state actions in at least California, Delaware, the District of Columbia, and Indiana. At the Federal level there are at least 5 cases excluding this one, and one Federal criminal case.

104.     Victor's frequent use of the Court systems and disregard for the truth helped him to implement his malicious plan to defame Plaintiff. However, his dishonesty has not gone unnoticed by the Courts.

105.     Victor and MPC were recently engaged in litigation over a storage room that Victor claimed he had a lease for. MPC claimed there was no such lease and that Victor had taken it as a perk for himself as he "dominated" the Board. When Victor was asked to produce it he said he didn't have a copy and a hurricane likely destroyed MPCs copy of it. The Judge ruled against Victor stating that his affidavit was not only self-serving but "incredible".

106.     During the FEC investigation into Victor's political contributions, Victor's daughter contacted Plaintiff to explain that her and her family were being financially and physically threatened by Victor as he attempted to force them to let his lawyer represent them and sign whatever statements Victor put in front of them.

107.     Victor did similarly with his employees, having them lie to the FEC in an attempt to discredit Plaintiff's well founded allegations. They submitted sworn statements claiming that reimbursement checks they received were for their retirement accounts or other personal purposes rather than the matching amounts they had all given to politicians that Victor had relationships with. The FEC did not find their stories to be credible.

108.     The FEC issued a report about the false affidavits Victor solicited:

Respondents offer a variety of explanations for the remarkable coincidences in time and amount between the transfers they received and the contributions they purposely made. But those explanations do not seem nearly as likely as a much simpler one: Victor gave them money for the purpose of making political contributions. Tellingly, none of the alleged conduits swear that they made contributions with their own money.

109.     Ultimately when the FEC voted to issue subpoenas and FBI investigators interviewed those involved, Victor recanted his testimony (and theirs) and pled guilty. In the time since he has claimed that he was not guilty of what he admitted to doing but only did so because of pressure from the investigators.

110.	In California Victor was involved in Litigation involving two of his Gulfstream

jets. Earlier in the case Victor was accused of attempting to bribe a witness to give useful

testimony, which he blamed on his lawyer going rogue. After years of Victor's ever

change story the Judge wrote a scathing decision which excoriated Victor's credibility,

specifically Victor's tendency to change his story every time he tells it:

> Mr. Victor is a convicted felon. While there was considerable evidence about other
> litigation filed by Mr. Victor prior to and after the current litigation, the court did
> not permit much in the way of detail about these lawsuits, finding them peripheral.
> However, certain statements made by Mr. Victor in those actions impair his
> credibility in this case...The court finds his declaration to be an example of his
> willingness to present false testimony under oath. Mr. Victor also admitted that the
> position he took earlier in this litigation--under oath-- that he had not agreed to pay
> 13.5% commissions was neither true nor fair...The court found this testimony to
> lack credibility...The court finds Mr. Victor's claim at trial that he could not
> understand the credit memo to be greatly exaggerated in an effort to bolster his
> portrayal of himself as the unsophisticated mark who was taken advantage of by
> Mr. Prero.

111.	Victor's shameless ability to lie to Courts about Plaintiff has been driven by an

almost the highest degree of malice only made possible by Victor's significant wealth,

influence.


## VICTOR TRIED TO MAKE HIS ALLEGATIONS CREDIBLE

112.	Unhappy with merely poisoning the docket with his false allegations about

Plaintiff, he tried every way he could to convince law enforcement to target Plaintiff.

Victor retained computer forensic firms and private investigators going as far as to look

for fingerprints on envelopes and surveilling Plaintiff's house.

113.	Victor went on to try and convince anyone who would listen that they should

target Plaintiff. The NYPD, local district attorneys, ICE and the Department of Justice all

declined his requests.

26

114.     Victor's lawyer explained to Plaintiff that Victor's strategy was effectively the pot calling the kettle black and that "I was constantly warning him [Victor] about extortion laws. … He [Victor] said something like the best way to beat a civil case is to make it criminal."

115.     Victor cultivated contacts with government officials and various agencies over the years. He would be sure to inform people of these connections. Whether it be by being sure Khatskevich heard him on phone calls with Senator Manchin's office regarding her immigration status or his website that proudly displays Victor at events with President Obama as well as other dignitaries around the world.

116.     Victor told his employees that Khatskevich would be scarred for life by law enforcement if she would not return to work for him:

> They're putting people in jail and they're basically strip-searching them. They'll have people coming in multiple times opening up her vagina. You think about that. I think the mentality of an India woman is very similar to that of a Kazakhstan girl. She has that scar for life.  I think that's worse than rape, because it was sanctioned by society.  Which means you don't know, it can happen any time. You can be arrested…They don't only search for the vagina but they put their thing in the asshole, also. And make you open your mouth, it's totally humiliating.

117.     He fixated on the topic raising it on multiple occasions:

> The refugee [Khatskevich] could have problems … They'll strip search her.  She's worried about me seeing her naked, wait until they basically put their fingers up her ass. … They go, they take everything off, and they basically for guys, they put their fingers up your ass. For women they put their fingers up your ass and they basically put their fingers in your pussy. Every time you're arrested.  … She's a good looking girl. They'll enjoy stripping her.

118.     Victor attempted to interest the NYPD by befriending a detective, Richard Bradish whom he would take to dinner and offer Yankee season tickets. Victor had

Bradish attempt to make a case against Erdman and others, even showing up in Court to try and talk to the Judge about his investigation.

119.       Victor also attempted to interest law enforcement in his invented claims of theft by intermingling secretive "national security issues" so he could try to give his claims some trumped-up significance and more credibility.

120.       Victor wrote to an ICE agent seeking to prosecute Erdman and deport Khatskevich, claiming that Plaintiff "assisted her [Khatskevich] in the theft of files, and that further "Ms. Khatskevich has caused a serious breach on a national security concerns".

121.       Victor also contacted the DOJ telling them that he was served with a "slap lawsuit" and "The lawsuit contains totally false information, which I am frankly not concerned about - except for one section. In that section, it details activity that affects National Security. We moved in Court to have my answers Sealed. The Judge refused to so, without some government input...None came."

122.       Unhappy with just telling the DOJ Plaintiff filed false claims, he continued to accuse Plaintiff of more criminal conduct:

in this day of increasing vigilance against Cyber Crime, the theft of my computer files by Mr. Erdman and Ms. Khatskevich need to be addressed...Third, why is a now illegal alien, who has hurt our national security and stolen computer files, still in this country, when she has shown her contempt for both its law and national security interests?

123.       Victor also went to the district attorneys with similar goals:

The last time we talked you indicated that you didn't think a crime was committed by Mr. Tyler Erdman, nor Ms Yevgeniya Khatskevich, both of whom has stolen over 2700 of my computer/server files, because they had not provided them to Third parties...but for a sinister breach of National Security. The National Security issue may be a Federal issue…

124.      Faced with the stark reality that the Government didn't believe Plaintiff

committed any crimes, Victor then contacted Government officials seeking a specific law

to be passed to target Plaintiff:

>    If you still truly believe that this is not a violation of New York State law, I ask that
>    you use your best efforts to work with the legislative leaders of both Houses and
>    both Parties of the New York State Legislature, as well  the Attorney General of
>    the State of New York - and urgently have them enact Legislation that clearly
>    defines what has happened as a crime in New York.

## DEFENDANT'S MALICE

125.      Victor obsessed over Khatskevich, a Kazakhstani immigrant. He constantly tried

to convince her to have a sexual relationship with him.

126.      Victor fired Claudette, the family's nanny who was like a second mother to his

children after she spoke ill of Khatskevich.

127.      Victor told Khatskevich he would leave his wife if that would convince her to

have a relationship with him. He would even tell his employees that: "I was prepared to

leave my wife for Eve" before going on to detail his fantasy.

128.      Victor's obsession was so overwhelming, his son testified that he cut off contact

with his father in fear of his behavior because he "mentioned her one too many times".

129.      Victor had gotten Khatskevich an H1-B visa, so that he could leverage her

immigration status, threatening that he would cancel it if she did not obey him.

130.      Victor attempted to convince her that his conduct was typical of American

workplaces.

131.      He plainly explained what he wanted from Khatskevich:

>         I wanted a deal where she'd basically be my mistress. I think she told you that,
>         I told you that, what have you. And then when that didn't work, I said, 'Let's

try, will you work with me, ok.'...I just couldn't do it. I just needed to see her naked, I needed to try to basically seduce her. I could not be with her without being sexual. It became too difficult. That's why when I saw her, you know, naked, that's why I would tease her all the time, I just couldn't do it. If there was, if we basically were sleeping with each other, Eve would still be here, with the same fucking job, running the same hours. It was all about sex, OK? It was all about sex. If I had that or she was able to do it, she'd be happy, she'd be here with a job, she'd be on a career, she'd be doing all this type of stuff.

132.    As he himself described his obsession:

 I thought I could have a relationship with Eve where it was strictly professional where she worked, where it would not be sexual, ok. But she was too pretty for me, ok. She was just too pretty, and I never got over my desire to basically have sex with her. And I teased her, and I was hoping, I hoped that if I went over and I went over and I saw her naked that she'd freeze, and I'd come over and I fantasized that I would kiss her and that I would start stuff, and that she'd melt and seduce and we'd have, and we'd make love and what have you. That was my fantasy. That's why I did it, ok. And so, I was too weak.

133.    Victor explained that since he was paying Khatskevich for her work that she should not have sex with anyone other than himself:

There's probably 100 million women in the world that would have sex with me every day in exchange for paying $80,000. I mean, it's just a fact and you know that's true.

Like I said to Eve [Khatskevich] before, I don't want some guy getting free vagina. And that's not unfair and not unreasonable. And you know I was serious...You know, maybe if you were saying "Adam, I wanna have sex with you 3 days a week, but I need to have sex with someone else the 4th day", maybe I'd say OK.

134.    When Victor learned of Khatskevich and Plaintiff's relationship, he interrogated Plaintiff seeking intimate details. He made no efforts to hide his jealousy and disdain of Plaintiff.

135.    In Victor's view, Plaintiff had been disloyal to him. Victor told Plaintiff's coworkers that this disloyalty was why he wanted to go after him.

136.    Victor opined that Khatskevich's interest in Plaintiff was so that she could obtain a green card, complaining "If she's going to sleep with a guy she doesn't like, why didn't she sleep with me?"

137.    In another instance he jealousy remarked, "In my view, she could've found so much more of a man than Tyler … He's ugly, he's a goofball...too young"

138.    Victor was so fixated on Plaintiff he would go on to speculate about the condition and operation of Plaintiff's genitals to one of his employees.

139.    Victor outlined his plan to maliciously attack Plaintiff for his disloyalty. Explaining that he planned to make false allegations against him and Khatskevich.

140.    Victor's plan was to portray both Khatskevich and Plaintiff as a criminals, pondering out loud how he would make "all types'" of claims against Plaintiff, such as theft which he would go on to allege was part of an extortionate plot Plaintiff engaged in, adding that he was even not sure Plaintiff had done what he was accusing him of.

141.    Plaintiff's coworker recorded his plan:

> What Tyler doesn't realize is that I'm gonna sue him for aiding and abetting, for breaking into my computer, um, for all types of things, and so he's gonna be sued. So he's gonna have to spend, you know, a hundred thousand dollars in legal fees to defend himself. And I'm gonna sue him for my reputation - a hundred million dollars.

10. Victor made good on his threat suing Plaintiff in New York, alleging he stole documents, engaged in unfair competition, and aided and abetted Khatskevich's purported breach of fiduciary duty. The claims were dismissed and Plaintiff brought counterclaims against MPC, Victor and Victor's companies. Victor then sued Plaintiff in Delaware for defamation, alleging millions in damages. Victor withdrew the action rather than respond to Plaintiff's motion to dismiss it.

~~11. Victor outlined on audio recordings how he hoped that attacking Plaintiff would isolate Khatskevich and leave her homeless. He explained his plan to defame Khatskevich in an effort to discredit her claims. Victor openly stated that he would make up a claim about prostitution, knowing it was false:~~

142.        "~~[~~His plan also included Khatskevich, whom he explained that he would falsely accuse of prostitution.

> ~~[~~S]o now Tyler's parents are gonna say, 'What the fuck are you doing, Tyler? You're making us give you money, you stand in exposure of basically getting a judgment against you that bankrupts you, because you have to declare personal bankruptcy, for a woman who was a prostitute.' **We know she wasn't a prostitute, but this is gonna be war.**  And so, I think that Tyler's parents are gonna cut him off, throw him out of the house where Eve is, and say, 'Either get rid of the girl, or we're basically kicking you out of your uncle's apartment.' So, I think what's gonna happen, Tyler's gonna lose the apartment, unless he dumps Eve, unless he cuts off - because that's the only way we're gonna basically settle with Tyler. We're gonna basically say 'we'll settle with you if you throw her out.' And so she's gonna be, so she's not gonna have any place to stay then~~"~~.

~~18.~~ With litigation failing to sate Victor's appetite for revenge, Victor ~~contacted law enforcement to attempt to have them prosecute Plaintiff and Khatskevich for "stealing" documents from him. They declined.~~

~~19. Victor wrote government officials to unsuccessfully petition them to rewrite laws to criminalize what he believed to be Plaintiff's actions.~~

~~20. Victor told employees that he had worked for the CIA and/or FBI. As part of that he took Khatskevich and other employees to functions with people he claimed were North Korean officials.~~

~~21. Victor stated that he was attempting to obtain a metal sample related to the North Korean nuclear program for Senator Manchin of West Virginia, one of the politicians Victor pled guilty to giving illegal campaign contributions to.~~

22. Victor in an affidavit said that he even spied on residents of MPC on behalf of US intelligence agencies:

"In 1985, I moved into Manhattan Place Condominium, inexplicably one of the defendants in this action. By chance, the FBI suspected one of my neighbors to be a Chinese intelligence officer and asked me to befriend him, which I did. We developed a relationship, and through him, I was introduced to a North Korean diplomat, all through the direction of the FBI."

24. Victor had "government agents" come to his office while Plaintiff was present, to "debrief" female employees that Victor had brought to events with people Victor explained to be North Korean diplomats.

25. Victor later threatened those employees and others with action from government agencies, such as having them followed, or "sent home in a box".

26. Victor on multiple occasions has promised that the Government will verify these claims, and after several years of lobbying appear to have declined his requests.

27. Victor contacted I.C.E. falsely claiming that Plaintiff and Khatskevich had stolen records from his computer. He tried to imply his contacts with law enforcement meant that an investigation was underway. He claimed that Khatskevich caused a serious breach of national security, namely detailing threats he made to her. As a result, he claimed that she should be deported.

28.1.    Victor was known by those close to him to be a serial liar and prone to legal threats. He is also a litigation enthusiast. Searches of court websites show 18 actions involving him listed in New York Supreme Court, state actions in at least California,

Delaware, the District of Columbia, and Indiana. At the Federal level there are at least 5 cases excluding this one, and one Federal criminal case.

29. As a result of Victor's tendency to litigate and lie while doing so, many in his orbit had recorded their interactions with him to protect themselves. Plaintiff is aware that at a minimum that likely includes:

.   Plaintiff and fellow employees;

.   Victor's household staff such as Agnes, his housekeeper;

.   His own children, including  Alia whom he threatened with litigation if she didn't lie for him during the FEC investigation;

.   MPC employees such as Greg DeJong, the superintendent of the building;

.   His fellow MPC Board members; and

.   Unit owners

**Victor hides the suits against MPC**

37. When Khatskevich sued Victor and MPC, Victor undertook to hide the suit's existence from MPC. Rather than notify the Board and Unit owners about the lawsuit filed against them, Victor hid it, having his own personal attorneys represent MPC for years.

38. Victor's attorneys represented MPC, often taking positions detrimental to MPC's own interests from 2014 until 2019.

39. Victor had at least five firms appear for MPC over the years, including his own criminal defense attorney.

40. Victor intensified his efforts to discredit Khatskevich and Plaintiff to avoid responsibility for his actions. Hoping that he could make the lawsuits disappear through a years-long unsuccessful campaign to lobby law enforcement to target Khatskevich and Plaintiff for

prosecution, with the goal of having Khatskevich deported and forced to drop her suit before he was forced to tell MPC's Board and unit owners.

41. Victor had accepted service of the litigations on MPC's behalf, in an apparent bid to keep it hidden from other members of the Board.

42. In one instance, motions were mailed as legally required to members of the MPC Board. Victor realizing this would ruinjustified his plan, had MPC staff retrieve the mailings before they were given to the rest of the Board. Upon information and belief this effort was partially successful, except that one Board member's mailing address was outside of MPC and he was unable to intercept it.

43. To rectify this Victor's attorney assured the Board that the litigation was a nuisance suit and not to worry.

44. In another instance, a letter was sent to unit owners by a person unknown to Plaintiff. Said letter stated that Victor should resign as President of MPC based on the litigation he was embroiled in as well as incompetence.

45. Wrongfully believing that Plaintiff had sent it, Victor instructed building staff to open unit owners mailboxes and take the letter from them so unit owners would never see it, and potentially learn MPC was a defendant in various actions.

46. Victor then claims he has retained the stolen mail, so his private investigators could search for Plaintiff's fingerprints.

47. When Victor's five-point plan proved unsuccessful, Victor made claims to MPC's insurance policy which he used to pay his own personal attorneys.

48. Upon information and belief, the insurance company was unaware that they were subsidizing the defense of Victor's companies.

**~~Unit owners discover Victor's misconduct~~**

50. ~~Elections had not been held at MPC for over two decades, as Victor took steps to prevent a quorum and election from taking place that could disrupt his carefully constructed control of the condominium.~~

51. ~~Eventually Victor's stranglehold broke when unit owners demanded he resign after they learned about his criminal conviction and other allegations of misconduct against him. When they discovered MPC was a defendant in multiple lawsuits for years without being informed, it gave new urgency to their efforts to have Victor removed. This triggered Victor to take steps to try to avoid accountability.~~

52. ~~At that point, Plaintiff was contacted by and subsequently spoke with unit owners, board members, and attorneys about Victor's improprieties and~~ <u>explaining</u> how ~~they could settle Plaintiff's claims against MPC.~~

53. ~~Given that Victor and his attorneys had left MPC's unit owners and Board in the dark about the litigation in which they had been in for years, Plaintiff, while adverse, was one of the best sources for them to get information from.~~

54. ~~This led to multiple Board members meeting with Plaintiff to discuss the status of various litigations and potential ways of settlement. The Board also arranged for Plaintiff to give a presentation to unit owners summarizing the litigations and to present information about Victor's actions.~~

55. ~~When Victor was faced with evidence of his misconduct, as President of MPC, he took efforts to continue their five-point plan of retaliation and to convince his predecessors to do the same. Seeking to discredit Plaintiff was necessary to keep unit owners from discovering the truth of Plaintiff's allegations.~~

**Never settle**

57. Defendants' efforts to defame and discredit Plaintiff were vital components of Victor's personal defense.

58. Victor, on recordings, stated that he would never settle with Plaintiff. Victor also stated that if he did settle it would be a ruse, and he would sue in order to force the funds to be wasted on legal fees.

59. When Plaintiff and Khatskevitch made settlement offers to MPC, Victor and his attorneys never communicated them to MPC.

60. When Victor did agree to having a settlement meeting, he sent Jeffrey Scott Shapiro, the son of Len Shapirro, one of Victor's employees who MPC hired to the tune of over $100,000 per year. Len's actions were detailed in various lawsuits, and Jeffrey had a conflict of interest whereas he would want to avoid MPC from discovering the litigations and his father's scheme.

61. Victor had been using MPC's insurance policy to pay for his personal defense.

62. Victor's attorneys who were also representing MPC had said Victor would be indemnifying the building in regards to Khtaskevich's lawsuit. Khatsekvich's and Plaintiffs lawsuits are frequently referred to interchangeably by MPC.

63. Those very attorneys, Davidoff Hutcher and Citron, later sued Victor and MPC for unpaid legal fees totaling $637,014.98.[4] MPC was forced to defend itself and Victor again used MPC's insurance to fund his defense.

64. Upon information and belief MPC's insurance also paid a settlement on Victor's behalf to that firm.

65. Convincing the Board to not even have a settlement meeting with Plaintiff was paramount to Victor's attempt to offload his cost of defending the actions against him on

---

[4] Davidoff Hutcher & Citron LLP v. Adam Victor & MPC 651717-2018

to MPC's insurer. This strategy leaves MPC unit owners holding the bag when the insurance exhausts and MPC has no insurance coverage for the various claims brought against it.

66. As MPC got their own separate representation in 2019 after unit owners discovered the litigation, Victor found himself sharing the insurance coverage.

67. If MPC were to settle with Plaintiff, the money Victor is using his defense would instead go to Plaintiff.

68. Victor had to resort to hiring a personal attorney, Jon Silveri, separate from Schlam Stone & Dolan, his MPC insurance paid attorneys to defend him as President of the Board to continue receiving coverage.

69. Victor has had his MPC-funded attorney do the heavy lifting for his defense while Silveri would often not even bother to show up for depositions, arguments or respond to motions.

**Defendants defame Plaintiff**

72. Victor started a campaign of intimidation to stop unit owners at MPC from talking with Plaintiff by:

   .   Sending cease and desist letters to numerous unit owners and Board members, alleging that they were defaming him.

   .   Sending subpoenas to unit owners and Board members.

   .   Beginning a series of frivolous litigations against the Board and unit owners.

76. During this time Plaintiff had been having discussions with Board members other than Victor and unit owners regarding the structure of potential settlements, particularly ones that would be within the scope of MPC's insurance coverage. Such settlement would be beneficial for unit owners and determinantal to Victor who was replying on MPC's insurance coverage to fund his defense.

77. On April 1, 2016 a member of the Board, Walter Brindak appeared in Court during a hearing in the Davidoff Hutcher & Citron action, to tell the Court the attorney representing them for months, never informed them they were a party to that action or even representing them. That attorney attempted to argue to the Court that they had never met Mr. Brindak, had never communicated with him, or could even be sure he was a Board member. MPC and Victor both found different attorneys after that event.

78. Later that day, Victor brought a suit against that Board member and others to try and stop his removal as President. Court papers filed by an attorney hired by the dissenting Board members stated that "...the Board of Managers and unit Owners of MPC have reason to believe that Mr. Victor has used his position as President of the MPC's Board of

Managers to commit serious abuses of power beyond the scope of the authority afforded him under the By-Laws."[5]

79. Victor began an effort to try and retain control of his litigation with Plaintiff, so that he could continue to defend the action to the detriment of MPC.

80. Victor tried to delay his removal so that he could leverage his resignation to get concessions from the Board. On April 15, 2019 Victor's attorneys who were also representing MPC at the time led this effort. His attorney from Schlam Stone and Dolan, offered for Victor to step down from the Board and indemnify MPC as long as they still had insurance. This would be exchanged for Victor retaining control of the defense of Plaintiff and Khatskevich lawsuits against MPC, as well as an extension of a lease for a 4th floor storage facility Victor falsely claimed to have.

81. On April 18th, 2019 Victor moved to have the Plaintiff enjoined from having contact with the Board or MPC unit owners. On May 23rd, 2019 Victor got an order banning the Plaintiff from communicating with the Board.

82. After Victor managed to prevent plaintiff from having any communication with the remainder of the Board, days later, on or around May 31st, Victor circulated a Letter (the "MPC Letter") to the hundreds of unit owners, which he signed as a member of the Board. Defendants defamed plaintiff in an attempt to avoid Victor being held accountable for his actions.

83. That letter stated:

"Additionally, I have been accused of using building funds to defend two lawsuits against me, my companies, and MPC, by two people--boyfriend and girlfriend--both falsely claiming to have been "employees" of MPC in 2012-2013. Neither were ever employees of MPC.

_____

[5]

https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=N/E6XPt8QCwrawp44hTUmA ==&system=prod

~~MPC was named in these lawsuits as an extortionate money grab. Nonetheless, while I was President, I have funded 100% of the costs of defending these lawsuits. Our Independent Audits have shown that, while I have been President, MPC has never paid any legal fees for these or any other lawsuits I have been involved in."~~

86.~~1.~~ ~~The "boyfriend" and "girlfriend" referred to are Plaintiff and Khatskevich.~~

87. ~~The MPC Letter falsely stated that Plaintiff has been engaging in extortionate conduct against MPC.~~

88. ~~The MPC Letter also falsely stated that Plaintiff had committed perjury in those pending actions by claiming that he was an employee of MPC.~~

89.143. ~~Defendants made these~~if he made false statements ~~to unit owners with actual malice knowing full well they were false.~~they would be justifiable because "this is gonna be war".

144. ~~The~~ Victor's malicious plan took place over years, as he planned false allegations in Court documents everywhere he could, regardless of the relevance.

145. Victor knew that his statements were false but persisted to ensure any reader of dockets relating to him would be riddled with his falsehoods.  "So we need something in the public record to diffuse the allegations and their allegations aren't the only ones out there."

146. When Victor was facing his removal from MPC's Board, he leveraged his efforts to mislead the recipients of the MPC Letter ~~also underscored the significant liability Victor~~ he sent accusing Plaintiff of defamation and perjury.

147. As he designed the only information that could be accessed would paint Plaintiff as a criminal.

41

148.     Victor knew that his letter was riddled with other falsehoods such as "I have funded 100% of the costs of defending these lawsuits." When asked to testify on that phrase, he explained that MPC's insurance company was paying:

> 90.     Manhattan Place was basically -- had encumbered MPC and itsan insurance policy that all unit owners withfunded, and that fund -- that funding, which costs unit owners no additional money, was being used to pay for attorneys. So I stand by that statement.

Victor and MPC distributed these defamatory statements to unit owners, in an attempt to misinform unit owners about:

.     Victor's theft of building funds;

.     Victor and the Board's mismanagement and ineptitude;

.     The Board's negligent supervision of Victor, allowing him to skim funds at will;

.     Victor and the Board's large-scale insurance fraud;

.     Victor and the Board's liability for the sexual harassment and retaliation claims in an action pending against them;

.     Victor's breach of his fiduciary duty to the Board by (i) failing to notify them of the various New York City Human Rights Law and legal fee actions against them; and (ii) hiring his own personal attorneys to represent MPC without MPC's knowledge;

.     Victor and MPC being sued by their former attorney for hundreds of thousands of dollars of unpaid bills; and

.     Victor's felony conviction and house-arrest served inside of MPC.

91. After receiving the order banning the Board's communications with Plaintiff and the chilling effect of Victor's threats, Defendants knew that letting Victor's statements go unanswered would cause damage to the Plaintiff.

92. Upon learning of the MPC Letter, on June 10, 2019 MPC's attorney was contacted and informed that the letter was defamatory and that a meeting of the parties should be arranged to avoid a defamation action.

    MPC's attorney stated that a new Board election was about to be held and that "Once that occurs, I will discuss these issues with the new board members and see if we can try and resolve this matter".

93. When a new Board was elected on June 18th 2019, Victor successfully worked to convince them that they should further his defamation of the Plaintiff and Khatskevich, and let MPC continue to operate according to his retaliatory five-point plan.

**Meet the new board, same as the old board**

Defendants had long tried to have Khatskevich deported in an attempt to force her to drop her claims. When they learned Khatskevich was designated a victim of human trafficking by the Government, Defendants sought to force disclosure of Khatskevich's T visa application in the speculative hope to find something they could report to immigration authorities or otherwise use against her.

94. While arguing that motion, MPC's attorney, Gary Ehlrich, told the court he hadn't made many discovery requests, but this one was important to his clients.

94. Amos Tamam and Avi Ganatra, newly elected Board members put in charge of MPC's litigation, latched on to the five-point plan to defame Plaintiff.

94. The Board began to tell unit owners in or around the beginning of July 2019 that unit owners shouldn't be concerned about litigation against MPC because it would soon disappear.

94. The Board including Tamam and Ganatra reiterated and expanded on the Board's previous defamatory statements stating that:

.   Plaintiff stole documents from Victor in conjunction with Khatskevich.

.   Plaintiff had distributed stolen information to unit owners.

.   Plaintiff had committed perjury.

.   Plaintiff extorted MPC.

94. The Board, specifically its new President, Amos Tamam, in early July 2019, explained to unit owners that they would soon have Khatskevich deported and as a result her case dropped.

95. Tamam and the Board falsely told unit owners that Plaintiff and Khatskevich had committed criminal acts in obtaining documents from Victor and that would be grounds for Khatskevich's deportation.

Victor and MPC had previously made allegations of Conversation, Unfair competition and aiding and abetting a breach of fiduciary duty against Plaintiff. Those claims were dismissed in their infancy.

96. Defendant MPC made these statements with actual malice to further their own goals and retaliate against Plaintiff, knowing that such claims had already been dismissed.

96. The new Board, since their election on June 18th, 2019 to the current day, followed Victor's five-point plan to the letter.

96. Defendants continued their defamatory conduct in order to discredit any information unit owners presented to MPC, and to deny any request for information unit owners are legally entitled to that would vindicate Plaintiff. Ensuring that they could hide or discredit any information about their own misconduct.

96. Defendants through their maliciously constructed plot to defame Plaintiff have destroyed Plaintiff's reputation among unit owners, killing any chance of settlement between the parties.

96. Defendants' unwillingness to correct their defamatory statements and efforts to hide the truth from unit owners further compound the damages from their defamatory statements.

**Deluge of Board misappropriation**

MPC's board both under Victor and Tamam's leadership has enriched select board members at unit owners' expense.

97. The Board, under Tamam, specifically has experienced a series of damaging water leaks they have tried to downplay and keep hidden from unit owners.

97. On or around June 2020, an apartment on the 18th floor of MPC had reported damage to their ceiling and wall.

97. Building staff investigated and found that the leak originated from a toilet in Apartment 19M, owned by Avi Ganatra, a board member.

97. Typically, such repairs of such damage would be billed to and paid for by the owners of the unit where the leak originated.

97. Upon information and belief, Ganatra and/or the Board ordered staff not to disclose the true source of the leak, and to repair it using MPC resources at no cost to Ganatra.

97. In another instance Ganatra reported to the staff that he needed a plumbing valve replaced. In order to do so, an entire row of apartments needed to have their water shut off. In the normal course, the building would be required to send a notice to anyone who would be affected and require a licensed plumber to complete the work. Gantara instead had building staff immediately shut off the water without notice to other residents and have the work completed by building staff at no cost. An abnormal perk for unit owners.

97. Even Victor realized how improper this type of practice was and previously sued his fellow Board members about similar abuses of power during his tenure.[6]

---

[6] Adam Victor v. Walter Brindak et. al. 651907/2019
https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=TzrPt47H5sgeAr6l6O3Euw==&system=prod

~~"That assistant super was personally close with Defendant Brindak and Carullo, and, on information and belief, had provided Defendants Brindak and Carullo with free repair and maintenance work on their units."~~

~~When unit owners raised concerns of Ganatra getting a perk not given to other unit owners, the Board circulated a memo that was in form and substance a non-disclosure agreement to try to prevent building staff from whistleblowing.~~

~~98. During the COVID-19 related restrictions placed on MPC's fitness center they were forced to close their doors in early 2020. The fitness center is owned by a member of the MPC Board, Sandra Albo.~~

~~98. On or around August 2020, a multitude of apartments in the "G line" of MPC reported a water leak, that was found to originate from the fitness center's pool on the top floor.~~

~~98. Again staff were directed to not disclose the source of the leak and were directed to fix the resulting damage using building funds and resources. This avoided Albo from having to pay for the damage caused.~~

~~98. In response to COVID-19's effect on her business, Albo declined to apply for government assistance such as EIDL or PPP loans or have her employees go on unemployment. Instead MPC's Board voted to hire and pay her own employees. The Board once again used the backdrop of a crisis to offload its members employees onto the buildings payroll as they had with Victor and Hurricane Sandy.~~

~~98. During Victor's tenure as President, he led the Board to commence a lawsuit against a building constructed across the street from MPC, claiming $6 million in damages were caused to MPC.~~

99. After bringing the action, MPC refused to participate in discovery to avoid revealing the damage was nonexistent and fabricated by Victor.

That lawsuit had unforeseen consequences to the unit owners of MPC. They quickly found it hard to get mortgages due to the claims that MPC's suffered structural damage.

100.    The Board had decided in January of 2020 that they would settle their lawsuit about the fictitious structural damage. However, it was not announced to unit owners until June of 2020, during which time they suffered from depressed property values due to the difficulty of receiving financing.

100.    Upon information and belief, Tamam used the extended delay in communicating the settlement to MPC's unit owners to enrich himself.  In April 2020 Tamam purchased unit 19C, located next to apartments 19D and 19E which he already owned, for $1.275 million dollars. The purchase was made before Unit Owners were informed in June that there was no structural damage, which substantially limited the potential buyers of that apartment. Units 19D and 19E were both purchased in 2009 for $1.8 million and are nearly identical in size to 19C.

**The Board supports Victor despite their conflict**

100.    Even after Victor had hidden litigations from MPC as well as siphoning funds and other abuses of power, the current Board appears to not care. Rather it appears to have inspired their own abuses of power.

100.    Victor has been delinquent on his common charges due to MPC, since the day after the Defamatory letter was sent to Unit Owners, and an election was held. He remains in arrears to this day, in excess of $70,000

101.        Victor is evidently protesting his removal from office by no longer paying any

common charges since the new Board was voted into.

Victor on audio recordings had emphasised that his status on the Board and the

perks that it gave him were jeopardized, he would consider leaving his family and

disappearing to Paris without a trace.

102.        Since Victor began to fight to remain on the Board in 2019 to the present day, him

and MPC have been in eight actions with each other. Those actions are:

. Victor attempting to stop a Board meeting to vote on his removal from office.

. MPC trying to evict Victor from a 4th floor storage room.

. Victor suing MPC and its insurers for not providing him with insurance coverage.

. Victor and MPC were sued for unpaid legal fees regarding a lawyer Victor hired

on MPCs behalf, and fees in which Victor agreed to indemnify MPC for.

. A foreclosure action in which MPC is seeking to foreclose on Victor's apartments

due to unpaid common charges.

. An action by Victor's mortgage company to foreclosure on two of Victor's

apartments after he defaulted on his mortgage. MPC is a defendant because it is a

creditor related to Victor's unpaid common charges.

. Victor sued MPC, its Board members and unit owners for $42,000,000 for

defamation and tortious interference.

. Victor again sued MPC and its insurance companies but has yet to serve a

complaint.

103.      The Board has called Victor's cases against them frivolous and baseless but they still apparently cede control of the defense of Plaintiff and Khatskevich's litigations, including assisting in attempts to deport Khatskevich.

Both the Board and Victor have admitted that they have a "contentious relationship", and accused each other of lying.

104.      Amos Tamam even stated that Victor "dominated the Board of Managers and used it to benefit himself personally."

104.      Victor's attorneys Schlam Stone and Dolan, where representing MPC and were ordered by MPC to withdraw subpoenas they issued against unit owners on Victor's behalf.

104.      They declined and only then admitted they had a conflict and withdrew from their representation of MPC. Their defense to this conflict was to say they haven't prejudiced MPC's ability to bring cross claims against Victor.

104.      MPC even defaulted in Plaintiff and Khatskevich's actions rather than produce responsive documents just as Victor did. MPC had previously even stipulated to producing documents then ignored the Court's order.

104.      MPC has taken efforts to hide the true cost of Victor's actions against them from unit owners. In one instance the Board did not issue a 2019 financial statement until well into 2020, waiting until two 2019 actions were dismissed. While brought and defended in 2019, they were left off the financial statements and their impact undisclosed to unit owners.

104.      Instead the Board only issued a report stating that insurance and litigation costs have skyrocketed, trying hard to downplay how much of that was due to Victor's actions.

105.        Despite that they have taken no real steps to hold him accountable for anything other than getting back the 4th floor storage space.

105.        Upon information and belief Victor even used his own incompetence against MPC. After Hurricane Sandy, MPC's fire alarm system was damaged and not functioning. Victor had never repaired the system. On July 1, 2020 two of Victor's suits filed against MPC, the Board and others were dismissed.

105.        On July 2, 2020 Victor retaliated. Upon information and belief Victor had spent hours to report a tip to the FDNY that MPC's fire alarm system was not functioning. Later that day the FDNY appeared in force and found that the fire alarm system was not functioning. The FDNY then fined the building a substantial sum.

105.        This strange relationship in which Victor constantly takes actions against MPC but pays little price seems to only continue so that Victor can try and deliver on his deportation efforts and hope that they encourage Plaintiff and Khatskevich to drop their actions against MPC so they could avoid actual settlement negotiations.


**DAMAGES**

105.        At the time Defendants slandered Mr. Erdman to MPC unit owners, Erdman was in the process of trying to negotiate a settlement with MPC.

105.        Defendants slanderous misrepresentations destroyed any possibility of a settlement of Plaintiffs claims against MPC.

                As such, Plaintiff is damaged in excess of junctional limits.

149.        The statement is simply untrue and Victor knew full well that it was since he would know exactly who was paying his own attorneys.

150.        Despite the letter stating that "People are entitled to their own opinions about me - but they are not entitled to their own facts." it was filled with statements Victor knew to be false and maliciously included to defame Plaintiff.

151.        Victor's plan against Plaintiff, while detailed, did not envision an end but rather a continuing effort against him until Victor got bored of it. Victor explained that even if he was to settle with Khatskevich, he would turn around and sue her again to make her spend any money she received. Plaintiff however was in a class of his own. Victor explained that he would never settle with Plaintiff, he wanted to make him suffer.

~~106.~~152.    Victor did not want money from Plaintiff, he even told others that he knew he didn't have any. He didn't want to settle with Plaintiff, he moved for sanctions when Plaintiff even made an attempt to settle.. He just wanted to express his ill will by maliciously defaming Plaintiff.


**FIRST CAUSE OF ACTION ~~AGAINST ALL DEFENDANTS~~ (Defamation - New York common law ~~and Connecticut General Statutes Title 52 § 52-237~~)**

~~107.~~153.    Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

~~108.~~154.    ~~Victor, on his own behalf and as a member of the Board~~ Victor sent the MPC Letter  to more than 400 MPC unit owners falsely claiming that Plaintiff:

    a.    Falsely claimed to be an MPC employee when he made sworn statements in a proceeding  (a predicate for Plaintiff's action against MPC under the New York City Human Rights Law)

b.  Commenced suit against Victor and MPC as part of "an extortionate money grab."

109.155.   ~~Defendants then compounded~~Victor made these ~~defamatory~~ statements ~~by falsely telling unit owners that Plaintiff had: (i) stolen~~after a years-long campaign to plant false allegations in Court documents ~~from Victor; (ii) distributed stolen~~, then deprived the recipients of any information to ~~unit owners; (iii)~~the contrary so that his statements would be taken as truthful descriptions of crimes committed ~~perjury; and (iv) extorted MPC.~~ by Plaintiff.

110.156.   ~~Defendants~~Victor made these false allegations with actual malice. Victor knew Plaintiff worked for MPC as he did so at Victor's own direction. ~~MPC knew Plaintiff worked for MPC as it paid Plaintiff for his work for MPC at Victor's direction. Further, Victor and MPC are both in possession of documents showing that Plaintiff worked for MPC.~~

~~12. Similarly, Victor was aware at the time that told MPC unit owners that Plaintiff had stolen documents from Victor that his statement was false. MPC knew that claims they made against Plaintiff had been dismissed nearly half a decade earlier. Defendants evidenced reckless disregard of the truth of those statements when it repeated them to unit owners.~~

157.      ~~Defendants'~~Similarly, Victor was aware that his detailed accounts of extortion were fabricated and would give credibility to his claim that Plaintiff was engaged in an "extortionate money grab".

111.158.   ~~Victor's~~ statements qualify as defamation *per se* in that they state Erdman was involved in a crime.

112.159.    Since ~~Defendants'~~Victor's statements constitute defamation *per se*, special

damages are not required.

~~113.        Nevertheless, as a result of Defendants' defamatory statements, Plaintiff has lost~~

~~the opportunity of settling his action against MPC.~~

114.160.    Moreover, Erdman has suffered and will continue to suffer damages as a result of

harm to his reputation as a result of ~~Defendants'~~Victor's defamatory statements.

115.161.    By reason of the foregoing, Plaintiff is entitled to an amount of damages in

excess of $75,000 in an amount to be determined.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff ~~Tyler Erdman demand~~demands judgment against ~~defendants Adam Victor and the Board of Managers of Manhattan Place Condominium~~Defendant as follows:

~~117.~~I.      On the first and sole cause of action for actual damages in an amount to be determined at trial, but ~~in any event, exceeding $75,000, and for punitive damages; and~~not less than $75,000;

II.      Requiring Defendant to pay punitive damages on the first and sole cause of action;

~~118.~~III.      For such other and further relief as the Court deems appropriate, together with reasonable costs and disbursements of this action.

Dated: ~~October 26, 2020~~August 9, 2021

/s/ Tyler I. Erdman

Tyler I. Erdman
Telephone: (917) 301-0401
Email: tyler@erdman.it
20 Old Farm Road
Weston, CT 06883

*Plaintiff Pro Se*
