UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| TYLER ERDMAN, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ADAM VICTOR | ) |
| | ) |
| | ) |
|    Defendant. | ) |
| _____ | ) |

Case No.: 1:20-cv-04162-LGS

JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT

Plaintiff *pro se*, Tyler Erdman, for his Second Amended Complaint against

defendant, Adam H. Victor ("Victor") respectfully alleges as follows:

## NATURE OF THE ACTION

1. This action seeks redress for certain defamatory statements made by Victor to Unit
   Owners of Manhattan Place Condominium ("MPC") and others.

2. Plaintiff had worked for several years for Adam Victor and entities he controlled until the
   Summer of 2013. One of those entities was MPC where he was President of the Board of
   Managers ("the Board") for approximately two decades. MPC at Victor's direction had
   employed Plaintiff and other associates of Victor.

3. During Plaintiff's employment he witnessed Victor stealing from MPC, and Victor's
   ongoing harassment and trafficking of a female employee, who was Plaintiff's girlfriend
   at the time, Yevgenia Khatskevich ("Khatskevich").

4. Victor obsessively tried to force Khatskevich into a sexual relationship to the point that it was intolerable even to his own family, with his own son testifying that he completely severed ties with his father because he brought up Khatskevich "one too many times."

5. Victor had told Khatskevich that the terms of her employment, and more importantly her H1-B visa, forbade her from having a boyfriend other than himself. To enforce his edict, he turned her friends into paid informants, and stalked her both in person and electronically.

6. When Victor realized that Plaintiff had a relationship with Khatskevich, he became enraged and redirected his obsession into a malicious vendetta against Plaintiff. He explained in a recorded conversation with an employee that he planned to use his wealth and influence to attack Plaintiff in retaliation for his relationship and support of Khatskevich.

7. Victor began a campaign to plant false allegations against Plaintiff, accusing him of criminal activity in numerous Court filings made in at least three States and the District of Columbia.

8. Ultimately, Victor was sued in separate actions by Khatskevich and another former employee for sexual harassment. Following through on his malicious plan, Victor filed a separate action against Khatskevich and Erdman, accusing them of stealing a trove of documents. Plaintiff filed counterclaims against Victor and MPC. These actions (collectively, the "State Actions") all arose from Victor's conduct as President of the Board of Managers of MPC.

9. Victor viewed his position as Board President and the perks in which he granted himself as instrumental to his lifestyle. He even told others if he were to lose his position he would abscond to Paris, leaving the United States and his family behind.

10. For years Victor had successfully kept Unit Owners in the dark about the State Actions and MPC's involvement in it. He did so by having his own attorneys defend MPC and report solely to him.

11. That plan fell apart when Unit Owners discovered the State Actions and others involving Victor in early 2019.

12. Victor responded to Unit Owners by acting to prevent them from gaining any information regarding the facts from any documents within MPCs control.

13. Unit Owners called for an election for the first time in over a decade. On the eve of the election, Victor maliciously sent a letter to Unit Owners that alleged Plaintiff had committed criminal acts of perjury and extortion.

14. Specifically, Defendant Victor, as a member of the Board, sent a letter on May 31, 2019 to the hundreds of unit owners, with statements he knew to be falsely stating that Plaintiff was engaged in an "extortionate money grab", and had perjured himself by making false claims under oath that he worked for MPC.

15. Due to Victor's efforts, the Unit Owners would have every reason to believe those allegations to be true. Their main source of information for the recipients of the letter was Court dockets and Victor spent years creating a false narrative in fillings accusing Plaintiff of extortion, perjury and a litany of other criminal acts.

16. A search of the dockets would result in long explanations of Victor's accusations of criminal acts that explained how Plaintiff "went to extraordinary and illegal lengths to

secure leverage over him[Victor]" as part of a complex and illegal extortion attempt. These allegations made clear that when Victor made his claims of extortion they were not mere hyperbole. It was not an instance of Victor giving an opinion that Plaintiff was engaged in meritless litigation. It was targeted to convince the readers that Plaintiff was a criminal trying to extort Victor.

17. Victor was aware that Erdman had submitted a series of sworn Affidavits in the State Actions and others that stated under oath that he was employed by MPC. Victor would know yet again, the readers of the docket would find those statements and believe them to be perjurious after receiving his letter that very clearly stated that those statements were lies. As President of the Board Victor would appear to be authoritative on the subject.

18. As a result of the defamatory letter and follow up statements, Plaintiff's opportunity to settle claims with MPC has effectively been destroyed along with his reputation.

19. This action seeks redress for defamatory statements made by Adam Victor.

## PARTIES

20. Plaintiff Tyler Erdman is an individual residing in and a citizen of the State of Connecticut.

21. Defendant Adam H. Victor is an individual who resides in this District and is a citizen of the State of New York.

## JURISDICTION AND VENUE

22. This action is within the Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiff and Defendant and the

amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

23. Defendant is subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 with proper venue pursuant to 28 U.S.C. § 1391 as the defendant is a resident of this district and the events giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

## VICTOR'S DOMINATION OF MPC

24. Adam Victor had been the President of the Board of Managers of Manhattan Place Condominium for decades.

25. After gaining power, he conspired with his hand-picked managing agent to prevent elections from occurring by making it near-impossible for Unit Owners to achieve a quorum. In the absence of elections Victor had the power to appoint his own loyalists to the Board so that he went unchecked.

26. In the aftermath of Hurricane Sandy, Victor used his near-dictatorial control of MPC to loot it and its insurance companies in a variety of ways:

　　a. Victor directed MPC to employ his own companies' employees and associates, including Plaintiff. Victor instructed his various employees to do certain minor tasks for MPC. Victor then told them that he would no longer be paying them. They were instead told to bill MPC for the work they performed, the bulk of which was for Victor or his companies.

　　b. Victor's former au pair was hired as an interior designer and received approximately $84,000.

c. An employee who was on the payroll of Victor's defunct power plant, delivered sand bags before Hurricane Sandy. He received $42,068.26..

d. Victor's right-hand man, a resident of Florida was put in charge of managing construction in New York while he received $7,500 per month plus expenses. He charged MPC for travel costs, coming to New York when he would need to be there for Victor's business activities.

e. MPC Managing Agent testified that he believed Victor was submitting fraudulent expenses as a way to remunerate himself for work he had done as an unpaid Board member. .

f. Victor's company, Gas Alternative Systems received payments totaling at least $32,842.98, claiming expenses such as car service fees, and the cost of printer ink and steak dinners.

g. Those amounts included charges for employee time, include "overtime" in the amount of Khatskevich's rent payment which Victor would normally make. Victor also claimed over ten thousand dollars in car service fees, allegedly incurred by her and other Victor associates during their work for the Condo.

h. Upon information and belief MPC then billed its insurance company for a portion of the amounts paid to Victor's employees as well as Victor's fraudulent expenses. The balance was borne by MPC's unit owners.

## VICTOR HIDES THE SUITS AGAINST MPC

27. Victor did his best to hide the State Actions from both MPC's Board and Unit Owners, by having his own personal attorneys represent MPC for years and report solely to him. This plan was largely successful from 2014 to 2019.

28. In early 2015, MPC's auditors were reviewing financial statements, and contacted the attorneys representing MPC in the State Action, Davidoff Hutcher and Citron ("DHC") to explain legal bills.

29. DHC responded to the Auditors with a March 26, 2015 Letter that explained the State Actions and stating the Victor has been and will continue to indemnify MPC:

> Adam Victor has been paying the legal bills associated with that case and will continue to do so. There is no loss contingency for the Company since Mr. Victor has agreed to indemnify the Company for any and all legal fees or losses.

30. Upon information and belief MPC never received a written indemnification agreement.

31. A copy of that letter was sent to MPC's treasurer at the time, Joe Carrulo. This enraged Victor who had wanted any conversations between auditors and DHC to be kept hidden from other Board members. Victor stated:

> The auditor was an idiot for sending Larry's letter to Joe Carullo. Carullo, who always complains and fights about legal fees as you know is immediately going to accuse me of having my matter paid by the building - no matter what Larry's letter says. I cannot believe this junior auditor sent the letter to anyone but Larry.

32. Upon information and belief this was the first notification that a Board Member received that indicated MPC's involvement in the State Actions.

33. Victor was asked about the State Actions at a Board meeting. He convinced the Board that the State Actions were part of an extortion attempt against him, that MPC was only tangentially involved, and they shouldn't worry because he was not only leading the defense but paying for it. Assured of indemnification the Board paid no further attention.

34. With most litigations the Board minutes would reflect regular conversations and decision making. However, Victor had control of what information was put into Board meeting minutes, and he used that to ensure that no record of that conversation

35. Later in 2015 a flyer was distributed by an unknown party to Unit Owners at MPC quoting a New York Post article about the State Actions and stating that Victor was incompetent and should be removed from the Board.

36. Since this mailing jeopardized Victor's control of information to Unit Owners, he instructed MPC staff to open Unit Owner's mailboxes and steal the flyers and deliver them to him. Victor testified that he did this so that he could search for Plaintiff's fingerprints.

37. Victor then began to make allegations that this mailing was somehow part of an extortion plot engineered by Plaintiff.

38. Upon information and belief, the Board had no other discussions about the State Actions until June of 2016, when Khatskevich moved for contempt against MPC and the motion papers were mailed to them.

39. Victor yet again instructed MPC staff to intercept the envelopes from the other Board members' mailboxes and give them to him in an effort to keep his colleagues in the dark.

40. Upon information and belief this effort was only partially successful, with at least one Board member receiving the papers.

41. Victor's attorney then sent June 15, 2016 in an email titled "Information about lawsuits against Adam Victor":

> I am writing to you because you received packages directly from a lawyer who claims to be suing Manhattan Place Condominium. Adam Victor was sued two and a half years ago in state court by Yevgeniya Khatskevich and Tyler Erdman...Nevertheless, because the Mr. Victor is the president of the Board of MPC, Mr. Victor agreed to pay all of MPC's legal bills arising from these lawsuits and agreed to indemnify MPC for any and all liability in these cases.

42. This communication was meant to mislead the Board into thinking that MPC wasn't an actual party to the lawsuit by stating that the lawyers litigating the State Actions only "claims to be suing Manhattan Place Condominium" and that it was really information about "lawsuits against Adam Victor".

43. Victor was yet again successful in framing the lawsuits as only relating to himself rather than MPC and placating the Board.

44. Since the rest of the Board was silent, Victor was able to influence financial reports to omit reference to the State Actions in order to keep Unit Owners unaware.

45. Upon information and belief the 2014 report included an explanation of Victor's indemnification since DHC was forced to disclose it to them at the time. It was omitted from reports thereafter until 2018.

46. Around that time Victor decided to report these years-old claims to MPC's insurance company to have them pay for his legal expenditures. As a result the auditors were no longer able to ignore the various actions pending against MPC.

## UNIT OWNERS DISCOVER VICTOR'S MISCONDUCT

47. As a result of Victor's secrecy, Unit Owners had few ways to find accurate information.

48. In or around March 2019 Unit Owners had begun to petition the Board to remove Victor due to what they perceived to be his discrimination against various staff members.

49. That led Unit Owners find that Victor was embroiled in a sexual harassment and discrimination suits against brought by his former employees.

50. This came as a surprise to them since they had never been told about those allegations against Victor and they only happened to find them because of a chance search of a Court docket.

51. Even more surprising to them was learning that there were multiple actions. Shortly after finding one action, they discovered the two actions involving Plaintiff and Khatskevich that not only contained similar allegations, but that MPC had been a party to them for around five years.

52. In 2019, Unit Owners' tried to get information about the State Actions from MPC's records but were stymied by Victor dictatorial control of MPC.

53. During the efforts to oust Victor from the Board, he unilaterally hired his own attorneys to be MPC's "house counsel".

54. With Unit Owners only being able to find information on Courts' dockets, they requested to review records relating to the allegations against Victor, MPC's new house counsel instructed the managing agent to refuse their request.

55. Victor instructed the resident manager, James Kellogg, and Superintendent, Greg DeJong, to remove relevant documents from MPC's files, destroying documents in the event someone came looking.

56. Unit Owners who persisted were met with escalating threats. Victor started with cease and desist notices. If that was not sufficient deterrence he followed with subpoenas and filing suits against them.

57. In the information vacuum Victor created, Unit Owners found themselves fighting for every scrap of information they could find.

58. Just in regards to Victor's indemnification agreement they would find information saying he never offered it, then another a letter would say that he, the next would say insurance was paying, followed by a lawsuit brought by Victor claiming no one is paying and MPC should indemnify him.

59. Being unable to find any information that wasn't somehow disputed somewhere along the grapevine, Unit Owners were not able to determine fact from fiction. Even Victor's felony conviction and house arrest inside MPC became a contested fact despite it being right on the Department of Justice's webpage.

60. Victor resisted Unit Owners pressure to resign, suing the Board to stop a vote to remove him as President. Victor's attorneys acting as MPC's "house counsel" appeared to defend MPC against another one of Victor's attorneys.

61. When that failed, Victor held a Board meeting on April 15, 2019 where he offered to voluntarily leave office. Victor's counsel (who also represented MPC at the time) explained that among other things Victor demanded that he be permitted to keep a storage room he had given himself, that he would need to retain "control" over the State Actions, and that he would only indemnify MPC as long as their insurance coverage was not voided. The Board did not agree to his terms and an election was organized.

62. Realizing that his tenure was coming to an end, on April 18th, 2019 Victor moved to have the Plaintiff enjoined from having contact with the Board or MPC unit owners. On May 23rd, 2019 Victor got an order banning the Plaintiff from communicating with the Board about the State Actions.

**THE LETTER**

63. With MPC unable to find information or even ask Plaintiff, Victor circulated a Letter (the "MPC Letter")  on or around May 31st, to the hundreds of Unit Owners, which he signed as a member of the Board.

64. That Letter stated:

Additionally, I have been accused of using building funds to defend two lawsuits against me, my companies, and MPC, by two people--boyfriend and girlfriend--both falsely claiming to have been "employees" of MPC in 2012-2013. Neither were ever employees of MPC. MPC was named in these lawsuits as an extortionate money grab. Nonetheless, while I was President, I have funded 100% of the costs of defending these lawsuits. Our Independent Audits have shown that, while I have been President, MPC has never paid any legal fees for these or any other lawsuits I have been involved in.

65. The "boyfriend" and "girlfriend" referred to are Plaintiff and Khatskevich.

66. The MPC Letter falsely stated that Plaintiff has been engaging in extortionate conduct.

67. The MPC Letter also falsely stated that Plaintiff had falsely claimed to be an employee of MPC -- statements Plaintiff had made in sworn affidavits.

68. Victor made these statements to unit owners with malice knowing full well they were false and distributed to express Victor's ill will towards Plaintiff.

69. By Victor's design, recipients of the Letter were unable to find information regarding the State Actions and the claims made by Victor.

70. Unit Owners would have every reason to believe it was factual since correspondence from the Board to Unit Owners was a rare event. When such correspondence was sent it would be factual such as a financial report or other similar information. Since Victor was the President of MPC for approximately two decades, a letter from him would be assumed to be similar to one from the Board.

71. The MPC Letter portrayed itself to be a factual summary of issues involving MPC, going issue by issue to explain specific details and give an accounting related to them.

72. The tone of the MPC Letter was that of a factual explanation of Victor's tenure on the Board. To a reasonable reader it would appear to be a dry and calm explanation of issues devoid of fiery rhetoric or hyperbole.

73. The MPC Letter further clarified that it should be taken as fact rather than opinion: "People are entitled to their own opinions about me - but they are not entitled to their own facts."

74. Victor also stated in the Letter that he "funded 100% of the costs of defending these lawsuits" and stated that Independent Audits have shown that while he was President, MPC had never paid legal fees for the State Actions.

75. As with the other claims made, a reader would have no reason to doubt them. They are led to believe that Victor's statements would not only be truthful but they would be based on undisclosed information such as information gathered by auditors.

76. They would not know that Victor controlled the audits, or that by stating MPC never paid legal fees it was because their insurance company was.

77. While Victor did his best to eliminate any sources of information, he couldn't control information publicly filed in Court.

78. Knowing that Unit Owners believed Court documents would inherently be more reliable and truthful than statements made outside of proceedings, he sought to fill the docket with claims of extortion and other wild allegations about Plaintiff.

79. Victor's statement that Plaintiff was engaged in an "extortionate money grab" and that he had been "falsely claiming to have been "employees" of MPC in 2012-2013" were meant to be taken as a factual statements and were be supported by those same claims Victor had made in several actions as part of his malicious campaign to attack Plaintiff.

80. One such statement explained that Plaintiff's actions to extort and perjure himself "went to extraordinary and illegal lengths to secure leverage over him." These statements make clear that Victor fully meant readers to view "extortionate money grab" as a well-defined

fact backed up by extensive criminal conduct, and that perjury was just another part of Plaintiff's plan.

81. A casual reader of the docket would see claims that Plaintiff was hell bent on extortion who has trespassed, hacked into computer systems, stolen, manipulated evidence, and perjured himself to do so.

## **MENTIONS OF EXTORTION**

82. Victor engaged in a years-long malicious campaign to spread false claims of Plaintiff being engaged in extortion and perjury that could later be weaponized to mislead Unit Owner and others into thinking Plaintiff was everything from a criminal mastermind to his "mildly autistic" adopted son.

83. He warned one of Plaintiff's coworkers how the judicial privilege could be used to make normally defamatory allegations privileged and then could then be spread outside of the Courtroom to damage his adversaries.

84. When she too brought suit against Victor for discrimination and sexual harassment, he implemented that plan by including allegations of prostitution while answering her complaint. The Court found it so blatant that he was forced to remove them and reanswer.

85. While arguing to keep those allegations, Victor's attorney said the quiet part out loud:

> It's directly relevant. And it's also necessary to be in the answer because there's a person named Tyler Erdman who you know who he is - we call him a computer hacker - and he has been trying to solicit media attention to this case. Mr. Victor has been called by different media outlets and different journalists are saying Tyler Erdman is contacting them. So we need something in the public record to diffuse the allegations and their allegations aren't the only ones out there.

86. Victor knew that Plaintiff was not who he alleged him to be. Even avoiding accusations in Court claiming we "call him" a computer hacker rather than saying that he is.

87. Victor's blatant statement that his false allegations were merely meant to counter Plaintiff could not make this his plan clearer.

88. From the outset of the State Actions, Victor made sure the docket was littered with stories of Plaintiff's supposed criminal activity. Victor made sure to outline all the steps that made Plaintiff's extortion not only illegal but supported by Victor's "facts."

89. Victor's stories were always in flux, claiming Plaintiff was extorting him as part of a get rich quick scheme, or because Victor wouldn't let him date his daughter, or because Victor stopped financing a business project.

90. In one filing in the State Actions Victor claimed Plaintiff had stolen and helped others to steal information from him in order to extort him.

> The information stolen by Defendant is extremely sensitive and valuable and would cause Plaintiffs severe irreparable harm if disclosed. This business information is being held by Defendant as part of her effort to extort an unwarranted settlement in the Related Lawsuit.

91. Victor had filed a lawsuit against Plaintiff in Delaware in an attempt to force him to retain local counsel. It claimed that Plaintiff had defamed Victor as part of an "extortion scheme" that caused Victor's lenders to increase the interest rates he was charged for loans related to his Gulfstream jets. It was voluntarily withdrawn after a motion to dismiss was filed.

92. The 16-page complaint mentioned extortion 15 times despite extortion not being a cause of action.

93. The lawsuit claimed that:

   a. Plaintiff was engaged in an "extortion scheme".

b. Plaintiff "performed sporadic services for Plaintiffs, which is where Erdman [and Victor's other employees] met and arranged for their plot to extort Adam Victor"

c. That Plaintiff had assisted a coworker to secretly record Mr. Victor so that she could use the recordings so that she "could also use to later extort Mr. Victor."

d. Plaintiff was involved in Khatskevich's effort and "made an extortionate demand to be paid $3 million or else Ms. Khatskevich would sue Mr. Victor for sexual harassment and use her secret recordings to destroy his family."

e. "Mr. Erdman also either assisted or directed Ms. Khatskevich to copy thousands more of Mr. Victor's private and confidential electronic files onto flash drives in the 3 days before Mr. Khatskevich decided she had enough materials to extort Mr. Victor with and quit".

94. In a different lawsuit brought by Victor against Khatskevich in the District of Columbia, he claimed that he was defamed by a letter that she had written to the Judge presiding over his sentencing for a felony. In it she explained how Victor's actions had affected her.

95. Despite Plaintiff not being a party to the D.C. action, Victor's complaint went into extensive detail about Plaintiff's alleged extortion attempts:

a. "Dissatisfied with Mr. Victor's decision to stop funding his pet project, Erdman convinced Khatskevich to embark on a scheme to gather evidence against Mr. Victor and seek retribution. They met with a former attorney of Mr. Victor's entities and a friend of Erdman's...the three discussed how they could seize on Khatskevich's crass relationship with Mr. Victor to extort him into a quick and quiet payment. They began to surreptitiously gather and steal substantial and

meaningful evidence against Mr. Victor in furtherance of their scheme to extort him with a hostile work environment lawsuit that Khatskevich would bring."

    b. "Khatskevich and Erdman -- guided by Mr. Victor's former, then suspended attorney -- went to extraordinary and illegal lengths to secure leverage over him."

    c. "In October 2013, once Khatskevich and Erdman were satisfied that they had recorded and stolen enough leverage over Mr. Victor to extort him into a substantial payment...That lawsuit which relied heavily on the secret recordings that Khatskevich had manufactured --- was an attempt to secure a quick and quiet payment from Mr. Victor that would lead [them] to riches."

    d. "With their extortion scheme facing a roadblock, [they] doubled down."

    e. "When he learned of Erdman's illegal conduct, Mr. Victor promptly shut the project down."

96. Victor's legal filings could not be construed as hyperbole, but alleged explicit illegal conduct, e.g. asserting Plaintiff "went to extraordinary and illegal lengths to secure leverage over him." and describing in detail the illegal acts Plaintiff allegedly undertook in order to effectuate his extortion attempt.

97. In response to the FEC complaint Plaintiff filed, Victor accused Plaintiff of multiple crimes including trespassing, "hacking" and theft knowing that the response would be posted on the FEC's website and easily discovered by Unit Owners and others.

98. In his response Victor came up with a new story explaining that:

> The complaints are embedded within a much larger context...That all changed several years ago when Mr. Victor refused to let Complainant date his daughter. Since then, Mr. Erdman broke into Mr. Victor's apartment, hacked his computer and copied thousands of files and emails from his computer without permission. Adam Victor has been battling in New York state court for almost two years concerning Mr. Erdman's theft of his computer files.

17

99. Since Khatskevich wasn't relevant to that complaint, Victor's story shifted. Instead of Plaintiff being engaged in an extortionate plot because of his romance with a coworker, he instead committed criminal acts in revenge for not being allowed the privilege of dating Victor's daughter.

100.　　　Ultimately, the FEC found Victor violated campaign finance laws and Victor pled guilty after the Department Of Justice brought criminal charges against him.

101.　　　At a deposition in the State Actions, Victor couldn't miss the opportunity to go after Plaintiff, accusing him of being "mildly autistic," a "sexual pervert," that his eyes made him resemble the "Parkland killer," as well as accusing Plaintiff of lying in Court filings and manipulating evidence.

> And so you know, Mr Erdman has put in several affidavits in this case. And it's amazing how you started off this deposition yesterday reminding me about perjury. Let's see if you remind your client that when he has his depositions.

102.　　　Victor made sure the record reflected the reality that he wanted to present to Unit Owners even beyond its relationship to Plaintiff. Testifying among other things that he never agreed to indemnify MPC and that his former lawyer's letter was a lie if it claimed that he did, despite emails clearly proving that he knew of and authorized it.

### **VICTOR'S DISHONESTY BEFORE COURTS**

103.　　　Victor was known to be inclined to litigate any issue in front of him and recommend anyone around him did the same. He is also a litigation enthusiast. Searches of court websites show 18 actions involving him listed in New York Supreme Court, state actions in at least California, Delaware, the District of Columbia, and Indiana. At the Federal level there are at least 5 cases excluding this one, and one Federal criminal case.

104.     Victor's frequent use of the Court systems and disregard for the truth helped him to implement his malicious plan to defame Plaintiff. However, his dishonesty has not gone unnoticed by the Courts.

105.     Victor and MPC were recently engaged in litigation over a storage room that Victor claimed he had a lease for. MPC claimed there was no such lease and that Victor had taken it as a perk for himself as he "dominated" the Board. When Victor was asked to produce it he said he didn't have a copy and a hurricane likely destroyed MPCs copy of it. The Judge ruled against Victor stating that his affidavit was not only self-serving but "incredible".

106.     During the FEC investigation into Victor's political contributions, Victor's daughter contacted Plaintiff to explain that her and her family were being financially and physically threatened by Victor as he attempted to force them to let his lawyer represent them and sign whatever statements Victor put in front of them.

107.     Victor did similarly with his employees, having them lie to the FEC in an attempt to discredit Plaintiff's well founded allegations. They submitted sworn statements claiming that reimbursement checks they received were for their retirement accounts or other personal purposes rather than the matching amounts they had all given to politicians that Victor had relationships with. The FEC did not find their stories to be credible.

108.     The FEC issued a report about the false affidavits Victor solicited:

> Respondents offer a variety of explanations for the remarkable coincidences in time and amount between the transfers they received and the contributions they purposely made. But those explanations do not seem nearly as likely as a much simpler one: Victor gave them money for the purpose of making political contributions. Tellingly, none of the alleged conduits swear that they made contributions with their own money.

109.     Ultimately when the FEC voted to issue subpoenas and FBI investigators

interviewed those involved, Victor recanted his testimony (and theirs) and pled guilty. In

the time since he has claimed that he was not guilty of what he admitted to doing but only

did so because of pressure from the investigators.

110.     In California Victor was involved in Litigation involving two of his Gulfstream

jets. Earlier in the case Victor was accused of attempting to bribe a witness to give useful

testimony, which he blamed on his lawyer going rogue. After years of Victor's ever

change story the Judge wrote a scathing decision which excoriated Victor's credibility,

specifically Victor's tendency to change his story every time he tells it:

> Mr. Victor is a convicted felon. While there was considerable evidence about other litigation filed by Mr. Victor prior to and after the current litigation, the court did not permit much in the way of detail about these lawsuits, finding them peripheral. However, certain statements made by Mr. Victor in those actions impair his credibility in this case...The court finds his declaration to be an example of his willingness to present false testimony under oath. Mr. Victor also admitted that the position he took earlier in this litigation--under oath-- that he had not agreed to pay 13.5% commissions was neither true nor fair...The court found this testimony to lack credibility...The court finds Mr. Victor's claim at trial that he could not understand the credit memo to be greatly exaggerated in an effort to bolster his portrayal of himself as the unsophisticated mark who was taken advantage of by Mr. Prero.

111.     Victor's shameless ability to lie to Courts about Plaintiff has been driven by an

almost the highest degree of malice only made possible by Victor's significant wealth,

influence.


### VICTOR TRIED TO MAKE HIS ALLEGATIONS CREDIBLE

112.     Unhappy with merely poisoning the docket with his false allegations about

Plaintiff, he tried every way he could to convince law enforcement to target Plaintiff.

Victor retained computer forensic firms and private investigators going as far as to look for fingerprints on envelopes and surveilling Plaintiff's house.

113.     Victor went on to try and convince anyone who would listen that they should target Plaintiff. The NYPD, local district attorneys, ICE and the Department of Justice all declined his requests.

114.     Victor's lawyer explained to Plaintiff that Victor's strategy was effectively the pot calling the kettle black and that "I was constantly warning him [Victor] about extortion laws. … He [Victor] said something like the best way to beat a civil case is to make it criminal."

115.     Victor cultivated contacts with government officials and various agencies over the years. He would be sure to inform people of these connections. Whether it be by being sure Khatskevich heard him on phone calls with Senator Manchin's office regarding her immigration status or his website that proudly displays Victor at events with President Obama as well as other dignitaries around the world.

116.     Victor told his employees that Khatskevich would be scarred for life by law enforcement if she would not return to work for him:

> They're putting people in jail and they're basically strip-searching them. They'll have people coming in multiple times opening up her vagina. You think about that. I think the mentality of an India woman is very similar to that of a Kazakhstan girl. She has that scar for life.  I think that's worse than rape, because it was sanctioned by society.  Which means you don't know, it can happen any time. You can be arrested...They don't only search for the vagina but they put their thing in the asshole, also. And make you open your mouth, it's totally humiliating.

117.     He fixated on the topic raising it on multiple occasions:

> The refugee [Khatskevich] could have problems … They'll strip search her.  She's worried about me seeing her naked, wait until they basically put their fingers up her ass. … They go, they take everything off, and they basically for guys, they put their

fingers up your ass. For women they put their fingers up your ass and they basically put their fingers in your pussy. Every time you're arrested. … She's a good looking girl. They'll enjoy stripping her.

118.      Victor attempted to interest the NYPD by befriending a detective, Richard Bradish whom he would take to dinner and offer Yankee season tickets. Victor had Bradish attempt to make a case against Erdman and others, even showing up in Court to try and talk to the Judge about his investigation.

119.      Victor also attempted to interest law enforcement in his invented claims of theft by intermingling secretive "national security issues" so he could try to give his claims some trumped-up significance and more credibility.

120.      Victor wrote to an ICE agent seeking to prosecute Erdman and deport Khatskevich, claiming that Plaintiff "assisted her [Khatskevich] in the theft of files, and that further "Ms. Khatskevich has caused a serious breach on a national security concerns".

121.      Victor also contacted the DOJ telling them that he was served with a "slap lawsuit" and "The lawsuit contains totally false information, which I am frankly not concerned about - except for one section. In that section, it details activity that affects National Security. We moved in Court to have my answers Sealed. The Judge refused to so, without some government input...None came."

122.      Unhappy with just telling the DOJ Plaintiff filed false claims, he continued to accuse Plaintiff of more criminal conduct:

> in this day of increasing vigilance against Cyber Crime, the theft of my computer files by Mr. Erdman and Ms. Khatskevich need to be addressed...Third, why is a now illegal alien, who has hurt our national security and stolen computer files, still in this country, when she has shown her contempt for both its law and national security interests?

123.    Victor also went to the district attorneys with similar goals:

> The last time we talked you indicated that you didn't think a crime was committed by Mr. Tyler Erdman, nor Ms Yevgeniya Khatskevich, both of whom has stolen over 2700 of my computer/server files, because they had not provided them to Third parties...but for a sinister breach of National Security. The National Security issue may be a Federal issue…

124.    Faced with the stark reality that the Government didn't believe Plaintiff committed any crimes, Victor then contacted Government officials seeking a specific law to be passed to target Plaintiff:

> If you still truly believe that this is not a violation of New York State law, I ask that you use your best efforts to work with the legislative leaders of both Houses and both Parties of the New York State Legislature, as well  the Attorney General of the State of New York - and urgently have them enact Legislation that clearly defines what has happened as a crime in New York.

## **DEFENDANT'S MALICE**

125.    Victor obsessed over Khatskevich, a Kazakhstani immigrant. He constantly tried to convince her to have a sexual relationship with him.

126.    Victor fired Claudette, the family's nanny who was like a second mother to his children after she spoke ill of Khatskevich.

127.    Victor told Khatskevich he would leave his wife if that would convince her to have a relationship with him. He would even tell his employees that: "I was prepared to leave my wife for Eve" before going on to detail his fantasy.

128.    Victor's obsession was so overwhelming, his son testified that he cut off contact with his father in fear of his behavior because he "mentioned her one too many times".

129.    Victor had gotten Khatskevich an H1-B visa, so that he could leverage her immigration status, threatening that he would cancel it if she did not obey him.

130.    Victor attempted to convince her that his conduct was typical of American workplaces.

131.    He plainly explained what he wanted from Khatskevich:

> I wanted a deal where she'd basically be my mistress. I think she told you that, I told you that, what have you. And then when that didn't work, I said, 'Let's try, will you work with me, ok.'...I just couldn't do it. I just needed to see her naked, I needed to try to basically seduce her. I could not be with her without being sexual. It became too difficult. That's why when I saw her, you know, naked, that's why I would tease her all the time, I just couldn't do it. If there was, if we basically were sleeping with each other, Eve would still be here, with the same fucking job, running the same hours. It was all about sex, OK? It was all about sex. If I had that or she was able to do it, she'd be happy, she'd be here with a job, she'd be on a career, she'd be doing all this type of stuff.

132.    As he himself described his obsession:

> I thought I could have a relationship with Eve where it was strictly professional where she worked, where it would not be sexual, ok. But she was too pretty for me, ok. She was just too pretty, and I never got over my desire to basically have sex with her. And I teased her, and I was hoping, I hoped that if I went over and I went over and I saw her naked that she'd freeze, and I'd come over and I fantasized that I would kiss her and that I would start stuff, and that she'd melt and seduce and we'd have, and we'd make love and what have you. That was my fantasy. That's why I did it, ok. And so, I was too weak.

133.    Victor explained that since he was paying Khatskevich for her work that she should not have sex with anyone other than himself:

> There's probably 100 million women in the world that would have sex with me every day in exchange for paying $80,000. I mean, it's just a fact and you know that's true.

> Like I said to Eve [Khatskevich] before, I don't want some guy getting free vagina. And that's not unfair and not unreasonable. And you know I was serious...You know, maybe if you were saying "Adam, I wanna have sex with you 3 days a week, but I need to have sex with someone else the 4th day", maybe I'd say OK.

134.    When Victor learned of Khatskevich and Plaintiff's relationship, he interrogated Plaintiff seeking intimate details. He made no efforts to hide his jealousy and disdain of Plaintiff.

135.    In Victor's view, Plaintiff had been disloyal to him. Victor told Plaintiff's

coworkers that this disloyalty was why he wanted to go after him.

136.    Victor opined that Khatskevich's interest in Plaintiff was so that she could obtain

a green card, complaining "If she's going to sleep with a guy she doesn't like, why didn't

she sleep with me?"

137.    In another instance he jealousy remarked, "In my view, she could've found so

much more of a man than Tyler … He's ugly, he's a goofball...too young"

138.    Victor was so fixated on Plaintiff he would go on to speculate about the condition

and operation of Plaintiff's genitals to one of his employees.

139.    Victor outlined his plan to maliciously attack Plaintiff for his disloyalty.

Explaining that he planned to make false allegations against him and Khatskevich.

140.    Victor's plan was to portray both Khatskevich and Plaintiff as a criminals,

pondering out loud how he would make "all types'" of claims against Plaintiff, such as

theft which he would go on to allege was part of an extortionate plot Plaintiff engaged in,

adding that he was even not sure Plaintiff had done what he was accusing him of.

141.    Plaintiff's coworker recorded his plan:

> What Tyler doesn't realize is that I'm gonna sue him for aiding and abetting, for
> breaking into my computer, um, for all types of things, and so he's gonna be sued.
> So he's gonna have to spend, you know, a hundred thousand dollars in legal fees to
> defend himself. And I'm gonna sue him for my reputation - a hundred million
> dollars.

142.    His plan also included Khatskevich, whom he explained that he would falsely

accuse of prostitution.

> [S]o now Tyler's parents are gonna say, 'What the fuck are you doing, Tyler? You're
> making us give you money, you stand in exposure of basically getting a judgment
> against you that bankrupts you, because you have to declare personal bankruptcy,

for a woman who was a prostitute.' **We know she wasn't a prostitute, but this is gonna be war.**  And so, I think that Tyler's parents are gonna cut him off, throw him out of the house where Eve is, and say, 'Either get rid of the girl, or we're basically kicking you out of your uncle's apartment.' So, I think what's gonna happen, Tyler's gonna lose the apartment, unless he dumps Eve, unless he cuts off - because that's the only way we're gonna basically settle with Tyler. We're gonna basically say 'we'll settle with you if you throw her out.' And so she's gonna be, so she's not gonna have any place to stay then.

143.     Victor justified his plan explaining how if he made false statements they would be justifiable because "this is gonna be war".

144.     Victor's malicious plan took place over years, as he planned false allegations in Court documents everywhere he could, regardless of the relevance.

145.     Victor knew that his statements were false but persisted to ensure any reader of dockets relating to him would be riddled with his falsehoods.  "So we need something in the public record to diffuse the allegations and their allegations aren't the only ones out there."

146.     When Victor was facing his removal from MPC's Board, he leveraged his efforts to mislead the recipients of the MPC Letter he sent accusing Plaintiff of defamation and perjury.

147.     As he designed the only information that could be accessed would paint Plaintiff as a criminal.

148.     Victor knew that his letter was riddled with other falsehoods such as "I have funded 100% of the costs of defending these lawsuits." When asked to testify on that phrase, he explained that MPC's insurance company was paying:

Manhattan Place was basically -- had an  insurance policy that all unit owners funded, and that fund -- that funding, which costs  unit owners no additional money, was being used to pay for attorneys. So I stand by that statement.

149.     The statement is simply untrue and Victor knew full well that it was since he would know exactly who was paying his own attorneys.

150.     Despite the letter stating that "People are entitled to their own opinions about me - but they are not entitled to their own facts." it was filled with statements Victor knew to be false and maliciously included to defame Plaintiff.

151.     Victor's plan against Plaintiff, while detailed, did not envision an end but rather a continuing effort against him until Victor got bored of it. Victor explained that even if he was to settle with Khatskevich, he would turn around and sue her again to make her spend any money she received. Plaintiff however was in a class of his own. Victor explained that he would never settle with Plaintiff, he wanted to make him suffer.

152.     Victor did not want money from Plaintiff, he even told others that he knew he didn't have any. He didn't want to settle with Plaintiff, he moved for sanctions when Plaintiff even made an attempt to settle.. He just wanted to express his ill will by maliciously defaming Plaintiff.


### FIRST CAUSE OF ACTION (Defamation - New York common law)

153.     Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

154.      Victor sent the MPC Letter  to more than 400 MPC unit owners falsely claiming that Plaintiff:

    a.   Falsely claimed to be an MPC employee when he made sworn statements in a proceeding  (a predicate for Plaintiff's action against MPC under the New York City Human Rights Law)

      b.   Commenced suit against Victor and MPC as part of "an extortionate money grab."

155.     Victor made these statements after a years-long campaign to plant false allegations in Court documents, then deprived the recipients of any information to the contrary so that his statements would be taken as truthful descriptions of crimes committed by Plaintiff.

156.     Victor made these false allegations with actual malice. Victor knew Plaintiff worked for MPC as he did so at Victor's own direction.

157.     Similarly, Victor was aware that his detailed accounts of extortion were fabricated and would give credibility to his claim that Plaintiff was engaged in an "extortionate money grab".

158.     Victor's statements qualify as defamation *per se* in that they state Erdman was involved in a crime.

159.     Since Victor's statements constitute defamation *per se*, special damages are not required.

160.     Moreover, Erdman has suffered and will continue to suffer damages as a result of harm to his reputation as a result of Victor's defamatory statements.

161.     By reason of the foregoing, Plaintiff is entitled to an amount of damages in excess of $75,000 in an amount to be determined.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

I.    On the first and sole cause of action for actual damages in an amount to be determined at trial, but not less than $75,000;

II.   Requiring Defendant to pay punitive damages on the first and sole cause of action;

III.  For such other and further relief as the Court deems appropriate, together with reasonable costs and disbursements of this action.

Dated: August 18, 2021

/s/ Tyler I. Erdman
Tyler I. Erdman
Telephone: (917) 301-0401
Email: tyler@erdman.it
20 Old Farm Road
Weston, CT 06883
*Plaintiff Pro Se*
