**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TYLER ERDMAN,

*Plaintiff,*                               Case No. 20-cv-4162

v.                               Hon. Lorna G. Schofield

ADAM VICTOR

*Defendant.*

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS AND TO STRIKE**

Tyler Erdman
20 Old Farm Road
Weston, CT 06883

*Plaintiff Pro Se*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

I.   STATEMENT OF FACTS .......................................................................................... 2

   A.   THE ORIGINS OF DEFENDANT'S CAMPAIGN AGAINST PLAINTIFF ........................ 2

   B.   VICTOR'S FALSE CLAIMS ................................................................................... 3

   C.   VICTOR'S EFFORTS TO PETETION LAW ENFORCEMENT ........................................ 4

   D.   COURTS HAVE FOUND VICTOR TO LACK OF CREDIBILITY .................................... 5

   E.   VICTOR HID THE STATE ACTIONS FROM MPC ..................................................... 6

   F.   THE DEFMATORY LETTER .................................................................................. 6

II.  ARGUMENT ............................................................................................................... 7

   A.   STANDARD GOVERNING THE MOTION .............................................................. 7

   B.   PLAINTIFF'S DEFAMATION CLAIM IS LEGALLY SUFFICIENT ................................. 8

   C.   DEFENDANT ALLEGED SERIOUS CRIMES ........................................................... 9

   D.   MALICE VOIDS THE COMMON INTEREST PRIVILEGE ........................................... 12

   E.   § 74 OFFERS NO PROTECTION TO FABRICATED ALLEGATIONS ............................ 13

   F.   THE STATEMENTS MADE WERE NO OPINION OR EPITHETS ................................... 19

     1.   OPINONS CAN BE IDENTIFIED BY THEIR CONTEXT ........................................ 19

     2.   VICTOR'S STATEMENTS WERE NOT OPINIONS OR EPITHETS ........................... 22

III.  DEFENDANT'S MOTION TO STRIKE SHOULD BE DENIED ............................ 24

IV.   IN THE ALTERNATIVE, PLAINTIFF SHOLD BE ALLOWED TO REPLEAD. 25

V.   CONCLUSION ........................................................................................................... 25

**Cases**

Abkco Music, Inc., 2016 WL 2642224.................................................................................. 18

*Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123 (2d Cir. 2009) ......................................... 7

*Armstrong v. Simon Schuster*, 85 N.Y.2d 373, 380 (1995) ............................................................ 8

Barnet L. Liberman v. Gelstein 80 N.Y.2d 429 .............................................................................. 12

*Bell Atl. Corp. v. Twombly* (2007) ................................................................................................... 7

*Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 666–67  (S.D.N.Y. 1991)......... 9

*Coronel v. Quanta Capital Holdings Ltd.*, (S.D.N.Y. Jan. 26, 2009)................................................ 7

*Erickson v. Pardus*, 551 U.S 89, 94 (2007) .................................................................................... 8

*Estelle v. Gamble*, 429 U.S. 97 (1976) ............................................................................................ 8

*Flomenhaft v Finkelstein, 44 Misc. 3d 1215(A), 997 N.Y.S.2d 668 (Sup. Ct. NY County 2014)*. 16, 19

*Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F.Supp.2d 405, 411 (S.D.N.Y. 2009).................... 8

*Gilling v New York Post, 166 A.D.3d 584, 586 (2nd Dept. 2018)* .................................................. 18

*Giuffre v. Maxwell* 165 F.Supp.3d 147 (2016) ............................................................................ 19

*Good Gov't Group of Seal Beach, Inc. v. Superior Court*, 22 Cal. 3d 672, 682 (1978)................ 8

*James v. Gannett Co.*, 40 N.Y.2d 415, 418, 353 N.E.2d 834,  837 (1976) ................................... 8

*Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 605 N.E.2d 344, 348 (1992) ............................. 11, 12

*Melius v. Glacken, 94 A.D.3d 959, 959-60 (2d Dep't 2012)* ........................................................ 23

New York Times Co. v Sullivan, 376 U.S. 254, 280.................................................................... 12

Pecile v. Titan Capital Grp., LLC, 947 N.Y.S.2d ...................................................................... 23

*Sprewell v. NYP Holdings, Inc.*, 1 Misc. 3d 847, 850, 772 N.Y.S.2d 188, 192 (Sup. Ct. N.Y. Co. 2003) ................................................................................................................................ 9

*Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*, 146 A.D.2d 1, 4 (3d Dep't 1989)..................... 8

*Thai v. Cayre Group, Ltd. 726 F.Supp.2d 323, 329 (S.D.N.Y. 2010)* ........................................... 13

Thomas H. v Paul B., 2012 NY Slip Op 01318 [18 NY3d 580] .................................................. 22

*Thomas v. G2 FMV, LLC.*,2016 NY Slip Op. 30143(U) ....................................................... 14, 15

Trails W. v Wolff, 32 N.Y.2d 207, 219 ..................................................................................... 12

*Zappin v. NYP Holdings, Inc., 2018 WL 1474414 (S.D.N.Y. Mar., 26, 2018) aff'd, 769 F. App'x 5 (2d Cir.2019)*................................................................................................................... 18

## Statutes

*18 U.S.C. § 1030(c)(2)(C)*................................................................................................... 11

Fed. R. Civ. P. 12(b)(6).......................................................................................................... 7

Fed. R. Civ. P. 15(a) ............................................................................................................. 25

Local Civil Rule 7.2 ............................................................................................................... 24

N.Y. Civ. Right Law § 74 ...................................................................................................... 14

*New York Penal Code § 210.15* ........................................................................................... 11

New York Penal Law § 135.65................................................................................................ 10

New York Penal Law §140.20.................................................................................................. 10

Plaintiff Tyler Erdman ("Erdman") respectfully submits this memorandum of law in opposition to the motion filed by Defendant Adam Victor ("Victor"), along with the October 12, 2021, Declaration of Tyler Erdman ("Erdman Decl.") in support of his motion opposing Defendant's motion to dismiss the Second Amended Complaint ("SAC"). This memorandum also refers to the September 23, 2021, Declaration of Alfred Polizzotto (the "Polizzotto Dec."). A copy of the Second Amended Complaint is attached as Exhibit 1 to the Erdman Decl.

## PRELIMINARY STATEMENT

Plaintiff and his former girlfriend, Yevgenia Khatskevich ("Eve") have been embroiled in a series of litigations with the Defendant Adam Victor ("Victor") as well as his companies and Manhattan Place Condominium ("MPC") where he was the President of the Board of Managers.

Khatskevich, a Kazakhstani immigrant became the target of Victor's pervasive sexual abuse, harassment, and discrimination as he attempted to leverage her immigration status (SAC¶ 129). Plaintiff helped her to assert her rights under the New York Human Rights Law ("NYHRL") and sue Victor, his companies and MPC (SAC ¶ 6).

Victor developed a plan to strike back at them both (SAC ¶ 7), as he made false allegations in Court fillings to defame them. A trio of actions in State Court ("State Actions") formed as Victor sued Khatskevich and Plaintiff and another coworker also sued under the NYHRL. Since 2014, Victor churned through over half a dozen lawyers as he creates constant delay. Along the way, he has used every opportunity to allege a vast extortion plot engineered by Plaintiff (SAC ¶ 82) in both the state actions and others, creating a pervasive record of false claims against Plaintiff.

Since the beginning of the State Actions, Victor endeavored to hide their existence from his constituents at MPC (SAC ¶ 27). This plan was largely successful until Unit Owners discovered them in 2019 (SAC ¶ 51). Victor went on to distribute a May 31, 2019 Letter (the "Letter") where he defamed Plaintiff by calling him a liar and an extortionist (SAC ¶ 14). The Letter relied on the foundation of false claims to give it claims credibility. (SAC ¶ 15-17).

Defendant seeks to Dismiss the Second Amended Complaint using a near identical copy of his previous motion that does not account for the difference in pleadings and ignores the Court's June 16, 2021 Order (the "Order"). Defendant's assertions of privileges and claims of merely stating opinions are inapplicable. For those reasons, and the reasons that follow, Defendant's motion to dismiss should be denied in its entirety.

Additional, Defendant has moved to strike allegations of the SAC, again using a copy of their previous motion. They quote allegations that don't exist and describe paragraphs that bear no resemblance to what they purport to reference. Defendant can't move to strike allegations that do not match his arguments, as such the motion should be denied.

## I.      STATEMENT OF FACTS
### A.      THE ORIGINS OF DEFENDANT'S CAMPAIGN AGAINST PLAINTIFF

Plaintiff had worked for Victor, his companies and MPC (SAC ¶ 2) alongside Khatskevich. During that time, she was subjected to sexual assault, harassment, and a litany of other indignities. Victor explained "I wanted a deal where she'd basically be my mistress" (SAC ¶ 131), "She was just too pretty, and I never got over my desire to basically have sex with her" (SAC ¶ 132). After realizing she was dating Plaintiff (SAC ¶ 4) he complained "If she's gonna sleep with a guy she doesn't like [Erdman], why didn't she sleep with me?" (SAC ¶ 136).

2

With Plaintiff's support Khatskevich escaped Victor and sued under the New York Human Rights Law ("NYHRL") including Victor, his companies and MPC (SAC ¶ 6). Victor then he enacted a plan to attack them both with false claims made in Court documents (SAC ¶ 7).

Victor outlined his plan to file sham allegations (SAC ¶ 139-145). "What Tyler doesn't realize is that I'm gonna sue him for aiding and abetting, for breaking into my computer, um, for all types of things, and so he's gonna be sued. So he's gonna have to spend, you know, a hundred thousand dollars in legal fees to defend himself. And I'm going to sue him for my reputation – a hundred million dollars." SAC ¶ 141. Victor would even admit that his statements were false (SAC ¶ 142) but justified it because "this is gonna be war" (SAC ¶ 143).

### B.    VICTOR'S FALSE CLAIMS

Victor retaliated with a lawsuit against Khatskevich and Plaintiff detailing a scheme to steal documents, Plaintiff and Khatskevich Countersued for retaliation under the NYHRL (SAC ¶ 8). His efforts continued with an action in Delaware (SAC ¶ 21) and the District of Columbia (SAC ¶ 94). Regardless of the venue, Victor would be sure spread his fabricated and detailed claims of criminal activity at every opportunity (SAC ¶ 7).

When filing an answer, Victor tried to interject comments about Plaintiff and accusations of prostitution because it's "necessary to be in the answer because there's a person named Tyler Erdman…we need something in the public record to diffuse the allegations and their allegations aren't the only ones out there" (SAC ¶ 85). Defendant laid bare that his allegations were just meant to attack Plaintiff' (SAC ¶ 87). His Defenses were also weaponized:

> The Complaint is barred in whole or in part on account of Erdman's unclean hands. Erdman hacked into Counterclaim Defendants' computer networks, and stole confidential and sensitive files in furtherance of his scheme to

3

extort Counterclaim Defendants. Erdman also illegally hacked into Counterclaim Defendants' mobile device in order to physically track Adam Victor. Erdman has also contacted various media outlets in an effort to publicize certain allegations that would be detrimental to Adam Victor, also in furtherance of Erdman's extortion scheme. Erdman has also communicated with adversaries of Adam Victor in an unrelated litigation in California in furtherance of Erdman's extortion scheme. (Exh 2).

His allegations went into detail of exactly how Plaintiff worked to further his extortion attempt and the crimes supporting it such as perjury, "hacking" and burglary. The Delaware complaint contained 15 mentions of extortion (SAC ¶ 92-93) explaining a "plot to extort Adam Victor". In the District of Columbia, he alleged "Erdman convinced Khatskevich to embark on a scheme to gather evidence against Mr. Victor and seek retribution…They began to surreptitiously gather and steal substantial and meaningful evidence against Mr. Victor in furtherance of their scheme to extort" (SAC ¶ 95). Defendant even managed to work his allegations into papers filled with the Federal Election Commission, explaining how Plaintiff broke into his apartment to steal files from his computer" but explained it was because "Mr. Victor refused to let Complainant [Erdman] date his daughter" (SAC ¶ 98).

C.    **VICTOR'S EFFORTS TO PETETION LAW ENFORCEMENT**

While filing his false claims Victor tried to convince law enforcement to join his crusade (SAC ¶ 112-124), his lawyer remarked "He [Victor] said the best way to beat a civil case is to make it criminal" (SAC ¶ 114). Victor alleged that Plaintiff's crimes had done tremendous damage as he contacted the NYPD, DOJ, ICE, and district attorney's office to have them pursue Plaintiff and Khatskevich. When it did not work, he petitioned to "enact Legislation that clearly defines what has happened as a crime in New York" (SAC ¶ 124).

4

### D.   <u>COURTS HAVE FOUND VICTOR TO LACK OF CREDIBILITY</u>

The Defendant himself made clear that not only was he going to disregard the truth, but that he would do so in a calculated way to hurt Plaintiff. The SAC details other instances of Defendant's chronic dishonesty in legal proceedings (SAC ¶ 103-11) that establish a pattern of lying to hurt his adversaries. A Judge in California summarized:

> "Mr. Victor is a convicted felon. While there was considerable evidence about other litigation filed by Mr. Victor prior to and after the current litigation, the court did not permit much in the way of detail about these lawsuits, finding them peripheral. However, certain statements made by Mr. Victor in those actions impair his credibility in this case...The court finds his declaration to be an example of his willingness to present false testimony under oath. Mr. Victor also admitted that the position he took earlier in this litigation--under oath-- that he had not agreed to pay 13.5% commissions was neither true nor fair...The court found this testimony to lack credibility...The court finds Mr. Victor's claim at trial that he could not understand the credit memo to be greatly exaggerated in an effort to bolster his portrayal of himself as the unsophisticated mark who was taken advantage of by Mr. Prero." (SAC ¶ 110).

In that action, his lawyer had offered that if a witness provided "helpful testimony" they would be compensated according to the size of the judgement Victor was awarded as a result.

When faced with an investigation by the Federal Election Commission, Victor threatened his own family members to lie along with him. (SAC ¶ 106-109). During this episode Victor's daughter texted Plaintiff "…I don't want my mom or sisters involved. Especially since he'll succeed in bullying them into committing perjury", "…the point is he's now put a gun to our heads to lie for him".

In another instance Victor exchanged emails with one of his employees Sonja Bozic regarding the Delaware Action. After serving the suit on Christmas Eve, Victor told her "We sued Tyler last night as his home in Connecticut for $10 million" (Exh. 3). Bozic responded "Great news about Tyler. Can't wait to see how things will move forward. As your witness, I get

10%" (Exh 4.) Around that time, she drafted affidavits for Victor refuting allegations in the State Actions, audio tape of the events refutes her statements.

###   E.   VICTOR HID THE STATE ACTIONS FROM MPC

From the beginning of this saga to early 2019, Victor had done his best to hide the mere existence of the State Actions from Unit Owners at MPC (SAC ¶ 27-46). After some Unit Owners discovered the State Actions (SAC ¶ 49) they tried to see if there was any truth to the allegations. Victor responded by taking steps to prevent them from assessing any information to evaluate Plaintiff and Khatskevich's claims (SAC ¶54-56). The only information available to them became the Court dockets, which were full of Victor's fabrications (SAC ¶ 77-78).

###   F.   THE DEFMATORY LETTER

Victor sent a Letter to hundreds of unit owners on or around May 31, 2019, defaming Plaintiff as it claimed he perjured himself as part of an extortion attempt. This kind of Letter from the Board was rare but would appear factual to the recipients (SAC ¶ 70). It claimed that:

> "Over the past several weeks several false statements have been made against me. Particularly troublesome are those statements that accuse me of finical impropriety during my time as President of MPC. They are all untrue". (Polizzotto Dec. Ex. 2)

The impropriety denied by Victor is based on the allegations of the State Actions which outlines the ways in which Victor had MPC pay Plaintiff, his associates, and himself using fraudulent insurance claims in the wake of Hurricane Sandy. Victor's efforts to keep records from Unit Owners, made it impossible for them to investigate the claims made in the State Actions (SAC ¶ 59). The Letter continued:

> Additionally, I have been accused of using building funds to defend two lawsuits against me, my companies, and MPC, by two people--boyfriend and girlfriend-- both falsely claiming to have been "employees" of MPC in 2012-2013. Neither were ever employees of MPC. MPC was named in these lawsuits as an extortionate money grab. Nonetheless, while I was President, I have funded 100% of the costs of defending these lawsuits. Our Independent Audits have shown that, while I have been President, MPC has never paid any legal fees for these or any other lawsuits I have been involved in. (SAC ¶ 64, Polizzotto Dec. Ex. 2)

This statement accused Plaintiff of an "extortionate money grab" (SAC ¶ 66) as well as perjury as part of it through "falsely claiming" to have been an employee of MPC (SAC ¶ 67). The claims in the Letter are identical to the false statements planted by Victor. While being purposely denied access to information by Victor, any investigation by Unit Owners would lead them to see dozens of detailed allegations of criminal conduct that match the statements in the Letter. Recipients would have every reason to believe that Victor was accusing Plaintiff of serious crimes as his allegations where detailed and appeared have been based on facts.

## II.    ARGUMENT
## A.    STANDARD GOVERNING THE MOTION

It is well established that on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) that:

> a court must accept all of the allegations set forth in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. … A court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.

*Coronel v. Quanta Capital Holdings Ltd*., No. 07 Civ. 1405, 2009 WL 174656, at *10 (S.D.N.Y. Jan. 26, 2009). *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 572 (2007) (in deciding Rule 12(b)(6) motion, court must "accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in the [non-movant's] favor.") *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

The rule is particularly applicable where, as here, the Plaintiff is proceeding *pro se*: "A document filed *pro se* is 'to be liberally construed' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S 89, 94 (2007) *quoting Estelle v. Gamble*, 429 U.S. 97 (1976).

In considering a motion to dismiss a defamation case, the inquiry is whether the allegedly defamatory words, in their ordinary meaning and in context, are susceptible to a defamatory connotation. If so, the issue of the statement's meaning to the average reader must go to the jury. *Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*, 146 A.D.2d 1, 4 (3d Dep't 1989). *See also*, *Armstrong v. Simon Schuster*, 85 N.Y.2d 373, 380 (1995); *Good Gov't Group of Seal Beach, Inc. v. Superior Court*, 22 Cal. 3d 672, 682 (1978) (jury question raised where statement is "ambiguous" as to whether it is "a fact or an opinion").

### B.       PLAINTIFF'S DEFAMATION CLAIM IS LEGALLY SUFFICIENT

The SAC alleges a cause of action for defamation, satisfying all four requirements "(1) a false statement about the [complainant]; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F.Supp.2d 405, 411 (S.D.N.Y. 2009) (alternations in original).

In determining whether a statement is defamatory *per se*, the courts must look at the character of the language used in the context of the entire publication as well as the circumstances surrounding its publication and whether it falsely imputed criminal activity in the mind of the average person. *See James v. Gannett Co.*, 40 N.Y.2d 415, 418, 353 N.E.2d 834,  837 (1976); *see also Church of Scientology Int'l v. Eli Lilly & Co*., 778 F. Supp. 661, 666–

67  (S.D.N.Y. 1991) ("…[t]he publication should be tested by its effect on the average reader. The Court should neither construe the words with technical precision or strain to place a particular interpretation on them, nor should the Court interpret the words in their mildest and most inoffensive sense to hold them non-libelous. … The Court should read the accused words against the background of their issuance with respect to the circumstances of their publication and the scope and apparent object of the writer.") Extrinsic evidence may be considered in assessing the context of the statement if the facts are known to the readers of the statement. *Sprewell v. NYP Holdings, Inc.*, 1 Misc. 3d 847, 850, 772 N.Y.S.2d 188, 192 (Sup. Ct. N.Y. Co. 2003).

## C.  DEFENDANT ALLEGED SERIOUS CRIMES

Charging a person with a serious crime constitutes defamation per se under New York law. Defendant has spent years of doing exactly that in Court dockets around the country as he planted false allegations that Plaintiff "scheme[d] to extort" (SAC ¶ 95 A), using "totally false information" (SAC ¶ 120) engaged in "illegal conduct" (SAC ¶ 95 E0, "manufactured" evidence (SAC ¶ 95 C), "broke into Mr. Victor's apartment" (SAC ¶ 95), hacked into his computer (SAC ¶ 81, 86, 97, 98) to steal "extremely sensitive and valuable" documents (SAC ¶ 90). These accusations of extortion and the perjury that enabled it, were repeated in the Letter as it described Plaintiff's "extortionate money grab".

Defendant now tries to argue that "Plaintiff does not and cannot allege that Defendants' falsely accused him of committing a "serious crime". This revisionist history is completely contrary Defendant's previous claims, such as a statement he wrote about Plaintiff stating that the NYPD "believes a serious crime has been committed" (Exh. 9). In another instance, Victor

9

submitted an affidavit swearing that the release of the documents Plaintiff stole could cause his companies "to lose hundreds of millions of dollars" (Exh. 10 at para. 9).

Victor overtures to law enforcement portrayed his allegations as quite serious. Victor befriended a detective with the NYPD (SAC ¶ 118), explaining that if certain stolen files were disclosed "it would severely hurt me economically…and were taken for the sole purpose of hurting me or destroying my business. I believe once we subpoena and examine their computer's we will find additional valuable documents stolen from me." (Exh. 5). Defendant went on tell I.C.E. that Plaintiff "assisted her [Khatskevich] in the theft of files" (SAC ¶ 120). He told the D.O.J. "in this day of increasing vigilance against Cyber Crime, the theft of my computer files by Mr. Erdman and Ms. Khatskevich need to be addressed" (SAC ¶ 122). Defendant told the D.O.J "Without my knowledge, she and Tyler became romantically involved and began conspiring to steal computer files and documents from my office over a period of several months" (Exh. 6). When Law Enforcement disagreed, Victor wanted them to "enact Legislation that clearly defines what has happened as a crime in New York" (SAC ¶ 124). Victor cannot claim he did not mean to make allegations of serious crimes, when he believed them to be so serious that law should be changed to ensure it.

Defendant made his allegations carefully so that they would be as severe as possible. Victor would claim that one of his employees "fears for physical violence". Since his allegations would include of threats of physical injury as part an extortion plot, the would be defined as Coercion in the first degree as defined in New York Penal Law § 135.65, a class D felony.

Victor's allegation that Plaintiff broke into his apartment to access files from his computer (SAC ¶ 97-98) would constitute Burglary in the third degree under New York Penal Law §140.20 a class D felony, since was done with the intent to "hack" and "steal" valuable

documents. Burglary and larceny among the serious minor offenses that are actionable without proof of damages. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 605 N.E.2d 344, 348 (1992).

Defendant had claimed Plaintiff violated the Computer Fraud and Abuse Act ("CFAA"). His allegation was designed to make be as severe a violation as the Act allowed. They included all special conditions required to raise a misdemeanor charge to a felony. *See 18 U.S.C. § 1030(c)(2)(C).*, Motive of "Threats and Extortion", could land a first time offender in prison for 5 years. Even the description of the documents raised the severity of the offense according to the *DOJ Justice Manual 9-48.000.*

Defendant has been clear that he meant his accusation of perjury:

"And so you know, Mr. Erdman has put in several affidavits in this case. And it's amazing how you started off this deposition yesterday reminding me about perjury. Let's see if you remind your client that when he has his depositions."

Defendant's acknowledgement of Plaintiff's sworn statements establishes that his accusations of false statements include statements Plaintiff made under oath in a court proceeding. In the Letter, Defendant describes the false claims of employment as the rational for MPC's inclusion in the lawsuits as part of the "extortionate money grab". Since that sort of false statement about employment would be "material to the action, proceeding or matter in which it is made". As Perjury in the First Degree, it is a class D felony that is punishable by up to 7 years in state prison due. *See New York Penal Law § 210.15.*

Defendant's detailed allegations made it clear that they detailed serious crimes rather than minor transgressions, and his contacts with Law Enforcement reinforce that severity. Plaintiff's claim that he has been accused of serious crimes that rise to the level required for defamation *per se* are well supported by evidence and should prevail.

### D.   MALICE VOIDS THE COMMON INTEREST PRIVILEGE

Defendant argues "Plaintiffs conclusory allegation of malice are not entitled to the presumption of truthfulness, and Plaintiff cannot overcome the common interest privilege." This argument is a vestige of Defendants prior Motion to Dismiss that does not take in to account the Court's order nor the changes made in the SAC. The Court stated that the First Amended Complaint "does not sufficiently plead malice to defeat the common interest privilege. Malice has two meanings – a constitutional meaning and a common law meaning. Either meaning "will suffice to defeat" common law privilege. *Liberman, 605 N.E.2d* at 360. (Court Order).

The SAC alleges constitutional malice that *Liberman* "defined as making a false statement "with knowledge that the statement was false or with reckless disregard of whether it was false or not" (New York Times Co. v Sullivan, 376 U.S. 254, 280; Trails W. v Wolff, 32 N.Y.2d 207, 219)." (Barnet L. Liberman v. Gelstein 80 N.Y.2d 429)

Plaintiff meets this burden by alleging defendant made "statements he knew to be false, stating that Plaintiff was engaged in an "extortionate money grab" and had perjured himself by making false claims under oath that he worked for MPC" (SAC ¶ 14). The SAC supports this allegation in detail, quoting audio recordings in which Defendant outlined his plan to get to get retaliate against Plaintiff' (SAC ¶ 139-144) by suing for "all types of things" (SAC ¶ 141). He would even plan to make false claims of prostitution to coerce Plaintiff's family to "cut him off, throw him out of the house" (SAC ¶ 142), while admitting the statement was false "we know she wasn't a prostitute, but this is gonna be war" (SAC ¶ 142-143). Plaintiff alleged the many instances of Victor enacting his plan of spreading false allegations (SAC ¶ 82-102) as part of a "years-long malicious campaign to spread false claims of Plaintiff being engaged in extortion

and perjury" (SAC ¶ 82) before he went on to distribute those false statements knowingly to the Letter's recipients (SAC ¶ 68).

As Defendants admit, *Thai v. Cayre Group, Ltd. 726 F.Supp.2d 323, 329 (S.D.N.Y. 2010)* allows for the common interest privilege to be overcome by "alleging that the defamatory statement was motivated solely by [common law or constitutional] malice". Defendant argues that "[m]ere conclusory allegations, or charges based upon surmise, conjecture and suspicion are insufficient to defeat the qualified privilege".

In making their argument, Defendant quotes only 4 words of the Second Amended Complaint, "hundreds of unit owners" (SAC ¶14). He makes no attempt to illustrate any deficiencies in the pleadings other than to describe them as "conclusory", ironically hoping that the Court will instead accept his own conclusory allegations. The SAC has a section entitled "Defendant's Malice" that spans 27 paragraphs (SAC ¶125-152) including numerous direct quotations of the Defendant himself. That level of detail is hardly conclusory.

Defendant's sole acknowledgement of the differences in the SAC is that it "attempts to utilize or invoke a kind of quasi-judicial privilege by citing a number alleged statement of opinion by the Defendant that are part of the State Actions". The logic of Plaintiff somehow invoking a privilege to defeat another privilege in this scenario or others is unavailing.

Plaintiff provides that Defendants have made no effective argument as to why his pleadings have not meet the requirements of Constitutional Malice as laid out in this Court's Order, and as such should not be able to claim the protection of the Common Interest Privilege.

### E.   § 74 OFFERS NO PROTECTION TO FABRICATED ALLEGATIONS

Defendant argues that the Letter is protected under N.Y. Civ. Right Law § 74 as a "fair and true reporting" because it is "a summary of claims and defense made in two pending lawsuits between Plaintiff and the Defendant". The SAC alleges that the claims and defenses referenced are false statements made to defame Plaintiff and as such have lost any protection under § 74.

Courts have found that § 74 is subject to abuse and accordingly has limits to prevent it. If a claim if fabricated to defame, it is impossible to provide a fair and true report of it. Plaintiff alleges at length that Defendants statements were based upon fabricated claims (SAC ¶ 82).

Victor's abuse of the docket that was used to mislead the recipients of the Letter (SAC ¶ 15, 16), is the definition of what Courts have defined as "sham litigations". Victor's former counsel, Schlam Stone and Dolan published a blog post entitled "Judicial Proceedings Immunity Is Not Absolute."[1], that examined a decision to deny a motion to dismiss based on the Judicial Privilege. *Thomas v. G2 FMV, LLC.*,2016 NY Slip Op. 30143(U) reflects similar facts to this action. The action was brought after G2, a hedge fund, sued Thomas, a former employee, claiming that he had committed serious misconduct including leaking confidential information. Thomas argued that the suit was made for the purpose of defaming him, and the Court agreed:

> "Civil Rights Law §74 does not insulate the report of a sham complaint maliciously distributed for the purpose of defaming. Williams v Williams, 23 NY2d 592, 598-599 (1969). It insulates an accurate and "fair" report. If the UA Complaint was a sham, publication of it would not be "fair." Instead, a sham complaint would be a false statement given to a news organization for the purpose of publication. Acadia Site Contracting, Inc., supra."

Thomas had claimed that the action brought by G2 was designed to defame him much the same as Plaintiff alleges Victor had done (SAC ¶ 7, 8, 15, 16, 37, 82-102).

---

[1] https://www.schlamstone.com/judicial-proceeding-immunity-is-not-absolute/

The judicial privilege defense does not require dismissal because a trier of fact could conclude that the UA Complaint was a sham maliciously filed solely to defame Thomas. G2's sole motivation to defame could be inferred from the fact that within four months, G2 discontinued the action and conceded liability on the Mirroring CCs, before any discovery took place. Malicious intent also could be inferred from Morley's statement about burying Thomas. The discontinuance and concession of liability on the Mirroring CCs before discovery and Morley's malicious statement lead the court to deny the motion to dismiss.

As in *Thomas* the discontinuance of their action inferred the purpose of it was to defame.

Victor's Delaware action alleging all sorts of criminal conduct resulting in $10 million in damages only be withdrawn (SAC ¶ 91-93), is an even clearer example of intent. Victor wanted millions, G2 wanted a declaratory judgement.

The Court found the intent is further clarified by emails stating, "we're going to bury him [Thomas]" and "this lawsuit is going to bankrupt him". In this instance Victor exhibited the same:

"So he's [Erdman] gonna have to spend, you know, a hundred thousand dollars in legal fees to defend himself" (SAC ¶ 141).

"[S]o now Tyler's parents are gonna say, 'What the fuck are you doing, Tyler? You're making us give you money, you stand in exposure of basically getting a judgment against you that bankrupt you, because you have to declare personal bankruptcy." (SAC ¶ 142).

Plaintiff's allegations of Defendants fabricated claims, creates a question of fact, with the evidentiary support to prove their plausibility.

"Whether the statements in the US Complaint were false is a question of fact that must be resolved in plaintiff's favor at this juncture. Falsity of some of the UA Complaint's central and most defamatory allegations can be inferred from the email correspondence...The allegations in the UA Complaint could amount to defamation per se. They accused Thomas of serious professional misconduct. The judicial privilege defense does not require dismissal because a trier of fact could conclude that the UA Complaint was sham maliciously filed solely to defame Thomas" (See *Thomas v. G2 FMV, LLC*, 2016 NY Slip op. 30143(U))

15

G2's defamatory allegations were spread in two trade publications. Victor spread his to the New York Post. Victor gave an interview where he denied the "sexual-harassment claims", two articles followed, with one making the front page. The Post reported on the fabricated claims: "In court papers, he says he rescued the Eastern European immigrants from a "Hell's Kitchen brothel" where they were working as prostitutes --- and claims the suits are "extortion" attempts" (Exh. 7).  The second article reported on Defendant's claim that "Khatskevich's history of prostitution is highly relevant to her instant claims of sexual harassment", "In a counter-filing, Victor says the judge shouldn't admit the recordings as evidence because they are of "dubious authenticity" and the metadata indicates they were altered" before finishing "Victor says the suits are no more than "extortion attempts" by disgruntled former employees." (Exh. 8).

Not only did Victor plan for his allegations to create a defamatory record, but he also knew how the privilege would apply. In a drafted "Statement" (Exh. 9) reiterating his false claims of Plaintiff's criminal activity, describing the State Action's allegations as "…a false, wildly absurd and pornographic set of charges for the sole purpose of shaking me down". He went on to explain how one could abuse the Judicial Reporting Privilege:

> "This case has important public policy implications and hopefully will lead to a change in law, that allows someone to steal computer files, file false and malicious charges in Court papers and hide behind the fact that these false, harmful, libelous and slanderous statements were raised in Court proceedings – meaning that anybody can say anything, no matter how detrimental, if said in a lawsuit. Hopefully, the laws will be modified once it become clear how great the abuse was in this case." (Exh. 9).

Victor's acknowledgement of how one could file "false and malicious charges" and shield them in proceedings, makes clear that Victor fully understood his abusive plan.

In Defendant's previous motion to dismiss their reply cited *Flomenhaft v Finkelstein, 44 Misc. 3d 1215(A), 997 N.Y.S.2d 668 (Sup. Ct. NY County 2014)*, with a footnote noting

16

"Critically, Plaintiff is not contending that the claims by Victor were made for the sole purpose of defaming him." This note would appear to be in reference to the Court's note at 638,

> "This Court has recognized, however that the privilege is capable of abuse and will not be conferred where the underlying lawsuit was a sham action brought solely to defame the defendants (see Lacher v. Engel, 33 A.D.3d 10, 13-14, 817 N.Y.S.2d 37 [1st Dept.2006]). *Lacher* derived this principle from *Halperin v. Salvan*, 117 A.D.2d at 544, 499 N.Y.S.2d 55, in which this Court declined to dismiss a defamation claim based on the pertinency privilege where the context in which the allegedly offending statement was made was a litigation that the plaintiffs filed but never prosecuted. The existence of this "sham litigation" exception has been confirmed (but not applied) in other cases in this Department, including *Case de Meadows Inc. (Cayman Is.) v. Zaman,* 76 A.D.3d 917, 920, 908 N.Y.S.2d 628 [1st Dept.2010] and *Sexter & Warmflash, P.C.,* 38 A.D.2d at 172, n. 5, 828 N.Y.S.2d 315. Accordingly, we disagree with Supreme Court's stamen that Halperin has "waned in precedential value."

The SAC alleges that Defendants abuse of the privilege in detail, specifically that Victor had used litigations to "plant false allegations against Plaintiff, accusing him of criminal activity in numerous Court filings made in at least three States and the District of Columbia" (SAC ¶ 7).

*Gottwald v. Sebert* (2021 NY Slip Op 02456) showed another instance "The record shows that there are factual issues…That record supports plaintiffs' allegation and creates an issue of fact as to whether the California complaint was a "sham" precluding the grant of summary judgement".

In one of the State Actions, Defendant unsuccessfully attempted to argue that his answer needed to include irrelevant remarks referencing prostitution among other things (SAC ¶ 84-87):

> "It's directly relevant. And it's also necessary to be in the answer because there's a person named Tyler Erdman who you know who he is – we call him a computer hacker …we need something in the public record to diffuse the allegations and their allegations aren't the only ones out there." (SAC ¶ 85).

17

Using an answer to "diffuse" allegations while explaining how Plaintiff needed to be targeted reveals the performative nature of Victor's claims, and the abuse Courts have tried to deter with the "sham litigation" exception.

The Defendant argues that as a "summary of claims and defense made in two pending lawsuits" it is pertinent to the litigation and should be protected as a result.

In Defendant's reply to the previous motion to dismiss, they cited *Gilling v New York Post, 166 A.D.3d 584, 586 (2nd Dept. 2018)* as to when the privilege would apply. *Gillings* examines the privilege through the lens of journalists reports. The Court said ""newspaper accounts of legislative or other official proceedings must be accorded some degree of liberality"…"[w]hen determining whether an article constitutes a fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision"" This "liberality" is required to allow Journalists to report on matters in which they cannot be expected to know the validity of statements or able to explain the goings on in an action with absolute precision.

Applying the journalistic standard to parties, makes the privilege ripe for abuse. The "sham litigation" exception serves as an important check on litigants. When Victor reports on his own false allegations, as he did on the Letter, he knows that he is reiterating false statements.

Defendant cites *Zappin v. NYP Holdings, Inc.* to justify their claim of privilege, however it provides more guidance:

> "Where the parties do not raise any issues of fact as to what was said and "only contest whether the undisputed content of the [allegedly defamatory writing] qualifies as a 'fair and true report' of the undisputed content of the [underlying proceeding], the Court can resolve the dispute as a manner of law[.]" Abkco Music, Inc., 2016 WL 2642224, at *4 (collecting cases)."

Here Plaintiff disputes the content of the entire underlying proceedings, as a result it cannot be decided as a manner of law.

Defendant had previously noted that *Flomenhaft* and the Court's ruling on "sham litigation" and how "Critically, Plaintiff is not contending that the claims by Victor were made for the sole purpose of defaming him". Now that the SAC alleges that (SAC ¶ 15, 82, 144), he offers no justification as to why he should not be held to that standard. Accordingly, Plaintiff submits that Defendant's statements are ineligible for protection under Section 74.

## F. THE STATEMENTS MADE WERE NO OPINION OR EPITHETS

Defendant attempts to have it both ways claiming his Statements to have been "fair and true" reports of his allegations, while also claiming that those same statements are also opinions or epithets. There is no difference between claiming a defense based on "Erdman's extortion scheme" in Court papers and stating that Plaintiff was part of an "extortionate money grab".

### 1. OPINONS CAN BE IDENTIFIED BY THEIR CONTEXT

The context of a statement is vital in allowing the Court to determine whether it is a fact or an opinion. In *Giuffre v. Maxwell* 165 F.Supp.3d 147 (2016), Giuffre claimed to have been a victim of sexual abuse and had identified Maxwell as "closely involved in Plaintiff's trafficking for the purpose of this abuse". The Court examined "whether, on the basis of the over-all context in which the assertions were made, a reasonable reader could have concluded that the statements were conveying facts about the plaintiff".

Victor's allegations of extortion are based on Plaintiff's efforts to assist Khatskevich in bringing her action and its 17 causes of action that include assault, battery, sexual harassment, immigration status discrimination, retaliation, unlawful surveillance, unlawful capturing of

images of another person's private aeras, and unlawful sexual abuse. The Court explained that a

denial of sexual abuse is more then the sum of its parts:

> "to suggest an individual is not telling the truth about her history of having
> been sexually assaulted as a minor constitutes more than a general denial, it
> alleges something deeply disturbing about the character of an individual
> willing to be publicly dishonest about such a reprehensible crime."

Defendant's allegations have made clear that Plaintiff assistance with brining claims of

sexual abuse against him were part of some extortionate plot. If that was not enough of a parallel,

Maxwell was identified Maxwell as taking part in Giuffre's "trafficking", much as Khatskevich

identified Victor of doing the same. Khatskevich received a T-Visa as a victim of human

trafficking, upon learning this Defendant, in the state actions attacked her, asserting that he

needed the application submitted to the Government because she could not have gotten the T-

Visa without perjuring herself. Similarly, to his denials of sexual abuse, Victor's denial and

demand to see the application implies that he is aware of facts that must disprove her statements

and that she is abusing a system designed to help victims of human trafficking.

Victor has made many statements to downplay the sexual abuse allegations and others

which Plaintiff assisted Khatskevich in asserting under the NYCHRL. He would describe them

as a "hostile work environment lawsuit" (SAC ¶ 95 A), to downplay the severity. He told the

Department of Justice "that he was served with a "slap lawsuit" and "The lawsuit contains totally

false information, which I am frankly not concerned about – except for one section" (SAC ¶121).

Defendant wanted to take advantage of exactly what the Court warned about, portraying

Khatskevich as not only fabricating allegations of sexual abuse but working with Plaintiff to steal

along with it. The overall picture implies "something deeply disturbing about the character of an

individual". Defendant has done at every opportunity, such as in an October 31st, 2015 article

about the State Actions stated, "Victor denied the sexual-harassment claims in an interview with The Post." (Exh. 8).

Defendant's allegations have been designed to discredit Khatskevich and her alleged accomplice, Plaintiff. Defendant's story entailed painting Plaintiff as engaging in criminal activity, relying on "manufactured" audio recordings (SAC ¶ 95 C), doing so with a "woman who was a prostitute." (SAC ¶ 142), as part of an "extortionate money grab". The New York Post reported on Defendant's sham allegations on December 8, 2015, about how "he claimed they worked as hookers", "the judge shouldn't admit the recordings as evidence because they are "dubious authenticity", and the metadata indicates they were altered" and "Victor says the suits are no more than "extortion attempts" by disgruntled former employees" (Exh. 8). The context far exceeds that as explained in *Giuffre*:

> "Defendant's statements clearly imply that the denials are based on facts separate and contradictory to those that Plaintiff has alleged. Sexual assault of a minor is a clear-cut issue; either transgression occurred, or it did not. Either Maxwell was involved, or she was not. The issue is not a matter of opinion, and there cannot be differing understandings of the same facts that justify diametrically opposed opinion as to where Defendant was involved in Plaintiff's abuse as Plaintiff has claimed."

The statements made by Victor paint a picture of Plaintiff as a criminal assisting a "woman who was a prostitute" to extort not only Victor but his neighbors through serious and disturbing allegations of sexual abuse and a litany of other acts. Even if Victor's statements are to be viewed as opinion, the opinion they would express still implies criminal and dark conduct on behalf of Plaintiff and those closest to him.

For Unit Owners of MPC, the truth of Khatskevich's sexual abuse allegations would be of great importance. The difference is between MPC being a participant to horrific acts, or the target deeply disturbed criminals. Describing the allegations of sexual abuse, harassment, and

retaliation as an "extortionate money grab" cannot be taken as anything other than a full-throated denial. The context of the Letter precludes its statements from being interpreted as anything other than defamatory statements for the purposes of this motion.

### 2.   VICTOR'S STATEMENTS WERE NOT OPINIONS OR EPITHETS

Facts can be tricky things, but they have an objective reality. "Generally, only statements of fact can be defamatory because statements of pure opinion cannot be proven untrue." *See Thomas H. v Paul B.*, 2012 NY Slip Op 01318 [18 NY3d 580]. Victor's allegations are provable, as claims and defenses they must be. The statements in the Letter can be proved all the same.

Defendant is attempting to argue that the Letter "is a summary of claims and defenses", "all the statements describing Plaintiff as a criminal and describing his lawsuits against the Defendants as a form of extortion are statements of opinion" and "the references to Plaintiff stealing documents are protected as hyperbole and vigorous epithets".

One cannot be proving a "fair and true' report of facts, which were also opinions unless they happened to be hyperbole.   Describing an "extortionate money grab" and "Erdman's extortion scheme" are indistinguishable. A statement of fact made inside a Court room, cannot be transformed into an opinion or a fiery epithet by the virtue of being made at 630 First Avenue rather than 60 Centre Street. Claiming that a statement is hyperbole because it is such an exaggeration, while alleging the very same, only serves to highlight the absurdity of Victor's statements.

Defendant premises his argument with many examples of statements claiming "extortion" or someone who called "no good" and "a criminal". These are inapplicable, they lacked the repeated and specific allegations such as Victor's which detailed exactly how Plaintiff engaged

22

in extortion and the accompanying perjury. In response to Plaintiff's Counterclaims, Victor

asserted 19 affirmative defenses, with arguments such as:

> "The Counterclaims are barred in whole or in part by documentary
> evidence. Documentary evidence establishes that Erdman was never
> employed by any of the Counterclaim Defendants. Documentary evidence
> also establishes than none of the Counterclaim Defendants (other than
> Manhattan Place Condominiums) had more than 4 employees at any
> relevant time period"

> "The Complaint is barred in whole or in part on account of Erdman's
> unclean hands. Erdman hacked into Counterclaim Defendants' computer
> networks, and stole confidential and sensitive files in furtherance of his
> scheme to extort Counterclaim Defendants. Erdman also illegally hacked
> into Counterclaim Defendants' mobile device in order to physically track
> Adam Victor. Erdman has also contacted various media outlets in an effort
> to publicize certain allegations that would be detrimental to Adam Victor,
> also in furtherance of Erdman's extortion scheme. Erdman has also
> communicated with adversaries of Adam Victor in an unrelated litigation in
> California in furtherance of Erdman's extortion scheme." (Exh 4).

The statements made in the Letter have no material difference from the ones made in

Victor's defenses or the multitude of other allegations he has made. If there is "documentary

evidence" clearly the statement can be proven one way or another.

The Court's order noted that "Victor's characterization of the lawsuit as "extortionate",

without more, is protected opinion and not an accusation of criminal conduct". In *Pecile v. Titan

Capital Grp., LLC, 947 N.Y.S.*2d the Court found that a statement did not "convey the specificity

that would suggest" that they "were seriously accusing [plaintiffs] of committing the crime of

extortion". Here the Statements reference very specific conduct which Victor determined to be

serious enough to report to Law Enforcement. That specify provides the "more" that the Court

requires. *Melius v. Glacken, 94 A.D.3d 959, 959-60 (2d Dep't 2012)* drew a line between an

"opinion as to the merits" and "factual accusation of criminal conduct". Defendant's statements

23

are the later, as they specify criminal acts committed in "furtherance of Erdman's extortion scheme", such as how he "broke into Mr. Victor's apartment" (SAC ¶ 98).

Victor's claims and defenses are no different than the defamatory statements in the Letter. Repeating a fact does not transform it into an opinion or epithet. Defendant's efforts to characterize his statements in the Letter as anything other than fact, fail.

### III.       DEFENDANT'S MOTION TO STRIKE SHOULD BE DENIED

Victor's motion to strike should not be granted. It is a copy of his previous motion, ignoring that the citations and arguments are not applicable to the SAC. As an example, Defendants ask to strike ¶ 48, claiming it "references conduct by Victor over thirty years ago", ¶ 48 of the SAC relates to events "In or around March 2019".

Plaintiff wrote to Defendant asking that he withdraw this portion of the Motion due to this issue, as well asking that he provide unpublished cases as required under Local Civil Rule 7.2. Defendant replied, "I laughed when I saw your letter…My advice to you would be to concentrate on the pending motion to dismiss". He would then point out the time elapsed for Plaintiff's opposition: "Tick tock. Your papers will be due soon" not having provided the unpublished cases. When asked for the cases again, he replied "Considering that we would provide those as a courtesy, you will get them as soon as I am able". Under LCR 7.2, they are due when "serving a memorandum of law". They were eventually provided 13 days late.

The Defendant's motion to strike is meritless and should not be granted. Plaintiff submits that the Court should consider sanctioning Defendant for wasting the Court's time with such a ridiculous motion and their unprofessional conduct.

**IV.**    **IN THE ALTERNATIVE, PLAINTIFF SHOLD BE ALLOWED TO REPLEAD**

If the Court does find that Defendant's Motion to Dismiss should be granted, it should provide Plaintiff with the opportunity to replead. Leave to amended should be freely given "When justice so requires." Fed. R. Civ. P. 15(a).

**V.**    **CONCLUSION**

At a deposition, Victor was asked "Have you ever accused Mr. Erdman of extortion?", he answered "I don't recall if I have or have not". If Victor is unable to recall whether he claimed to be on the receiving end of an "extortionate money grab" that caused $10 million in damage, there is a fundamental issue of fact that must be resolved. The Plaintiff respectfully requests that the Court deny the Defendant's motion in its entirety and so the parties have the opportunity to answer that very question.

Dated: October 12, 2021                                /s/ Tyler I. Erdman
       Salt Lake City, UT                              Tyler I. Erdman
                                                       Telephone: (917) 301-0401
                                                       Email: tyler@erdman.it
                                                       *Plaintiff Pro Se*