FILED: NEW YORK COUNTY CLERK 03/05/2018 11:07 AM
NYSCEF DOC. NO. 211

INDEX NO. 158981/2014
RECEIVED NYSCEF: 03/05/2018

Case 1:20-cv-04162-LGS-GWG   Document 279-2   Filed 08/13/24   Page 1 of 18

# EXHIBIT O

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------x
ADAM VICTOR, et. al.

                Plaintiffs,

      - against-

YEVGENIYA KHATSKEVICH and TYLER ERDMAN

               Defendants.
---------------------------------------------------------------x
TYLER ERDMAN,

              Counterclaim-Plaintiff,

      -against-

ADAM VICTOR, et. al.

             Counterclaim-Defendants.
---------------------------------------------------------------x
YEVGENIYA KHATSKEVICH,

              Plaintiff,

      -against-

ADAM VICTOR, et. al.

             Defendants
---------------------------------------------------------------x
NAZYM TOKTASSYNOVA

             Plaintiff,

      -against-

ADAM VICTOR, et. al.

            Defendants.
---------------------------------------------------------------x

Index No. 158981/14

**REPLY AFFIDAVIT
IN SUPPORT OF MOTION**

Index No. 151658/14

Index No. 162327/14

ADAM VICTOR, being duly sworn deposes and says:

1

1. I am plaintiff in the first above-captioned action and submit this Reply Affirmation in support of the instant motion for an evidentiary hearing to determine: a) if counsel John Brennan should be disqualified from the three above-captioned cases involving Adam Victor; and b) whether Mr. Brennan and/or Tyler Erdman should be held in contempt of court for defying two court orders and disseminating to litigation adversaries of mine more than 4,000 business records, emails, photographs and videos surreptitiously obtained from my computer system; and c) to have these cases placed *under seal*.

2. I have read the affidavit of Tyler Erdman, dated 12/22/17, submitted in opposition to this motion. Reading this affidavit was the first time I was informed that Mr. Erdman had taken and retained hard drives from any of my computers. His assertion that I left to his discretion whether he would 'dispose of' or retain possession of my computer files or hard-drives after he transferred data from one computer to another is false. To my knowledge, after a transfer of files from one computer to another, the hard-drive in the original computer was left in my possession, at my home office. I would not allow anyone, including Mr. Erdman, to retain possession of the voluminous financial, business and personal information contained in my computer files. Not only would such a situation be avoided for personal reasons, I would not risk violation of the non-disclosure agreements I commonly execute in the course of my energy business. This is particularly true in

light of my understanding that Mr. Erdman was only about 19 years old when I met him and only about 23 when he stopped working for me.

3. It is even more incredible that I would permit young Mr. Erdman to retain possession of computer equipment containing massive amounts of my personal, financial and business information after Mr. Erdman ended his working relationship with me and my companies.

4. It is beyond incredible that I would permit Erdman to retain my old hard-drives after learning in February of 2014 that his girl-friend, Ms. Khatskevich, had sued me. Rather, I would have instructed my attorneys to demand the immediate return of the old computer equipment that Erdman alleges I left in his possession. Such a demand also would have been part of my later lawsuit against Mr. Erdman and Ms. Khatskevich for illicitly obtaining information from my computers. Obviously, no such demands were made because, contrary to Erdman's affidavit, he gave me no indication that he was retaining old computer hard-drives of mine after migrating data from them to newer computers.

5. On the contrary, upon Mr. Erdman's departure, when we were discussing the new "IT" consultant replacing him, Mr. Erdman assured me that I had all the computer equipment and hard-drives he had worked on. I routinely retain old hard-drives at my office.

3

6. Consistent with that routine, I still have what I believe to be all of the old computer hard-drives I have used since meeting Mr. Erdman in 2009. My possession of these hard-drives, which I can demonstrate at an evidentiary hearing, severely undermines Mr. Erdman's assertion that he has old hard-drives of mine.

7. Likewise, Mr. Erdman's story is undermined by the fact that he advised me to purchase, and set up for me, a 'hard-drive reader,' which is an external device that permits me to read old hard-drives with my computer. A photostatic picture of this device is attached hereto as Exhibit A. Erdman's advice to me to purchase and maintain this device presupposes that I, not he, would retain the old hard-drives in computers I replaced.

8. There is yet another flaw in Mr. Erdman's story. Well before he stopped working for me, Mr. Erdman moved from his parents' home in Connecticut to an apartment in Manhattan in Battery City. If, supposedly, he retained old hard-drives out of a concern that I would become "enraged" if I couldn't locate a computer file, why would he store them in Connecticut? That would mean that, if I called and asked him to find a file, he would need to travel from Manhattan to Connecticut. Why not keep the hard-drives in his Battery City apartment or at my Manhattan office?

4

9. Overall, Mr. Erdman's affidavit makes little sense and raises more questions than it answered and warrants a hearing where those questions can be asked of him.

10. To my knowledge, each time a computer was retired, and its data transferred to another computer, the hard-drive from the retired computer was stored in a specific cabinet in my office. The computer itself was stored in the building for a certain period time, during which it might be sold; if it was not sold, it would be disposed. That was my standard operating procedure.

11. Prior to this motion, I sent my hard-drives to a computer forensics company known as SETEC, located in Los Angeles, which has confirmed that at least one of those hard-drives contains some of the information, notably old emails, that Mr. Erdman has produced. Furthermore, SETEC informs me that an examination of the six hard-drives I sent to them reveals that, collectively, they were in use from 2010 to 2014, which is almost the entire time that Mr. Erdman worked for me (2009 to 2013). This examination is consistent with my standard procedure, described above, whereby I would retain used hard-drives.

12. Therefore, I believe it is far more likely that Erdman acquired approximately 350,000 pages of information from my computer files by illicitly downloading those files rather than by retaining original hard-drives. If Mr. Erdman violated my procedure, it was without my permission.

13. My belief that Mr. Erdman acquired voluminous information from my computer system through surreptitious downloading/copying is also based on his admission in his 2015 affidavit to attaching an external hard-drive to my office computer. In addition, I have alleged that he took a laptop from my office, which may have been used to migrate data from my desktop computers.

14. Moreover, I permitted SETEC to remotely examine a computer located at my other office location at 230 Park Avenue, which was formerly the office of my long-time attorney, Tom Puccio, and where in fact I first met Mr. Erdman – and, upon information and belief, where Mr. Brennan interacted with Mr. Puccio when Puccio was my attorney. Mr. Erdman actually was the person responsible for changing the electronic lock passcode on that office after Mr. Puccio died and I took over his office. The 230 Park Avenue computer was devoted primarily to the production of promotional videos for my energy business and contained a special soft-ware, Final Cut Pro, for that purpose. Access to that computer was limited to me the two producers of the videos and two professional film editors, in order to protect the 300 costly hours of raw footage from corruption or disclosure.

15. Mr. Erdman, however, produced those videos to my adversaries in the Pegasus litigation. I am informed by SETEC that the Park Avenue computer was remotely accessed using a program called "Team Viewer" -- apparently by Mr. Erdman.

16. I have also discovered that Mr. Erdman likely 'hacked' into a "Dropbox" account I maintained under the email address tnalle@aol.com. He produced to Pegasus certain 'calendars' indicating the whereabouts of my two planes. Those 'calendars' had been stored in my Dropbox account along with other documents relevant to the Pegasus litigation, including those that Mr. Erdman had requested on my behalf from a company known as "Flightaware."

17. Mr. Erdman also produced emails, some between me and my Attorney, John Dax, Esq, my former aviation attorney to opposing counsel in California. Some of the emails date back to 2004, five years before I even met Mr. Erdman. Emails between my son and others were also included in the discovery production to Pegasus.

18. In light of these circumstances, I am informed that SETEC needs to examine the computer equipment and/or components that Erdman allegedly retained in order to determine how Erdman acquired the massive amount of information from my computer files that he possesses and whether the claims he makes in his affidavit denying that he acted in contempt of court are true.

19. In Mr. Erdman's affidavit, he notes that, after his departure from my office, I asked him in an email if he had the Flightaware information. He claims this request shows that I knew he retained computer equipment containing my computer files. That claim is patently untrue. What Mr. Erdman neglects to

7

explain is that he requested the Flightaware using his own email address and under his own company name: "Aerotainment." Mr. Erdman worked as independent contractor rather than an employee. Therefore, I thought he might have the Flightaware information within his own emails. I had no idea this information was stored in my Dropbox account and had no intention of asking him to access that account.

20. Mr. Erdman emailed me the Flightaware information without indicating where it had come from. There was no indication at that time that he had remotely accessed my Dropbox account. Years later, when he responded to the Pegasus subpoena, Mr. Erdman produced the 'calendars' even though I had not requested that he locate them. Evidently, while reviewing the Dropbox account – without authorization – Mr. Erdman saw these calendars, believed they might be helpful to Pegasus and copied them. The email exchange is attached hereto as Exhibit B. The files taken from that account included certain "Calendars" where the information gathered was being used by my California lawyers for the purpose of litigation.

21. Ever since the 3/16/15 hearing where Your Honor extracted a promise from Mr. Brennan to keep "confidential" the documents secretly downloaded from my computer system by his clients, I have assumed that this promise covered all of those documents. When some of those documents were used by Mr. Erdman and

8

Mr. Brennan to support an FEC Complaint against me, we moved for contempt. Although at the 6/27/16 contempt hearing Your Honor ruled that this Court lacked the power to prohibit use of the information to report a potential crime, I was informed that the Court directed that my "business records" should not be divulged to "third parties."

22. I was never made aware, until the opposition to this motion, that: a) Mr. Erdman has retained possession of my old computer equipment and components; or b) Mr. Brennan only intended that his promise of confidentiality apply only to those computer files of mine secretly acquired by Ms. Khatskevich but not to the far greater amount of information secretly acquired by Mr. Erdman. Had I been aware of either situation, I would have instructed my attorneys to: a) immediately demand the return of all such computer equipment or components – which I have done now – and b) seek judicial intervention to enforce what we believed was the Court's intention to instruct Mr. Brennan to keep "confidential" all of the documents obtained from my computer system by both of his clients (which had not previously been disclosed).

23. Ultimately, whether Mr. Erdman acquired the massive trove of my personal, financial and business information by secretly retaining my original hard-drives or by secretly downloading information from those hard-drives, I believe his acquisition of that information was improper. Naturally, he may have done both.

In addition, if Mr. Erdman acquired information by retaining hard-drives, I believe it was extremely misleading for he and his attorney to have agreed to keep copied files confidential while failing to disclose that Erdman possessed a massive amount of my files stored within my old hard-drives.

24. It seems clear from Mr. Erdman's affidavit that he believes the distinction between retaining old hard-drives and copying data from them is an important to determining whether he and/or his attorney acted in contempt of court. In other words, even though he and his attorney contend that they were obligated only to keep information from 5 flash drives confidential, he seems to concede that he and Mr. Brennan have a weaker defense if the information they produced to Pegasus was obtained through surreptitious downloading.

25. Therefore, for the purposes of this contempt motion, I feel it is important for this Court to hold a hearing find out how Mr. Erdman obtained the information of mine he produced to Pegasus. I also feel this is important with regard to our motion to have these cases sealed.

26. Therefore, I urge this Court to hold an evidentiary hearing where Mr. Erdman be directed to produce those hard-drives and, to the extent feasible, the other computer equipment he described or photographs thereof.

27. It is clear that Mr. Brennan has not been forthcoming with regard to my computer files. I am concerned he also has not been forthcoming about whether he acquired any information through his association with my former counsel, Tom Puccio, related to the claims against me he has made on behalf of his clients. So, an evidentiary hearing is needed on that issue also.

28. Given the extreme level of malice demonstrated by the surreptitious downloading of my personal information by Mr. Brennan's clients, and his repeated use of court filings to issue derogatory allegations against me, I am naturally concerned about the possible ramifications if this Court refuses to seal these cases.

29. My concern has been heightened upon being informed that, in their recent opposition papers, Mr. Brennan and Mr. Erdman take the position that there is no obligation of confidentiality covering the massive amount of my financial, personal and business information in their possession. Thus, I reiterate my urgent request that these cases be sealed in their entirety.

WHEREFORE, your affirmant respectfully requests that this Court issue an Order: a) disqualifying John Brennan from acting as attorney in any of the three above-captioned cases or, alternatively, holding an evidentiary hearing regarding whether disqualification is warranted; b) holding John Brennan in contempt of court for violating his promise to keep confidential non-public information, including business records, obtained by his clients from my computer files; c) holding an evidentiary hearing to determine whether Mr. Erdman should be held in contempt on the same grounds, with an instruction that he produce at such hearing any of my old hard-drives within his custody or control; and d) sealing the three above-captioned cases; and e) for such further relief as is just and proper.

ADAM VICTOR

Sworn to before me on the 15th day of January, 2018, when the person named above, known to be to be the same, came before me and executed the foregoing document and then confirmed that he had done so and was the person named above.

ALEKSANDR ROMANENKO
Notary Public - State of New York
NO. 01RO6347383
Qualified in Kings County
My Commission Expires Sep 6, 2020

Notary Public

FILED: NEW YORK COUNTY CLERK 03/05/2018 11:07 AM
NYSCEF DOC. NO. 211
INDEX NO. 158981/2014
RECEIVED NYSCEF: 03/05/2018

Case 1:20-cv-04162-LGS-GWG   Document 279-2   Filed 08/13/24   Page 14 of 18

# EXHIBIT A



# EXHIBIT B

From: adam@777.aero
Subject: Re:
Date: February 27, 2014 at 12:51 PM
To: Tyler Erdman tyler@aerotainment.com

Tyler:

Thanks.

Yes. Can you please send me the FAA documents about Pegasus you have.

Thanks again.

Adam
Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: Tyler Erdman <Tyler@Aerotainment.com>
Date: Thu, 27 Feb 2014 17:17:17
To: adam@777.aero<adam@777.aero>
Subject: RE:


Hi Adam,

Attached are the set of files from FlightAware and a ZIP file containing the second set of data from them. Do you want a copy of the FAA documents we got about Pegasus?

-Tyler


From: adam@777.aero <adam@777.aero>
Sent: Wednesday, February 26, 2014 10:08 PM
To: Tyler Erdman
Subject:

Tyler

Do you have the FlightAware records that were purchased for 771 and 772?

Thanks

Adam
Sent from my Verizon Wireless BlackBerry

From: **Tyler Erdman** tyler@aerotainment.com
Subject: RE:
Date: February 27, 2014 at 12:17 PM
To: adam@777.aero

Hi Adam,

Attached are the set of files from FlightAware and a ZIP file containing the second set of data from them. Do you want a copy of the FAA documents we got about Pegasus?

-Tyler

From: adam@777.aero <adam@777.aero>
Sent: Wednesday, February 26, 2014 10:08 PM
To: Tyler Erdman
Subject:

Tyler

Do you have the FlightAware records that were purchased for 771 and 772?

Thanks

Adam

Sent from my Verizon Wireless BlackBerry

FlightAware_N771AV.xls    FlightAware_N772AV.xls    FlightAware_PEG71.xls

FlightAware_PEG72.xls    FlightAware2012.zip