**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TYLER ERDMAN,
           Plaintiff,

    -against-

ADAM VICTOR, et al.,
           Defendants.

:
:
:  Case No. 1:20-cv-04162 (LGS) (GWG)
:
:  ECF Case
:
:  Hon. Gabriel W. Gorenstein
:
:
:

# <u>MOTION FOR SANCTIONS</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 3

PRELIMINARY STATEMENT ........................................................................................ 2

STATEMENT OF FACTS ................................................................................................. 3

    1.    THE CLAIM AND RELEVANT DISCOVERY ................................................... 3

    2.    THE REPOSITORIES ........................................................................................... 5

    3.    REPOSITORIES DEFENDANT NEVER SEARCHED ....................................... 8

    4.    VICTOR'S CONCEALMENT STRATEGY ...................................................... 11

ARGUMENT ................................................................................................................... 15

    A. THE AGIWAL FOUR-FACTOR TEST IS SATISFIED ...................................... 16

    B. VICTOR BEARS PRIMARY LIABILITY ......................................................... 19

RELIEF REQUESTED ..................................................................................................... 20

CONCLUSION ................................................................................................................ 22

TABLE OF AUTHORITIES

**Cases**

Agiwal v. Mid Island Mortgage Corp., 555 F.3d 298, 302 (2d Cir. 2009)................................... 16

Khatskevich v. Victor (Index No. 151658/2014)........................................................... 13

McWilliams v. Empire Agricultural Systems  et al.,  (Sup.Ct N.Y. Co.) Index No. 655727/2023)

    ................................................................................................................. 13

Sieck v. Russo, 869 F.2d 131 (2d Cir. 1989) ............................................................... 18

United States v. Victor, No. 1:17-cr-00053 (D.D.C.) ..................................................... 20

**Rules**

Rule 37(b)(2)....................................................................................................... 19

Rule 37(b)(2)(A)(i) .............................................................................................. 3

Rule 37(b)(2)(A)(ii) ............................................................................................. 3

Plaintiff, Tyler Erdman, hereby submits this memorandum of law in support of his motion for sanctions against Defendant, Adam Victor ("Victor").

## PRELIMINARY STATEMENT

Adam Victor accused Plaintiff of extortion, "hacking," theft, and other crimes. Victor disseminated these accusations to every law enforcement agency and organ of the press he could reach, claiming not only that he and his businesses were damaged but national security as well. (Erdman Decl., Ex. 1) He incurred thousands of dollars in expert fees to conduct forensic and legal analyses, which he repeatedly asserted supported his claims. However, he destroyed all evidence of those efforts when he was required to produce in this action.

Victor incredibly promised the Court that Plaintiff would "be receiving all documents held by the Plaintiff not subject to privilege, therefore he would be receiving everything he requested, and much more" (Erdman Decl., Ex. 2). Instead, he has destroyed evidence bearing on the validity of his accusations, rather than produce it.

This Court has already found it "clear that defendant failed to comply" (Erdman Decl., Ex. 3 at 3), found willfulness (Erdman Decl., Ex. 33 at 6-7), offered "one last chance" before sanctions (Erdman Decl., Ex. 25 at 52:19-20), and personally warned counsel of "personal consequences" for omissions (Id. 51:23-52:3). The Court's August 1, 2024 Order denied Plaintiff's prior sanctions application "without prejudice to an application made following the close of discovery," ruling that Plaintiff would be "free to raise all past conduct at that time." (Erdman Decl., Ex. 39).

The time has now come; discovery is closed. Defendant still refuses to comply with the Court's orders. At the September 6, 2024 status conference, this Court previewed the outcome: "He's going to have a great Rule 37 motion." (Erdman Decl., Ex. 15 at 56:7.) And the Court closed the door on further orders: "I'm not going to send them back to redo a search. If they didn't do a proper search, there will be a consequence for that." (Id. at 48:17-21.)

2

Plaintiff respectfully requests that this Court impose sanctions on Victor, establishing designated facts under Rule 37(b)(2)(A)(i), precluding specified defenses under Rule 37(b)(2)(A)(ii), and directing adverse inference instructions—to punish their conduct and restore the evidentiary record their concealment destroyed. Plaintiff also requests monetary sanctions against Victor and counsel as secondary relief.

## STATEMENT OF FACTS

### 1.  THE CLAIM AND RELEVANT DISCOVERY

Victor accused Plaintiff Tyler Erdman of theft of computer files, extortion, and computer hacking—to the Department of Justice, the Federal Elections Commission, the NYPD, Immigration and Customs Enforcement, and other agencies and multiple press outlets. (Erdman Decl., Ex. 1 at 5-6.) He even claimed that they somehow amounted to a breach of national security. Judge Schofield found that "[t]he statements made by Defendant to various law enforcement agencies and government officials accusing Plaintiff of breach of national security, theft of files from a computer and extortion impute a serious crime to Plaintiff and constitute defamation per se." (Erdman Decl., Ex. 1 at 6.)

Truth is a complete defense to defamation. Victor claimed to have evidence of Erdman's crimes:  the devices he claimed proved the alleged crimes, company records supporting his claims of grave damage to his business, forensic images he paid experts to create, and communications with law enforcement. Despite the Court's orders and Victor's promise to produce "everything," that did not happen, instead making up a story that the evidence disappeared on his watch. Even under the threat of sanctions, Victor has refused to produce. It is clear he considers the Court's sanctions preferable to disclosure. This matter warrants grave sanctions.

Victor's own accusations map directly to the repositories he has failed to produce. Each specific accusation, copying documents, phone hacking, file deletion corresponds to a specific

3

evidence source that Victor has concealed, as detailed in §II infra.  A defendant who makes accusations and then hides the evidence is not a defendant who believes his accusations are true. An innocent defendant would open these repositories, welcome inspection, and prove his case. Instead, Victor has misled the Court and avoided production.

After Victor admitted to not having conducted a search for this action, the Court compelled Victor to produce additional emails which he did in November 2024. The production revealed a series of emails between Victor and Deanna Paul, a Wall Street Journal reporter in February 2020 in which Victor claimed that Erdman and Khatskevich had stolen, "in excess of 300,000" files, that these "folks admitted to stealing, with no consequences", and that the NYPD recommended prosecution. (Erdman Decl., Ex. 5)

Victor had not disclosed contacting this reporter despite interrogatories seeking such persons. Such as Interrogatory No. 22 "Fully identify any documents and the recipients of any communications regarding Plaintiff, Khatskevich, or Toktassynova that mentions extortion, "hacking", theft or other criminal acts." (Erdman Decl., Ex. 6)

When deposed about his contact with reporters Victor was asked "Now, you previously said that you hadn't talked to reporters beyond Ms. Marsh." He answered "I say that I don't recall" then adding "Actually, there is one person I did speak with. He's a reporter for the Washing Times. His name is Jeff Shapiro". (Erdman Decl., Ex. 7 p. 171:14-24) Shapiro served as Victor's attorney in addition to his journalist endeavors.

It would appear that Victor was connected to Paul by a David Katz, a person working at PJN Strategies "a boutique strategic consulting firm." Katz has not been named by Victor as a person with knowledge, but he is shown actively taking part in Victor's crusade against Plaintiff in the privilege log produced in November 2024. That log showed emails exchanged with Victor entitled "A FEW QUESTIONS FOR TYLER ERDMAN. THIS KID IS SICK" with an attachment of "TYLER QUESTIONS SEPT 8 2019.docx", "HIGHLY CONFIDENTIAL" as well as emails about a "T-Visa" shortly before Victor raised that topic with the reporter. (Erdman Decl., Ex. 16),

4

That same log showed other emails accusing Plaintiff of illegal content throughout the entire time frame such as in January 2020: "Final Video and premature 1000% STOLE VIDEO BY TYLER that I want to make an issue that it was stolen." Just on May 22, 2020 Victor exchanged emails: "Victor v Erdman, DA mtg" and "The following is a brief summary of facts surrounding the hard drives in Erdman.docx" and "Statement of Facts to Weston Police[1] – ERDMAN LETTER".

Every document and log Defendant has reluctantly handed over has provided more proof of his bad conduct.

## 2.   THE REPOSITORIES

On July 26, 2022, this Court directed Defendant to "search all documents in repositories under his custody and control" and "provide plaintiff a sworn statement detailing his efforts to comply with this Order." (Erdman Decl., Ex. 8 at 1-2 ). Victor spent years concealing those documents while failing to even provide any clarity about what he searched and produced from. Detailed facts are set forth in the Erdman Declaration at the cited paragraphs.

### a.   <u>Defendant's Limited Production Repositories</u>

Defendant claimed to be producing "everything." (Erdman Decl., Ex. 2) What he produced was from collections done for other actions, productions from other actions, padded with Plaintiff's own documents, and searched by Victor himself with no attorney oversight. The Court had the parties detail their positions in an April 5th Letter to the Court (Erdman Decl., Ex. 9)

### b.   <u>Braverman files</u>

The bulk of the Defendant's production was a small portion of a collection assembled by Braverman Greenspun, LLC in response to a lawsuit filed by Davidoff Hutcher & Citron against

---

[1]  Plaintiff previously lived in Weston Connecticut. See Erdman Dec. at ¶48.

5

Victor for unpaid fees. A Letter from Victor's attorney explained their efforts to provide discovery. (Erdman Decl., Ex. 10 at 2). 'Neither Mr. Victor nor the undersigned can confirm what information was produced to the Plaintiff by prior counsel because the original documents have not been returned to Mr. Victor…These circumstances place the undersigned in the unenviable position of essentially starting over…he gave our office access to his ESI…The amount of the ESI is very large, consisting of over 900,000 documents."

Unknown persons using an unexplained process exported 37,731 documents from those 900,000 to be added to a different database used for production in this action on April 22, 2020. (Erdman Decl., Ex. 11 at 15) 96% of documents collected were removed from any review and production before this action was even filed. Plaintiff's document requests were not served until October 4, 2021 (Erdman Decl., Ex. 12). At the vendor conference Victor explained:

> "Tyler, if you want to find out who what was on there and what was served, I suggest you contact Schlam Stone and Braverman and ask them what they told SETEC, what they told TransPerfect to harvest…Al and. Emilio were not part of that harvesting…Emilio and Al were not part of that search…they were just basically the repository of everything that has been done in the past". (Erdman Decl., Ex. 9 at p. 8)

Relying on a repository of the past that no one can explain is simply insufficient. Defendant cannot claim to have produced everything when their own story includes omitting 860,000 documents.

### c.  Recycled state court productions

Prior to Defendant's production, the parties discussed how to handle productions in the related State Court actions, agreeing to use them in the instant action without reproducing them. Rather than complying with his agreement, however, much of Defendant's production consisted of documents produced to him by Toktassynova and Khatskevich, as shown by their original state court Bates numbers. (Erdman Decl. ¶ 41.)

6

### d.  Plaintiff's own drives

In the state court actions, Plaintiff was ordered to surrender five hard drives to Victor for forensic analysis. These were drives Victor claimed Erdman had stolen from him. Rodriguez claimed to have received drives from the Vendor who originally took possession of them, SETEC before sending them to TransPerfect. (Erdman Decl., Ex. 13) Defendant has been unable to explain what drives were sent to TransPerfect but one of which Defendant provided a collection log that detailed one of these drives' serial numbers (Erdman Decl., Ex. 14). and the production contained custodian information pointing to the same "G-Drive 2". The log provided shows 3 other unspecified hard drives being received the next day. Presumably other hard drives Erdman had provided.

However, Victor produced only selected documents—not the forensic images that Plaintiff requested (Erdman Decl., Ex. 12 at 17), which would allow independent analysis. Defendant admits to having withheld production of movie files he deemed irrelevant. See (Erdman Decl., Ex. 9 at 3). These files were stored on the drive as part of an effort to transfer them to Victor's aircraft. Omitting these files hides evidence showing the drives to be part of Plaintiff's ordinary employment that would underscore Victor's narrative.

Not providing full forensic images while selectively omitting files served to misrepresent the drives' contents and use.

### e.  Victor's email search

The Court's September 6th, 2024 Conference dealt with the issue that Plaintiff had found Victor produced no emails after August 2019. Victor claimed no responsive documents existed after that time but in reality, it was the result of no search having been done. Rather than providing oversight Rodriguez admitted that "We relied on what he told us" (Erdman Decl., Ex. 15 at 50:19-22).

7

Victor eventually did search a subset of his accounts and produced from them in November 2024 showing that his prior claims of their not being responsive emails after August 2019 to be false. This included emails between Victor and Deanna Paul, a Wall Street Journal reporter discussing Plaintiff and Khatskevich in February 2020. (Erdman Decl., Ex. 5).

The November 7th, 2024 privilege log accompanied this production was flawed as it didn't provide control number nor justify the reasons for the privilege claim beyond work product or attorney client privilege. It did show that Victor's efforts to target Plaintiff were ongoing throughout the time period it covered from June 2019 to June 2020. (Erdman Decl., Ex. 16). It also shows further examples of Victor claiming not to have documents because he had given them to his attorney, while he also claims the copies given to the attorneys is privilege.

### 3.  REPOSITORIES DEFENDANT NEVER SEARCHED

Despite the Court's order to search "all documents in repositories under his custody and control," the following were never searched or produced:

### a.  P-Drive (Office Server)

The P-Drive was the primary repository for documents at Victor's office. He claimed it contained highly valuable and confidential business documents, serving as the foundation of much of Plaintiff's alleged criminal activity. Plaintiff requested that forensic images of the drive be produced so that he could refute Victor's claims but they have not been produced. (Erdman Decl., Ex. 12 at 17).

Victor claimed to have turned the P-Drive over to the NYPD for analysis and that they had destroyed it rather than return it.  (Erdman Decl., Ex. 9 at 5).   But in the state court action, pursuant to a subpoena, Victor's former attorney produced a voicemail from Detective Bradish:

> "This is Officer Bradish from the NYPD. I'm calling about the uh, Adam Victor case. I have the hard drives back. I wanna know if it's alright with you if we voucher them and keep them here. They'll be in police custody until the trial is over. Um, so I just wanna make

8

sure that was all right with you guys, you guys didn't need them for the civil case."  (Erdman Decl., Ex. 17).

The Detective acknowledged ongoing civil litigation and the P-Drives relevance to them. Despite the offer to return them, the NYPD instead held on to them with the apparent consent of Victor's attorney, only for Victor to claim the NYPD to subsequently destroyed them.

Victor has claimed that he has had a copy of the P-Drive seemingly to mitigate the issues of it having been destroyed, but there is little to support his claim. Instead Polizzotto claimed "I cannot further detail the basis for that statement except that the volumes of discovery that were produced to you came from the sources set forth in the repository list" . (Erdman Decl., Ex. 9 at p.5 at 14) The repository list did not include the P-Drive.

The vendors seemed unaware of ever having the original or a copy of it, they were unable to explain how either would have been part of this actions production. Victor produced a document listing files contained on the P-Drive that appeared to be prepared as part of the efforts targeting Plaintiff; a comparison of that list to the production did not show evidence of it having been produced from. (Erdman Decl., Ex. 9 at 4).

A forensic image of the P-Drive would allow Plaintiff to prove or disprove Victor's claims of criminal activity. If its contents were as valuable as claimed, Victor would not let it disappear. Ultimately, despite acknowledging the importance of the P-Drive, Victor refused to produce from it.

**b.  Cell Phone:**

Victor claimed Plaintiff had "hacked" his cell phone. Rather than produce from it, he claimed it was replaced. The replacement phone was then searched only for "Adobe" and "Dropbox" apps—not text messages, call logs, voicemails, or calendar entries. (Erdman Decl., Ex. 3 at 2-3). This is plainly deficient. His phone would have contained texts and calls with Bradish (contacted "very frequently"), law enforcement and others. It would be the only repository for many of these communications, as Victor had told Plaintiff specifically that he had

9

relationships with law enforcement officials that were only to be contacted by phone and for their contact information to not be recorded (He disregarded that instruction).  (Erdman Decl. at ¶ 60).

### c. Office Computers

Victor had claimed that various computer contain evidence of Erdman's misdeeds yet they were not produced. These computers include the "Mac Pro" in Victors, the "iMac" in his office, Khatskevich's computer, an iMac kept at Victor's 230 Park Avenue office as well as a hard drive attached to it that contained documentary footage Victor had made. (Erdman Decl., Ex. 9).  Plaintiff has requested forensic images of these devices, but they have not been produced despite Victor having created such images at least twice.

A July 31, 2014 invoices a forensic firm, RVM (Erdman Decl., Ex. 18). showed remote work to create on forensic images of  "Adam Victor's iMac laptop computer", "Adam Victors Desktop computer" the Mac Pro, and "Imaging of office computer" likely the iMac from the 230 Park Ave office (D0480).  Victor received an email on March 30, 2015 from RVM about having "five forensic images currently stored in our forensic safe at RVM. We are currently maintaining the images beyond RVM's retention policy. Then asking if the drives should be retained, returned or destroyed. (Erdman Decl., Ex. 19). It is unclear what Victor chose but the invoices indicate that Victor retained physical possession of the computers.

A SETEC invoice from 6/7/2017 shows "Forensic Acquisition of Two loose Hard Drives" as well as "Remote Forensic Acquisition of Mac Pro" and "Mac" likely the 230 Park Ave iMac. (Erdman Decl., Ex. 20). Victor would seem to have retained those computers and provided them to yet another forensic firm for remote analysis. There is no evidence that the

10

collected images were turned over to Rodriguez for production in this action nor that Victor had provided devices for production in this action.

### 4.  VICTOR'S CONCEALMENT STRATEGY

The repository failures described in §II are connected by cross-cutting strategies that apply across all of them.

### a.  Curating the Custodian List

Victor's February 9, 2024 status letter listed the custodians he claimed to have reached out to for documents. (Erdman Decl., Ex. 21). The results Rodriguez reported are revealing, not for what they produced, but for the pattern they establish.

Rodriguez described reaching out to Sonia Bozic "through the school she is working at in Belgrade, Serbia". This seems designed to be misleading as she is a Professor at the New School in Manhattan where she is teaching courses and maintains an office. [2] Rodriguez had previously claimed to represent her in this action after Plaintiff had served a subpoena to her at that office. Just last week Victor told another Court she would be appearing as a Trial witness on his behalf and as described Victor seems very much aware she is not in Serbia. Rodriguez's characterization of her location would appear to be misleading at best.

Victor claims custodians have documents without defining what they would have, while many responded to say they have none. It would seem to be a ruse on Victor's part to try and excuse his lack of production. One such firm is Davidoff Hutcher who had told Victor they no longer had any of his documents. Davidoff had settled a lawsuit with Victor over unpaid fees after which they turned documents over to Victor's attorney at the time. This was described in motion practice in State Court where this settlement had delayed discovery. Victor's attorney withdrew shortly after, creating yet more delay as Rodriguez then delayed discovery as he waited for his predecessor to provide the documents.  It is hard to believe that Victor had settled with

---

[2] https://www.newschool.edu/media-studies/faculty/sonja-bozic/

Davidoff, had documents transferred to his attorney, Rodriguez went through motion practice on the topic for them to now claim they had his files.

Despite Defendant's large list of custodians, it is incomplete. Notably, Brian Kennedy, an attorney retained to lobby law enforcement on Victor's behalf and David Katz of PJN Strategies who is shown to be involved in Victor's crusade against Plaintiff are notably absent. Victor's strategy appears to be to populate the custodian list with people who had no documents while omitting those who did, most importantly himself.

### b.  Strategic Non-Payment

Victor distributed documents to agents and then stopped paying them, claiming the documents to now be beyond his reach. This pattern has happened so many times it is simply impossible for it to not be a tactic. Victor has been sued by DLA Piper for unpaid legal fees[3], Davidoff Hutcher and Citron defended Victor before ultimately going on to sue Victor for unpaid fees.  In this action Victor was represented by Schlam Stone & Dolan who withdrew after victor owed them $166,000. They now are now asserting a lien on Victor's documents. (Erdman Decl. , Ex. 22) This strategy of leaving attorneys holding the bag is still ongoing.

Victor had told the Court that his access to his production database was revoked because of an issue of insurance payments to TransPerfect.  He did not mention that his firm held the contract with TransPerfect and stopped payments. A suit has been brought against Polizzotto seeking $68,107.36 in unpaid TransPerfect bills related to Victor. (Erdman Decl. , Ex. 23)

Polizzotto had failed to respond to the complaint and a motion is pending seeking a Default Judgement. Polizzotto argues that they should not be defaulted as they wanted to add Victor's insurer as a party to the suit. (Erdman Decl. , Ex. 24) The insurer he claims to be responsible does not cover this action. This would seem to explain why Victor failed to conduct a new search and production as they would likely not cover it.

---

[3] 3 https://archive.nytimes.com/dealbook.nytimes.com/2013/03/25/suit-offers-a-peek-at-the-practice-of-padding-a-legal-bill/

The Court held its April 2024 conference ordering Defendant to explain themselves and produce. The Court made clear that the decision was to "do sanctions or we do a new searches" (Erdman Decl. , Ex. 25 at 60:14-15). Defendant made his choice when he decided to not pay that months TransPerfect bill or those that came after.

The pattern has repeated itself for years across several cases. Victor hires an expert, vendor or attorney, claims to have provided them with the only copy of a document or device, failed to pay them then claims he is unable to produce it.

### c.  Cross-Case Pattern

Victor is involved in so many lawsuits at any given time that his misconduct often spans multiple cases. He has used similar tactics in McWilliams v. Empire Agricultural Systems  et al., (Sup.Ct N.Y. Co.) Index No. 655727/2023). That action alleges Victor misappropriated a $1.5 million investment, nearly as soon as the funds cleared, tens of thousands were transferred to Polizzotto. When investors contacted Polizzotto regarding the funds, he claimed they were still in the account long after he did his part to empty it. (Erdman Decl., Ex. 28) Victor and Polizzotto used their regular excuses to avoid production and stymie discovery. The Court would go on to award attorney's fees as "consequences for Defendants' dilatory behavior, which as led to two otherwise unnecessary and wasteful discovery-related motions. (Erdman Decl., Ex. 29)

In Khatskevich v. Victor (Index No. 151658/2014)—the sexual harassment case in which Plaintiff participated as a witness, Judge Hagler restricted Victor's access to Khatskevich's T-Visa (For victims of human trafficking) documents after finding a "likelihood of retaliation.". (Erdman Decl., Ex. 30) The restriction meant Victor could not possess copies of those documents; he could review them only at his attorney's office to prevent him from using them to lash out at Khatskevich. The Court believed that Schlam Stone and Dolan as officers of the Court would serve to mitigate this risk. Instead they encouraged it. Victor arranged for the WSJ reporter to come to their office to review the documents so Victor could explain the "facts" and

13

his attorney the "law" while technically following the Court's order of not taking the documents from the office. (Erdman Decl., Ex. 5) This conduct would not have been known if not for the production in this action.

As every document produced reveals more misconduct, Victor is incentivized to avoid production whenever possible. Victor has found that treating Court Orders as the Court's suggestions is unlikely to result in severe repercussions so there is no reason to stop. This Court should persuade him that is not the correct course of action.

### d.  <u>Victor's Pattern of Discovery Abuse Across Multiple Cases</u>

Victor has constantly tried to wear down Court's resolve to avoid production. In State Court and this action Victor claimed that Toktassynova and Khatskevich's company email accounts were deleted when they should have been retained for the ongoing litigation. Plaintiff investigated and found that to not be the case (Erdman Decl. , Ex. 27). and this Court compelled their production in its July 26, 2022 Order. The State Court took notice of how the production from those emails accounts as well as other documents in this action showed the deficiencies of Victor's production in those State Actions resulting in sanctioning Victor $3,333 in each of the three actions. (Erdman Decl., Ex. 4) Victor then resisted payment of those sanctions for two years, requiring another Court order threatening a judgement.

Victor's history of lying under oath about discoverable materials predates even those sanctions. In September 2019, Victor testified under oath that he "could not recall" contacting Immigration and Customs Enforcement about Ms. Khatskevich. (Erdman Decl. , Ex. 31 at 351-352). This was false. When Ms. Khatskevich served a subpoena on Davidoff Hutcher & Citron LLP ("DHC"), Victor's former counsel, DHC produced scores of documents demonstrating Victor's extensive contacts with ICE, the FBI, the Department of Justice, the NYPD, the

14

Manhattan District Attorney, and other agencies—completely contradicting his sworn testimony. (Erdman Decl. , Ex. 32 ¶12-13) .

The documents revealed that Victor had contacted six law enforcement agencies over a four-month period (October 2015 - January 2016), all seeking prosecution or deportation of Erdman and Khatskevich, and that Victor continued these efforts for years after the Manhattan DA told him on October 19, 2015 that "no crime" had been committed. (Erdman Decl., Ex. 32.)

Victor never corrected his false testimony. Victor never amended his discovery responses. He just continued with his same conduct hoping it keep getting away with it. The pattern is clear, Victor lies, eventually evidence surfaces to prove it, Victor doesn't suffer consequences for it so he continues his behavior.

## ARGUMENT

On October 4, 2021, Plaintiff served document requests explicitly requiring production of email accounts (Erdman Decl. , Ex.12 at 21), forensic examination materials (Id. At 15 & 17), and law enforcement communications (Id. At 8 and 10). On July 26, 2022, this Court ordered Defendant to "search all documents in repositories under his custody and control," specifically including "the P-Drive, any office email accounts, forensic devices in his possession or subject to his control, his cell phone, and any cloud-based storage," and to "provide plaintiff a sworn statement detailing his efforts to comply with this Order" by August 3, 2022. (Erdman Decl., Ex. 8 at 1-2) Victor willfully defied Plaintiff's requests, that Court's order and the many that followed. Victor's claim to producing "everything" could not be further from the truth. In light of Victor's failure to comply with the Court's orders from the beginning of this case through the close of discovery, strong sanctions are required. Erdman asks that the Court strike Victor's defenses; order certain facts established and issue monetary sanctions against Victor and his counsel.

15

## A. THE AGIWAL FOUR-FACTOR TEST IS SATISFIED

The Second Circuit evaluates Rule 37(b) sanctions under the four-factor framework of Agiwal v. Mid Island Mortgage Corp., 555 F.3d 298, 302 (2d Cir. 2009): "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance."

### a. __Willfulness__

This Court has already found Victor's attorneys' conduct "willful in the sense that they have no processes in place to ensure compliance with Court-ordered deadlines or even to do the bare minimum of seeking an extension." (Erdman Decl., Ex.33. at 6-7) Defendant wasted years pretending to produce while doing nothing. Client and counsel alike had many opportunities to do what they were ordered to do and declined each one. When the Court warned in April 2024 of consequences for inaction, Defendant not only failed to act—he stopped paying his document vendor that same month. (Erdman Decl., Ex. 23.) There is no question the Defendant's misconduct is willful.

### b. __Efficacy of lesser sanctions__

Lesser sanctions have failed—comprehensively, repeatedly, and demonstrably. By January 2024, this Court was already "running out of tools in the toolbox' to ensure defendant complies with its obligations." (Erdman Decl., Ex. 33. At 6) Despite finding willfulness, the Court chose to forgo an ultimate sanction and instead ordered weekly status letters—a lesser sanction "tailored specifically to impress upon the attorneys their need to take their discovery obligations and court orders seriously." (Erdman Decl., Ex. 33. At 8) Defendant has been offered

16

this Court's leniency to purge himself of contempt. Instead, he doubled-down on non-compliance.

After the Court found willfulness in January 2024, it saw little improvement at the April 2024 conference, the Court asked: "Should I move to sanctions now, or do you want one last chance to do this?" (Erdman Decl., Ex. 25. At 52:19-20) Counsel chose the last chance. The Court described this case as "unique in the recalcitrance of the attorneys to get the information needed to determine whether a reasonable search was conducted." (Erdman Decl., Ex. 25 at 53:25-54:2.) Failing to pay TransPerfect's bill that month showed that they had no intent of compliance.

After this Court deferred sanctions in August 2024, the pattern continued: in October 2024, the Court was compelled to issue a second Order to Show Cause (Erdman Decl., Ex. 34) the second in ten months. Rodriguez went on to apply designed-to-fail search terms that yielded six irrelevant documents from over 70,000 emails (Erdman Decl., Ex. 35), the Court's frustration was clear "Obviously, defendant's attorney must immediately investigate..." (Erdman Decl., Ex. 35)  going on to "warn that if they fail to strictly comply with Docket #233, they may be sanctioned".

The Court's monitoring order, that Defendant provide weekly status letters, was a lesser sanction designed to ensure progress was instead just handled like a chore. They went through the motions of providing them, but they reported having done little to nothing. This Court has already reached the same conclusion. At the September 6, 2024 conference the Court stated: "Having been through this a million times, I'm not going to send them back to redo a search. If they didn't do a proper search, there will be a consequence for that." (Erdman Decl., Ex. 15 at 48:17-21) The Court observed: "I don't know what more to order" (Id. at 20:9-10) and "I don't

17

see what I can order." (Id. at 21:5.) Discovery orders have been exhausted. More severe sanctions are the only remaining remedy. See Sieck v. Russo, 869 F.2d 131 (2d Cir. 1989).

Victor's record confirms this futility. As detailed earlier, when the production in this action showed deficiencies in State Court productions Victor was sanctioned $10,000 across three cases on January 10, 2022. Victor then spent two years avoiding payment of those sanctions. He forced motion practice resulting in the Court threatening a judgement and that financial discovery that would accompany it. (Erdman Decl., Ex. 36) Only then did Victor's check book appear. He simply does not care about Court orders until made to do so. Finally, lesser sanctions are unavailing here because Victor has defied all of the Court's orders to produce and discovery is closed.

### c.  Duration.

The duration of Victor's noncompliance spans the entire case. Since November 2021 Plaintiff (Erdman Decl., Ex. 37) has had to make application after application in an attempt to get discovery. In the four years between then and the close of discovery Victor's promise of producing "everything" never materialized. Victor was given many opportunities to purge his contempt of this Court's orders and declined to do so.

### d.  Warning.

The Court provided escalating warnings at every stage without effect. Its orders have not been subtle as it warns of sanctions and "personal consequences". (Erdman Decl., Ex. 33) Instead of heeding those warnings, Victor committed further violations after each warning and fixed none of his discovery deficiencies.

18

**B. VICTOR BEARS PRIMARY LIABILITY**

Rule 37(b)(2) lists "the party" first and separately from "the attorney." Victor is not a passive client whose attorneys failed him. He is the architect of the concealment strategy—the person who decided what to search, what to produce, and what to hide. This conduct has been ongoing long before Rodriguez began representing him. The record establishes that Victor personally controlled every critical decision point:

Victor controlled the email searches. He has litigated enough to understand that professionals should have assisted with his production. Instead of reviewing requests and using proper search terms, he made sure to find nothing. (Erdman Decl., Ex. 15 at 22:11-13, 50:19-22) He then withheld the WSJ emails and failed to disclose them in interrogatories and testimony. Victor directed concealment and his attorneys did not fail him.

Victor decided not to pay vendors and his attorneys. He always has money for frivolous motion practice but never has it for productions he doesn't want to make.

Victor directed the his defamatory campaign, personally sending files to investigators, forwarding documents to counsel, directing criminal complaints, and pitching The Wall Street Journal while concealing the results.

Victor chose to engage and abandon law firms and vendors, fragmenting the evidentiary record across entities a pro se plaintiff cannot practically reach. He decided to spread documents around the country and make an adversary of most who had them. He failed to retrieve documents, those that have worked with them have gotten new jobs and no one can explain anything about repositories or productions. Victor created this mess because the mess serves his interests.

19

Victor's extensive litigation history establishes he cannot claim ignorance of legal obligations. His pattern of concealment through intermediaries extends beyond civil litigation. When the Federal Election Commission investigated Victor for illegal campaign contributions, Victor (Erdman Decl., Ex. 38), he threatened his own daughters if they did not lie for him. (Erdman Decl. ¶¶ 69-70) Victor had witnesses submit false affidavits only to admit guilt when the FEC prepared to issue subpoenas for documents that would show the truth and an FBI investigation became apparent. He would ultimately plead guilty to those charges (United States v. Victor, No. 1:17-cr-00053 (D.D.C.), admitting to the behavior his witnesses claimed didn't occur.

The behavioral pattern is the same: Victor uses intermediaries to conceal his role, Victor misrepresents the truth when asked directly, and Victor admits only when the evidence becomes incontrovertible. Here Victor has always been able to produce documents, he has chosen not to. He has maintained "control" of his documents, he has just decided that control would be used to prevent discovery. Victor has both contractual rights and practical ability to access vendor-held documents. His non-payment was an exercise of control, deliberately rendering documents inaccessible.

## **RELIEF REQUESTED**

Accordingly, for the reasons discussed above, Erdman requests the following relief:

(1) Victor's affirmative defenses be stricken;

(2) it be treated as established fact in this case that:

   I.    Victor's claims that Plaintiff committed criminal acts are false;

  II.    Victor's claims that Erdman stole any documents from him are false;

20

III.    Victor's claims that Erdman "hacked" or accessed his computers or devices without authorization is false;

IV.    Victor's claims that Plaintiff had breached, damaged or otherwise harmed "National Security" are false;

V.    Victor's claims that Erdman stole, copied or otherwise obtained business documents from him to profit from are false;

VI.    Victor's claims that Erdman had extorted him and or worked with Khatskevich and Toktassynova to do so is false;

VII.    Victor's claims that Erdman had committed perjury are false;

VIII.    Victor's claims Erdman, Khatskevich and/or Toktassynova conspired to steal and or commit crimes together are false;

IX.    Victor made false claims of Plaintiff engaging in criminal activity to law enforcement, members of the press and others;

X.    Victor made false claims of Plaintiff engaging in criminal activity with Khatskevich and/or Toktassynova to law enforcement, members of the press and others;

XI.    Victor published his false claims of Plaintiff engaging in criminal activity.

XII.    Victor made claims of Plaintiff engaging in criminal activity knowing that they were false;

XIII.    Victor made false claims of Plaintiff engaging in criminal activity with malice;

XIV.    Victor retaliated against Plaintiff after Plaintiff assisted Khatskevich bring claims against Victor;

XV.    Victor undertook efforts to gather and analyze devices and data relating to his allegations of Plaintiff's criminal activities;

21

XVI.     Victor's efforts to gather and analyze devices and data relating to his allegations of

Plaintiff's criminal activities resulted in no evidence being found to support those claims.

XVII.    Victor has destroyed devices, data and forensic information relating to his claims of

Plaintiff's criminal activities;

XVIII.   Victor has destroyed devices, data and forensic information relating to ongoing litigation;

XIX.     Victor's claims that he suffered any damage from Erdman's supposed crimes are false;

XX.      Victor has demonstrated contempt for this Court's Orders;


and (3) Erdman be awarded monetary sanctions in the amount of $430.06 per month for the

discovery period to recoup costs incurred from his eDiscovery software as well as any other

additional amount the Court deems just.

## CONCLUSION

For the reasons discussed above, Erdman respectfully requests that his motions for sanctions be

granted in full.

Respectfully submitted,

/s/ Tyler Erdman

Tyler Erdman

217 Bridge St, Apt E8

Stamford, Ct 06905

Tel: 917-301-0401

Email: tyler@erdman.it

Dated: February 17, 2026

22