```
                     UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
         ------------------------------:

TYLER ERDMAN,                          : Case No.: 20-CV-4162

                     Plaintiff, :

     v.                                :

ADAM VICTOR,                           : New York, New York

                     Defendant. : September 6, 2024

         ------------------------------:



              TRANSCRIPT OF STATUS CONFERENCE HEARING

          BEFORE THE HONORABLE GABRIEL W. GORENSTEIN

                 UNITED STATES MAGISTRATE JUDGE




APPEARANCES:

For Plaintiff:           TYLER ERDMAN, PLAINTIFF PRO SE
                         241 W 200 S
                         Apartment 630
                         Salt Lake City, Utah 84101

For Defendant:           POLIZZOTTO & POLIZZOTTO
                         BY:  Alfred J. Polizzotto, III
                         6911 18th Avenue
                         Brooklyn, New York 11204




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

THE DEPUTY CLERK:  Good afternoon.  This is in the matter of Erdman v. Victor, et al.; Case Number: 20-cv-4162.

Starting at plaintiff's counsel, please state your appearance for the record.

MR. ERDMAN:  Tyler Erdman.

THE COURT:  Okay.

MR. POLIZZOTTO:  For the defendant, Adam Victor, Alfred Polizzotto.

MR. RODRIGUEZ:  Also for the defendant, Adam Victor, Emilio Rodriguez.

THE COURT:  Okay.

All right.  You can be seated if you're not speaking.

We're here based upon two letters, I guess, Dockets 279 and 281.  I have to say there's not a lot of clarity in my mind about what is going on. There's also not a lot of clarity in my mind about what we're looking for and even what defamatory statements we're talking about.  All this makes it very hard to deal with this discovery dispute.  I mean, we're going to have to slog through it.

I mean, you know, the only statements that can be the subject of the defamation claim have to have occurred a year before filing the complaint,

which I guess would be sometime in June 2019 to June 2020. That doesn't mean that there might not be relevance. If the defamatory statements are about things that happened beforehand, then I gather that's the basis for which plaintiff is seeking discovery from the earlier period. That's not unreasonable to do so.

I realize -- you know, it's not going to happen.

THE DEPUTY CLERK: I know.

THE COURT: You're going to send a message to someone.

Sorry about the blinking light. There's one out, and there's one blinking. Two out. Three out.

THE DEPUTY CLERK: I just fixed the lights, too, but I'll --

THE COURT: There's five out -- six out -- seven, and then one blinking. So --

THE DEPUTY CLERK: Yep. I'll send an e-mail right now.

THE COURT: That's a big project.

THE DEPUTY CLERK: I'll send an e-mail right now.

THE COURT: Okay.

AMM TRANSCRIPTION SERVICE  631.334.1445

But, you know, the basic thing before you do anything is figure out, you know, what databases or custodians or files you're searching or producing, and then, you know, what gets searched in what years.  I mean, I don't know how this has gotten so out of control.

But, you know, the letters, you know, they're not in a form that allow me to say do X, Y, or Z, so maybe we can try to do that today.  But, you know, there's some value, I would think, Mr. Erdman, in ending this case and bringing whatever evidence you have and just going to trial or make a summary judgment motion.

So there's a value in that.  And there's also a principle of proportionality, which is you don't get every last possible 50 e-mail accounts that you think someone might have used.  You know, this is not that sort of case.

For all you know, Mr. Erdman, do you have any solutions, other than the asking for the world, which is what you've asked for?

MR. ERDMAN:  Yes, I understand that there are a lot of repositories in there, and I don't expect all of those.  They just never negotiate over what they would like -- what would be reasonable to

search.  They just say they provided everything, and there's no evidence they ever have done that. And --

THE COURT:  Well, I mean, they have an affidavit saying what it is.  I don't know.  That was -- I'm sure you know about it.  It was an affidavit from May, signed by Mr. Rodriguez, you know, listing these things, and in not terribly clear terms, suggesting that they had been, you know, made available to you.

So do you have some solution short of, you know, starting this over?  Because I don't think that's going to happen.

MR. ERDMAN:  Okay.  I believe one of the most important things are these forensic images that were created of various computers.  Those would be pretty dispositive of his claims of me hacking, taking files, et cetera.  I believe those should be fairly easy to produce.  I have invoices showing they were created a long time ago.

THE COURT:  Okay.  So hold on.  Hold on.

Can you translate this into terms that they will understand?  In other words, they say they had, you know, certain P drives.  I don't know if that's what you're talking about, or something else, but we

need to start talking the same language.

MR. ERDMAN:  Your Honor, at the last conference, ordered that they identify the hard drives on their list of repositories, which they did not.  So I --

THE COURT:  Okay.  Stop.

"Identify the hard drives on their list of repositories."  What does that mean?

MR. ERDMAN:  They had -- I believe they called it a collection log.

THE COURT:  Okay.

MR. ERDMAN:  And it would list hard drive, but that would be all that they identified the repository by.  They wouldn't say what it's from, anything about it.

THE COURT:  All right.  So this is what document?

MR. ERDMAN:  I believe that was one of the exhibits to their affidavit.

THE COURT:  I assume you're looking this up for me.

MR. ERDMAN:  It's double-printed.  I believe it is 266-1 or -3.

THE COURT:  That's the affidavit I've been talking about.

MR. ERDMAN:  It was an attachment to that.

THE COURT:  Okay.  Sounds like -- yes, these little, tiny Excel spreadsheets.  I have these here.

MR. ERDMAN:  Okay.  I made a copy where I compiled that information, where it was more readable, and identified what I believe each one to be, if you'd like to see that.

THE COURT:  Well, hold on.

Just so I understand.  Am I looking at page 1, 2, or 3 of the exhibits to the May 1st affidavit?

MR. ERDMAN:  I had them as separate pages. It's the longer of the two Excel sheets.  This one.

MR. POLIZZOTTO:  I believe that's 266-1, Your Honor.

MR. ERDMAN:  I think 266-1 is the list of e-mail accounts.

THE COURT:  Yeah, I think it's 2 -- dash 2. No?

MR. POLIZZOTTO:  No, Your Honor.

THE COURT:  Oh, yeah, it is dash 1.

MR. RODRIGUEZ:  It may be dash 1.  Yes.

THE COURT:  Okay.  So before we get anywhere, are these the P drives?  What are these, from your point of view?

MR. POLIZZOTTO:  No.  No, Your Honor.  Some of it is the P drives.

In the affidavit, the first six paragraphs identify that there had been two computers, an iMac and a Mac Pro, and that the documents had been transferred from one computer to another prior to the commencement of this action, and that what's detailed on that spreadsheet are the importing of the documents from those hard drives and the P drives.  The P drives were separate --

THE COURT:  I don't understand what you just said.

MR. POLIZZOTTO:  Okay.

THE COURT:  I read your affidavit twice -- three times, probably, trying to understand what was going on and how it related to this.

So you talk about files going from an iMac to a laptop -- I'm not going to worry about that -- and then being transmitted to TransPerfect.

So is one or all five of these that?

MR. POLIZZOTTO:  On 266-1 ...

THE COURT:  There's five things listed.

MR. ERDMAN:  And, Your Honor, I believe I identified all of those.

THE COURT:  You know what these are?

AMM TRANSCRIPTION SERVICE  631.334.1445

MR. ERDMAN:  Yes.

THE COURT:  What are they?

MR. ERDMAN:  They're hard drives that I had turned over to Mr. Victor in another action for him to do a forensic analysis of.  Mr. Rodriguez had an affidavit where he said that they didn't believe the documents to be responsive on some of those hard drives, so they just weren't produced.

THE COURT:  You think this is not described in Mr. Rodriguez's affidavit?

MR. ERDMAN:  Not at all.  And I checked. They did --

THE COURT:  You think they are?

MR. POLIZZOTTO:  Yes, after consulting with Tribble, TransPerfect and Setec.

THE COURT:  I mean, hold on.  Back up.

Are you producing hard drives to them of your stuff or --

MR. ERDMAN:  This was a year --

THE COURT:  Let me finish my sentence. We're on the record.

When you describe producing hard drives to them, are those hard drives of your materials or Victor's materials?

MR. ERDMAN:  I believe they were primarily

mine, but some mixed with Victor because I used them for work purposes and had a little bit of everything on them.

THE COURT:  And you think that -- something else?

MR. POLIZZOTTO:  No.  The way that the -- when we had consulted in a conference with Mr. Erdman and the companies that had imported the data, it was explained that there was a computer that Mr. Victor used and then hard drives that were in a file server.  Those hard drives that were in the file server were referred to as the P drives.  And what's on 266-1 was imported from the hard drive from Mr. Victor's computer and were clones of the P drive.  After the --

THE COURT:  Is one of the entries the computer and other entries the P drives?

MR. RODRIGUEZ:  Yes.

THE COURT:  Which is which?

MR. POLIZZOTTO:  So there were some -- I believe that the P drives were the ones from --

MR. RODRIGUEZ:  That's correct.

MR. POLIZZOTTO:  -- from TLS Forensics.

THE COURT:  The last two?

MR. POLIZZOTTO:  There are three.  One is

in dark gray.

THE COURT:  Oh, I see.  I can't even --
now, I see it.

MR. RODRIGUEZ:  Yeah.  Apologize for the --

THE COURT:  I was saying five.  In fact,
it's --

MR. RODRIGUEZ:  Yeah.

THE COURT:  -- 12, maybe.

MR. ERDMAN:  Your Honor, would you like --

MR. POLIZZOTTO:  12 entries.

THE COURT:  Okay.

All right, so you're saying some of these
are the P drives?

MR. RODRIGUEZ:  Yes.

MR. POLIZZOTTO:  Yes.

THE COURT:  And you're saying they're not?

MR. ERDMAN:  They're not.  They have
produced a list --

THE COURT:  How am I supposed to resolve
this?

MR. ERDMAN:  So to identify it, they had a
list of things that they said were on the P drive.
I checked the files on that list to their
production, and they're nowhere to be found.

In one of their collection logs, they

provided a serial number of a hard drive that I had provided to them.  That's the one from 7-8-21.  And I had also seen e-mails where they were talking about three other hard drives I had turned over to them at the same time.  And I had checked the amount of files on there and various documents to see what they were talking about on that.

MR. POLIZZOTTO:  Your Honor, if I might?

THE COURT:  Yeah.

MR. POLIZZOTTO:  After our last conference, we had a meeting with Mr. Erdman and the companies, the two companies that were involved in importing the files.

THE COURT:  Yep.

MR. POLIZZOTTO:  These issues, if they were even addressed -- and that was not addressed -- to them when they were online with us, could have been easily addressed if he had that issue.  But I did tell him at the time that there was nothing held back from them, that they had the drives that were these "P drives," and they had imported the documents from Mr. Victor's computer.

THE COURT:  I mean, do the P drives still exist in the material world, Mr. Erdman?

MR. ERDMAN:  I believe that --

THE COURT: Actually, I'll ask you guys first. Do they still exist, or is this all that's left of them?

MR. POLIZZOTTO: No. The police department had taken the originals. Those were subsequently destroyed or disposed of by the police department. And that documentation had previously been provided to Mr. Erdman. So the only thing that existed were these clones of the drives that the police department --

THE COURT: The clones still exist?

MR. POLIZZOTTO: They were given over to Setec and TransPerfect.

THE COURT: Where are they now?

MR. POLIZZOTTO: TransPerfect.

THE COURT: They have these. But you still have a relationship with TransPerfect or not?

MR. POLIZZOTTO: We still have a relationship with TransPerfect.

THE COURT: Okay. So there's physical copies of the P drives sitting with TransPerfect?

MR. POLIZZOTTO: They were delivered to TransPerfect.

THE COURT: And you think, Mr. Erdman, that TransPerfect -- it is not reflected on this listing

AMM TRANSCRIPTION SERVICE   631.334.1445

by TransPerfect, right?

MR. ERDMAN:  Correct.  What I believe --

THE COURT:  So you think they're just sitting on them?  I don't understand.

MR. ERDMAN:  I believe they might still be with one of the forensic companies, likely Setec.  Setec was sent to get the original drives from the NYPD and provided copies from Mr. Victor.

What I believe happened is Mr. Victor wanted to analyze the hard drives I had given him to --

THE COURT:  By the way, have you deposed Victor about all this?

MR. ERDMAN:  He doesn't recall pretty much anything of substance when asked.

THE COURT:  So the answer is, yes, but he doesn't recall.

Okay.  Go ahead.

You deposed him?

MR. ERDMAN:  Yes, I did.

THE COURT:  Or you talked to him?

MR. ERDMAN:  Deposed.

THE COURT:  Go ahead.

MR. ERDMAN:  Mr. Victor wanted to continue making claims to law enforcement, and he had hired a

new forensics company to do an analysis of the hard drives I provided. And I believe that's why Setec had only provided those four hard drives I had given them without providing additional material.

THE COURT: Okay. Well, you know, maybe we're in the land of spoliation. So if you think there are drives out there that they say they no longer have custody of, either personally or -- you know, obviously, they have the ability to get back hard drives from their contractors, like Setec and TransPerfect.

If you think you can prove that, when this is all over, you can make a motion for spoliation, but I can't order someone to produce something if they claim they don't have it. That's the problem.

MR. ERDMAN: They're also --

THE COURT: Even if you have -- if you have evidence, you know, that they once had it or they lost it or whatever, you can make a spoliation motion. That's at another time.

So, with that in mind, let's talk about what they actually have, that they admit they have -- because, you know, again, if you say they have it and they say they don't, that's spoliation land. I can't order them to do something with a

hard drive or anything else that they say they don't have. Now, if you end up proving that they had it when they claim they didn't, then you get spoliation sanctions, okay?

So let's, now, confine this entire application to things that they say they have, and this may end at the whole application. I don't know. Confine it to things that they admit that they have and that you say has not been searched or has not been produced.

Do you understand what I'm telling you to do now?

MR. ERDMAN: Yes, I do.

THE COURT: Okay. So now that we're doing that, what, if anything, is left?

MR. ERDMAN: Okay. I had raised the issue of the forensic images in my application, and they didn't make any claim that they do not have those images. Instead, they said, "Forensic images would have resulted in duplicates, which, as stated, were removed by part of the process."

THE COURT: And what are you quoting from? I'm sorry.

MR. ERDMAN: 281, their response to my letter. And that's on page 3.

AMM TRANSCRIPTION SERVICE  631.334.1445

THE COURT: Okay. I'm not sure I even understand it, but let me just read it.

What paragraph are you reading from?

MR. ERDMAN: It's the first paragraph. Three lines up from the end of the paragraph.

THE COURT: Forensic images -- okay.

I have no idea what that sentence means. Maybe whoever wrote it wants to explain it: "Forensic images would have resulted in duplicates, which, as stated, were removed as part of the process."

MR. RODRIGUEZ: After speaking to my client, Mr. Victor indicated that those images would have been of data that was already produced.

THE COURT: I don't know what images we're even talking about.

MR. RODRIGUEZ: That's a good question also, Your Honor.

THE COURT: Well, you wrote the sentence. What are you referring to?

MR. RODRIGUEZ: When I wrote the sentence, I was trying to go by what Mr. Erdman was referring to, saying that they use forensic images on these drives. And then I went to my client and that's the best answer that he could give.

THE COURT: Okay. Does he still have the forensic images or not? Or don't you know?

MR. POLIZZOTTO: Your Honor, my understanding is that these images, whatever images do exist, were all given to the two vendors. And the two vendors had performed the searches and --

THE COURT: Okay. So the forensic images were given to the vendors. You say the vendors didn't produce them.

MR. POLIZZOTTO: And then --

THE COURT: Okay. Hold on. Hold on.

MR. POLIZZOTTO: I'm just trying to explain the sentence, Your Honor.

THE COURT: Go ahead.

MR. POLIZZOTTO: And that when the experts had done their reviews they eliminated duplicates.

THE COURT: I'm sorry. "When the experts"? What are you referring to?

MR. POLIZZOTTO: When the experts had reviewed the --

THE COURT: When you say "experts," do you mean the vendors?

MR. POLIZZOTTO: I'm sorry. The vendors.

MR. RODRIGUEZ: The vendors.

MR. POLIZZOTTO: I apologize.

The vendors had done their review of all the import of the data.  They eliminated duplicates.

THE COURT:  Okay.

MR. POLIZZOTTO:  And that the forensic images were part of the duplicates.

THE COURT:  All right.

So, again, I think we're still in -- we're back where I was, Mr. Erdman, which is, they're claiming whatever they have they gave to the vendors, that their vendors gave everything to you.  You deny that.  So if you can show you didn't get something, then you get spoliation sanctions.  I can't make them produce something that they say they don't have.

MR. ERDMAN:  Okay.

THE COURT:  All right.

MR. ERDMAN:  One note on these hard drives they're talking about.  That's from 2021.  It doesn't look like they ever searched for anything, really, other than a couple e-mail accounts and Dropbox accounts since you ordered them to do so.  There's --

THE COURT:  Again, try to present this to me in the terms that I talked to you about.

So what is it that they admit exists that

has not been either produced to you or searched for you?

MR. ERDMAN:  I think one of the problems with that is they claim -- anytime I ask them about something, they claim it went to a vendor and was produced.

THE COURT:  Okay.  So if you can produce -- I think, then, we keep ending up back in the same place, which is, if you -- I don't know what more to order.

MR. ERDMAN:  Okay.

THE COURT:  If you can prove that they had a piece of evidence or repository of information and then, you know, destroyed it, lost it, failed to search it, you know, claimed it didn't exist, that's where spoliation comes in.

Do you know what spoliation is?

MR. ERDMAN:  Yes, I do.

THE COURT:  Okay.  So, you know, if something's lost or destroyed -- and this all comes within that -- even if you think it still exists, if they say it doesn't exist, then that's the same as it were -- if you can prove it once existed, that it's now lost.  Do you see what I'm saying?

MR. ERDMAN:  Yes, I do.

AMM TRANSCRIPTION SERVICE  631.334.1445

THE COURT:  So then if you show that, then you meet the first step of spoliation sanctions and can see if you can get any sanctions for that.  I'm not guaranteeing you will, but there's nothing -- I don't see what I can order.

MR. ERDMAN:  I think what we might be able to resolve is as far as e-mail accounts.

THE COURT:  Okay.  I mean, that's something where, if we know something exists, we can talk about whether an adequate search was done or not.  So I think you're, now, understanding what I'm getting at.

So tell me what part of your letter I should look at to see what we should talk about.

MR. ERDMAN:  So on my letter, 279, at page 7.

THE COURT:  Okay.  So you have a listing of 29 accounts that you believe was used by the defendant; is that right?

MR. ERDMAN:  Correct.

THE COURT:  Okay.  And you want a search -- or whatever that's been involving.  I don't know -- of those accounts because you think it hasn't previously been done?

MR. ERDMAN:  Yes.  They had said they only

AMM TRANSCRIPTION SERVICE   631.334.1445

searched a subset of accounts and that there's no responsive documents in other accounts, but I have a screenshot from Mr. Victor's computer showing those other accounts and there's clearly e-mails within them.

THE COURT:  Okay.  So we're talking about these -- did you folks investigate each of these 29 e-mail accounts?

MR. RODRIGUEZ:  Yes.

THE COURT:  And if so, how?

MR. RODRIGUEZ:  Yes.  Victor only used six of those accounts.  He's created all of those accounts, but he only used six of them.

THE COURT:  Okay.

MR. RODRIGUEZ:  Only six of them provided had -- according to our vendor, they were only able to pull e-mails from six of those accounts because only six of them had any information.

THE COURT:  Are you telling me the vendor actually went to all of these accounts?

MR. RODRIGUEZ:  The vendor, when he did the pull from Adam's computer, when they did the collection --

THE COURT:  Okay.

MR. RODRIGUEZ:  -- there was only e-mails

in six of the accounts.

THE COURT:  Got it.

So I guess the question is, where does this get pulled from?  It's getting pulled from his computer, not from some web repository; is that right?

MR. RODRIGUEZ:  That is correct.

THE COURT:  Okay.

Go ahead.

MR. ERDMAN:  In their collection log, they had searched Eugenia and Nazeem's office e-mail accounts, and they're very clearly delineated on the log when they did so.  There's no evidence that they searched these --

THE COURT:  Wait, wait.  What log?  I'm sorry.

MR. ERDMAN:  In one of their -- they provided a log of what repositories they searched.

THE COURT:  Okay.

MR. ERDMAN:  And this was in November of 2022.  They had searched two e-mail accounts, and it very clearly says they did an e-mail collection. There's nothing else indicating that for these accounts.  I believe they're trying to reuse a search that was done in 2019 by the Braverman firm.

AMM TRANSCRIPTION SERVICE  631.334.1445

And I don't believe they even have access to that anymore or know any details. And, like, their privilege log pretty much omits the entire limitations period. It's just blank because the Braverman search was done in August of '19 and it just stops. There's no Victor e-mails after that point.

THE COURT: Okay. So is it your contention, defendants, that this was searched after 2019, these 29 -- I'm sorry -- the six e-mail accounts that you say were used?

MR. RODRIGUEZ: That's correct, Your Honor. The two e-mail accounts that he's referring to are two employee accounts. That's not part of this list.

MR. ERDMAN: Not --

MR. RODRIGUEZ: Of this -- I'm speaking.

Of this list, all of these e-mails were searched. And Mr. Victor already knew that he only used six of them. He created all of them. But for his business and for himself, he only used --

THE COURT: Can you tell me which six?

MR. RODRIGUEZ: It's the six that had company names on them, actually. The TransEnergy one, TransGas Development, TransNational. Matter of

fact, and I list those six in my response to his letter.  This should be in my letter of 8-21, the exact six that produced e-mails.  And I've also referred to that --

THE COURT:  Hold on.  Hold on.

They're attached as an exhibit, the list of e-mail accounts.

MR. POLIZZOTTO:  Your Honor, it's a combination of Docket 266 and 281.  Five of them are listed in paragraph 16 in Docket 266.  And the other e-mail is listed in Docket 281 on page 205.

THE COURT:  Okay.  So now what do I do?

Again, they claim they've searched this thing, and you say you think they haven't.

What am I supposed to do?

MR. ERDMAN:  Would I be able to show you a document from his computer?

THE COURT:  Sure.  Should you have a copy for the other side?

MR. ERDMAN:  I believe I sent you guys that one.  It's from his -- a screenshot from his computer.

THE COURT:  Is it in something previously supplied to me?

MR. ERDMAN:  No.  No.

THE COURT:  Well, let them see.  And after they've looked at it, I'll look at it.  Tell them what it is.

MR. ERDMAN:  It's a screenshot that was from Mr. Victor's computer, and it shows the e-mail accounts that were in use on it.  And then it also shows the amount of e-mails in each account.

MR. POLIZZOTTO:  Your Honor, I --

THE COURT:  Give it to my clerk.

MR. POLIZZOTTO:  I don't know where that was taken from.  I don't know what it is.  It could have been made anywhere.  I'm not saying it's not accurate.  I'm not saying it is accurate.  It's the first time I've seen this purported screenshot.

MR. ERDMAN:  Here's another one.  Here's another one with similar information on it.

MR. POLIZZOTTO:  It would be the same argument I'd have to both.

THE COURT:  Well, you're going to have to look, at least, into this e-mail issue.

What year was this photograph taken?

MR. ERDMAN:  I believe that one was 2015.

Your Honor, I have an idea of how --

MR. POLIZZOTTO:  Your Honor, if I might, on the issue of this additional discovery, as the Court

had found in the motion to dismiss, the statements regarding the -- that are at issue here pertain to crimes and defamation per se.

The documents that are being sought right here -- he doesn't have to prove that the statements were not true.  To the contrary, I have to prove that they were true if there's going to be a defense.  These e-mail accounts, if they do contain anything, predate the statements -- he indicated that's from 2015 -- and would only hurt my client if they existed and weren't produced because then I couldn't use them in theory to show that the statements were true.

My client would only be hurting himself if he failed to produce anything in these e-mail accounts.  Because they're defamatory per se, I have to show they're untrue or they are true.

THE COURT:  So, Mr. Erdman, he says you don't really need this stuff from these e-mail accounts.

MR. ERDMAN:  And that's false because I don't have any of Victor's e-mails past August of 2019.  And they exist because they had retrieved a few e-mails from Patrick Timlin, who was --

THE COURT:  Okay.  But now you -- okay, so

you're talking about post-2019 e-mails.

MR. ERDMAN:  Yes.  I'm saying I --

THE COURT:  Okay.  So the issue is what he was using post-2019.  This, you said, is years before, right?

MR. ERDMAN:  Okay.  Yeah.

THE COURT:  Well, it doesn't mean he was using it in 2019.

How about if we get a sworn statement from him saying what e-mails he used in 2019?

MR. ERDMAN:  I have extensive knowledge of his affidavits and --

THE COURT:  No, no, but in 2019?  What e-mail accounts he was using in 2019?

MR. ERDMAN:  I don't think that response to be credible.

THE COURT:  No, but -- I know, but why does the fact that he was using something five years earlier show what he was doing in 2019?

MR. ERDMAN:  Oh, I understand your point on that.  I'm just saying, from their collection log and their information provided, there's no evidence they ever did a search as they were ordered to for this action, regardless of which e-mail accounts. Even if we're just limiting it to those six, they

never searched them for this action.

THE COURT:  Okay.  Now, we're talking about the six.

MR. ERDMAN:  Correct.

THE COURT:  Did you search them post-2019 for this action?

MR. RODRIGUEZ:  Yes, Your Honor, as our --

THE COURT:  Who did it and how?

MR. RODRIGUEZ:  Mr. Victor did the searches.  Matter of fact, our submissions have shown that we even submitted documents holding a date range from 1996 to 2022.

THE COURT:  So did you submit e-mails from those six accounts?

MR. RODRIGUEZ:  Yes, we did, Your Honor.

MR. ERDMAN:  It's very easy to prove that wrong.  You can just go on the privilege log, search for --

THE COURT:  Again, let's not go over this.  They claim they weren't claiming privilege.

MR. ERDMAN:  So for Mr. Victor's e-mail --

THE COURT:  Did you get any e-mails from those accounts after 2019 -- after June 1, 2019?

MR. ERDMAN:  No.  And I can tell because I --

AMM TRANSCRIPTION SERVICE   631.334.1445

THE COURT: Do you think there are such e-mails that you gave to him post-June 1, 2019?

MR. RODRIGUEZ: We have submitted e-mails, like I said, all the way to 2022. I don't know from which accounts exactly --

THE COURT: You don't know if it's from those six accounts?

MR. RODRIGUEZ: I don't know if it's in those six accounts exactly, but --

THE COURT: Did you do a search?

Do we know what the search was done on the e-mail accounts, or you just gave everything?

MR. RODRIGUEZ: We know that Mr. Victor indicated there was a search done. And, like I said, TransPerfect did make a network collection.

THE COURT: No, no, no. But that wouldn't -- is that getting these six e-mail accounts post --

MR. RODRIGUEZ: Yes.

THE COURT: -- post-2019?

MR. RODRIGUEZ: Yes, Your Honor.

THE COURT: Okay. Well, maybe now we're back where we were, which is you say -- well, no.

Okay. This is a little different because they're saying, yes, we have access to e-mails with

those e-mail accounts, but whatever you got, or if there was nothing, there was nothing responsive.  I think that's what's going on right now.

MR. ERDMAN:  I think one thing I'd like to figure out is when they went to search the two office e-mail accounts, TransPerfect was given access, and they collected --

THE COURT:  The two office e-mail accounts?  Just so I know what I'm talking about.

MR. ERDMAN:  Which is Eugenia@TGDS and Nazeem@TGDS.

THE COURT:  What numbers in 1 through 29?

MR. RODRIGUEZ:  That's not part of that list, Your Honor.  Those are two employee accounts.

MR. ERDMAN:  They had multiple lists.

THE COURT:  I thought we were talking -- this whole time, I thought we were talking about 1 to 29.

MR. RODRIGUEZ:  No.  That's why I said he's referring to two employee e-mail accounts.

THE COURT:  How did we get off 1 to 29?  That's what I thought I was talking to you the whole time about this.

MR. ERDMAN:  They had provided multiple versions of the collection log, which sometimes omit

and sometimes add to.

THE COURT:  Okay.  Well, now, we have to go back 15 minutes.

What I said to you was, let's focus on the things that you can prove they still have and haven't done something with.  And I explained to you why you hadn't done -- we're, now, not doing that anymore with the P drives or anything else.

And then you said to me, oh, the e-mail accounts.  And I said, what e-mail accounts?  And you said, 1 through 29.

MR. ERDMAN:  Oh, these were not on that list.  Those are just Victor's own accounts.

THE COURT:  Hold on.  I haven't finished where I was going.

So let me go back and say, are there -- first of all, is this not an exhaustive list?  Is that the problem?

MR. ERDMAN:  That list is based on an Excel sheet they had given to Braverman to do a collection in 2019.

THE COURT:  Okay.  Are we done talking about this or not?  I don't even know where we are anymore because you --

MR. ERDMAN:  Well, the point I wanted to

make is they had a professional collection done where they gave TransPerfect access to those e-mail accounts.

THE COURT:  What e-mail accounts?

MR. ERDMAN:  The office e-mail accounts, Eugenia and Nazeem@TGDS.com.

THE COURT:  And that's not on 1 through 29.

MR. ERDMAN:  No, it is not.

THE COURT:  Okay.  So I'm not done talking -- are we, now, done talking about the --

MR. ERDMAN:  No.  I'm trying to get back to it.

THE COURT:  Okay.  Go ahead.

MR. ERDMAN:  Just instead of having a professional do this collection and search, they had Mr. Victor do it.  And there's no evidence he ever gave anything to Setec or even found anything.

THE COURT:  Okay.  Well, now, this, at least, I'm understanding.  So we can talk about the accounts that -- I mean, I think it's not fulfilling their lawyerly duties to say to their clients, search the e-mail accounts and let me know what you find, without any oversight, and there's plenty of case law on that.

So maybe that needs to be redone if that's

really what happened here.  And it sounds like that is what happened here.  So if you tell me which e-mail accounts we're talking about that are active in 2019, then I'll discuss with them whether they need to, now, supervise a search in that.

MR. ERDMAN:  So the list of accounts that I quoted, that are on here, these 29, are from Victor in 2019 because he had provided these for a collection to Braverman that they did in August of 2019.

THE COURT:  Okay.  So --

MR. ERDMAN:  So presumably they would exist, as he thought them relevant enough to provide the Braverman.

THE COURT:  And yet defendants are telling me that he provided them to --

Do you deny they were provided to Braverman?

MR. ERDMAN:  So --

THE COURT:  No, no.  I'm asking defendants.

MR. RODRIGUEZ:  They were provided to Braverman because he was asked to provide a complete list of e-mail accounts that he has.

THE COURT:  Okay.  But you're saying he didn't use --

MR. RODRIGUEZ:  He created a lot of them --

THE COURT:  And then used six of them.  Got it.

Okay.  Back to where we were.

So if you can identify some e-mail accounts that he used, that you have reason to believe were not properly searched, either because they gave no oversight to it -- which it sounds like -- or some other reason, then I'm willing to talk about that, though I think I'm probably going to limit it to the ones that, at this point, he's claiming he actually used.  So --

MR. ERDMAN:  Well, I think --

THE COURT:  Go ahead.

MR. ERDMAN:  I just think they're not saying that they don't have these e-mail accounts.  They're just saying that they didn't feel like searching them based on their client saying he didn't use them.  I don't see why he should be taken at face value similarly to him saying he searched.

THE COURT:  I mean, I don't think it's unreasonable.  It's not that many.

I mean, how do people search, you know, e-mail accounts?  I mean, Gmail, we all know how to do that.

MR. ERDMAN:  So they could provide the --

THE COURT:  17, 18, 19, I don't even know what that is.  Those aren't e-mail addresses.

Anyone know?

MR. ERDMAN:  I believe you just left off the @gmail part for that.

MR. RODRIGUEZ:  That's possible.

MR. ERDMAN:  I mean, to do a search, as TransPerfect probably did, they would provide, like, a list of passwords such as this.  The vendor would then just be able to put that login information into their software, collect whatever they're collecting, and then do a search and production from it.  It's not a difficult process.

MR. RODRIGUEZ:  Your Honor, he keeps saying that it was something just, like, haphazardly Mr. Victor did, but he did it in conjunction with the vendor.  The vendor did a network collection of data.

MR. ERDMAN:  Can you --

MR. RODRIGUEZ:  So there was over --

THE COURT:  In 2019?

MR. RODRIGUEZ:  After 2019.

THE COURT:  After 2019.  For this case?

MR. RODRIGUEZ:  Yes.  That was a search

that was ordered by you back in 2022.

THE COURT:  And of which e-mail accounts?

MR. RODRIGUEZ:  Of these same e-mail accounts.

MR. ERDMAN:  So I only --

THE COURT:  Is that right, Mr. Erdman?

MR. ERDMAN:  I'm looking at their collection log; there's only one entry for 2022.  It says it was for e-mails and it was for --

THE COURT:  You're talking about a collection log, not a privilege log.

MR. ERDMAN:  Correct.

THE COURT:  And where are you getting this?

MR. ERDMAN:  This was the one attached to his affidavit, this table.

THE COURT:  Okay.  Is that a collection log?  Why does that not reflect all these e-mail accounts?

I'm asking defendants.

MR. RODRIGUEZ:  It does reflect those e-mail accounts, Your Honor.  As I said, you ordered that search.

THE COURT:  Okay.

MR. RODRIGUEZ:  Mr. Victor did that search in conjunction with the vendor.

THE COURT:  Again, it's --

MR. RODRIGUEZ:  He simply says that they don't cover those accounts, but they did.

MR. ERDMAN:  So the --

THE COURT:  They don't list the actual accounts in --

MR. RODRIGUEZ:  No, they do not.

THE COURT:  I see.

MR. ERDMAN:  The December '22 entry list is an e-mail collection.  It was for five items.  That's it.  It's --

THE COURT:  What do you mean, "for five items"?

MR. ERDMAN:  No.  They only imported five items.  When I talked to Mr. Rodriguez previously, he indicated that was getting documents from a custodian from --

THE COURT:  You know what the five items are?

MR. RODRIGUEZ:  Yes.  From Sonja Bozek, one custodian.  That's not a network collection from the vendor.

MR. ERDMAN:  But it says "e-mail."

MR. RODRIGUEZ:  Yeah, but those are e-mails that I had gotten from Sonja Bozek.  That's not what

those -- I'm telling you what they were.

MR. ERDMAN:  Well, then there's nothing in 2022 indicating that they searched and gave anything to TransPerfect.

MR. RODRIGUEZ:  It's indicated up there on the --

THE COURT:  Hold on.

Go ahead.

MR. RODRIGUEZ:  Your Honor, if we go to Exhibit -- it should be 266-4.

MR. POLIZZOTTO:  No.

MR. RODRIGUEZ:  Oh, I'm sorry -3.  I apologize, Your Honor.

It shows -- it's a batch collection, and it shows three days.

THE COURT:  Hold on.

MR. RODRIGUEZ:  Sure.

THE COURT:  Mine only goes up to 266-3.

MR. RODRIGUEZ:  It is -3, Your Honor.

It is -3, Your Honor.  So I apologize that I said "4."

If you go to last date, there's three collections that were done in November 2022.

MR. ERDMAN:  And that's not --

MR. RODRIGUEZ:  I'm not done speaking.

AMM TRANSCRIPTION SERVICE  631.334.1445

And he keeps saying that, oh, these were never done, but our vendor keeps showing that they were collected. There were three batch collections in response to the order that you gave.

THE COURT: And you're saying that covers these e-mail addresses?

MR. RODRIGUEZ: That is correct. And if you look at the record count, the record counts are pretty sizable. A couple of thousand --

THE COURT: What's your view, Mr. Erdman?

MR. ERDMAN: He had provided a different collection log that --

THE COURT: "He"?

MR. ERDMAN: Mr. Rodriguez -- that listed those collections as being from those two office e-mail accounts and two Dropbox accounts. Those weren't collections from Mr. Victor.

THE COURT: What are you referring to?

MR. ERDMAN: It was another log he had provided to me earlier.

THE COURT: You're going to have to show it to me.

Do you know what he's talking about, Mr. Rodriguez?

MR. RODRIGUEZ: No.

MR. ERDMAN:  I have the data copy and pasted to make it more readable.  It's the same data, if that --

THE COURT:  Well, show it to him.

MR. RODRIGUEZ:  I mean, our collections are perfectly --

MR. ERDMAN:  And I provided that to you.

THE COURT:  But this is a document that you say shows that this particular entry does not relate to Victor's e-mails?

MR. ERDMAN:  Correct.

And I also reviewed those documents to see where they came from.  And they had file path information that indicated they were from Dropbox or those two e-mail accounts.  And there was a pretty clear indication of where they were all from.

MR. POLIZZOTTO:  No.  Your Honor, this is -- what he's handed me is his analysis of 266-1 and -3 --

THE COURT:  You know, I think we're back where we were, which is, if you're claiming that you have evidence that they didn't produce this, I'm willing to count that as lost for purposes of spoliation.

I don't see -- you know, there's nothing

AMM TRANSCRIPTION SERVICE   631.334.1445

they could say.

I gather you're not going to say in response to the motion, oh, yeah, we have this, he never asked for it. Am I right?

MR. POLIZZOTTO: Correct. Depending what he asked for, but correct. I would assume that that would be the answer.

THE COURT: Okay. Because, you know, at this point, I'm just getting two different views about what you searched. So, at this point, you know, if you didn't search -- if he can prove that you didn't search something that you claim you have searched, then, I mean, either it's spoliation or it's just a regular -- I would do the exact same sanction under Rule 37, having now delayed it for, you know, years because it never got done.

So it's all a question of what you're going to be able to prove.

MR. ERDMAN: Would it make sense if I am allowed to depose those vendors under oath and just figure out exactly what they had, when they had it, what happened to it, what was searched?

THE COURT: I mean, I'd rather you just talk to them. Has that not been made available to you?

MR. ERDMAN:  They don't provide any details.

MR. POLIZZOTTO:  I'm sorry.  We had a conference, Your Honor, with myself, Mr. Rodriguez, Mr. Erdman and both vendors.

THE COURT:  Right.

MR. POLIZZOTTO:  And we were on for well over an hour to two hours.  For Setec, Mr. Erdman asked approximately five questions and finished with them.  He spent most of his time on TransPerfect. He indicated he was going to come up with some kind of list of questions they had afterwards, but he was not curtailed in how long he could ask them questions, what questions he could ask.  The individuals who were involved answered his questions.  He's, kind of, already done that.

THE COURT:  Yeah.  Why do we need to do it again?

MR. ERDMAN:  One of the witnesses had a hard cutoff and had to go, and I was being rushed off.  And the people provided didn't know details. I would ask -- there was e-mails of Setec going to retrieve the P drives.

THE COURT:  There was what?

MR. ERDMAN:  Setec was hired to go to the

AMM TRANSCRIPTION SERVICE  631.334.1445

NYPD and retrieve the P drive.  There's e-mails showing that, but when I asked the person there, they had absolutely no idea of that whole situation.  Same with TransPerfect.  When I asked him to tell me more about what's on these logs, he's just unable to do so.

THE COURT:  You think there's someone else there who knows?

MR. ERDMAN:  I think if there's someone who can actually review stuff -- like, there should be someone who could go in the closet and see what hard drives they have there.  It doesn't seem like there's been any effort to identify what these hard drives were.

MR. RODRIGUEZ:  Your Honor, can I answer that?

THE COURT:  Sure.

MR. RODRIGUEZ:  It's absolutely not true.  He dealt with Mr. Todd Stefan from Setec, who was the one who worked with Mr. Victor on collecting the Victor hard drives, and the person at TransPerfect who has worked with Mr. Victor's database from the time that we came into the case.  So it's absolutely not true.  He was the perfect person, and he had all the information, and he did answer his questions.

THE COURT:  I mean, I'm certainly willing to give you another session if someone said they had to leave.

MR. RODRIGUEZ:  Your Honor, may I say he literally had five minutes of questions for Mr. Stefan from Setec.

THE COURT:  That's the one who had to leave?

MR. POLIZZOTTO:  No.  And he acknowledged -- we asked him, do you have any other questions for him?  And he said no.

MR. ERDMAN:  Well, Setec, for example, wasn't able to define what hard drives they had sent to Mr. Rodriguez.

THE COURT:  Why don't you get a list of questions so that they're not blindsided by this. Get a list of very specific and not-hard-to-answer questions that you feel you need the answer to, and then let's have another session where they answer those questions, if they can.

I would rather not -- you know, I don't want to start torturing discovery vendors with depositions under oath.  It seems to me perfectly adequate for you to talk to them about what happened here.

MR. ERDMAN:  Yeah, I can definitely do that.

THE COURT:  I mean, unless -- I mean, if the defendant's going to object that, you know, he's -- if he brings up things they say -- usually, in discovery, it's not an issue.  He brings up things they say.  You're going to say, oh, that's not under oath.  You should reject it.  Then maybe I need to have a deposition.

I mean, are you willing to accept that the answers given by these individuals reflect the facts as Setec and TransPerfect understand them, or do I need to order a deposition?

MR. RODRIGUEZ:  Are you speaking to us, Your Honor, or Mr. Erdman?

THE COURT:  Yes.  No, to you.

MR. POLIZZOTTO:  I'm willing to accept their answer.

MR. RODRIGUEZ:  We'll accept it.

MR. ERDMAN:  I'm reviewing the transcript from that conference.  Just as an example, I asked Mr. Rodriguez to explain why that privilege log cutoff existed in 2019, which he was also ordered to do and did not.  He said, "It's no good because that's before the relevant time period for you.

June is anything after June."

So he was taking the position that anything after the cutoff would be undiscoverable.

MR. RODRIGUEZ:  Your Honor, I have answered that question many times.  We believe that's -- the last document on that log is the last document we're claiming privilege on.  We're not going to go and claim privilege on extra documents just to be able to satisfy his curiosity.  The last document on the log is the last document we're claiming privilege on, period.

THE COURT:  I feel like we've done this 50 times, Mr. Erdman.

MR. ERDMAN:  I mean, my problem isn't that it's not on the log.  There's also no e-mails produced after that time.  There's just -- when Braverman did their collection in August of 2019 --

THE COURT:  Okay.  But the reason -- can you just accept the reason has nothing to do with privilege at this point?

MR. ERDMAN:  Oh, yeah.  I'm not arguing that it is.  I'm just saying it demonstrates that they just didn't search e-mails after that point.  The easiest way to show that is off of their privilege log.

THE COURT:  Well, no, it's not the easiest way if they say they're not claiming privilege after 2019.

MR. ERDMAN:  Well, I'm saying if there's also -- if I review the production, I see that same gap.  There's just no documents in -- after August 2019.

THE COURT:  Well, okay.  That's a different question.  Let's not mix it up with privilege, okay?

So you think there should be documents out there.  They say that they did their search and it's not there.  So, you know, I don't know what else to tell you.  You can't order someone to produce something they say isn't there.  If they didn't do a proper search and you can prove that, then we're -- I'm willing to give you -- there will be sanctions for that because, at this point, you know, having been through this a million times, I'm not going to send them back to redo a search.  If they didn't do a proper search, there will be a consequence for that.

So, again, we're back to where we were before, which is:  Is there something that they admit they have that you know you can prove is not properly searched and that there's something they

can do now?

If there isn't anything, then I think we may be done.

MR. ERDMAN:  I believe it's just -- the easiest ones for that would be e-mail accounts. There's also office e-mail accounts.

THE COURT:  Okay.  One at a time.  I tried to do this before.  E-mail accounts.

So let's talk about what e-mail accounts we're talking about specifically.

MR. ERDMAN:  Mr. Victor used a corporate version of Gmail.

THE COURT:  Is this within 1 through 29 or somewhere else?

MR. ERDMAN:  It's going to be some of those accounts, but I can't tell definitively which ones.

THE COURT:  Okay.  Well --

MR. ERDMAN:  He changes the user names frequently.

THE COURT:  Okay.  You're interested in e-mail accounts that he used that are somehow not reflected on -- I mean, they have a contention as to -- that there's only six e-mail accounts he used, notwithstanding the creation of addresses, at least in the relevant time period, which is now, for this

purpose, 2019 -- June 1, 2019 to June 1, 2020.

Your answer to that, if I recall, was that the vendor did the search or that Victor did the search?

MR. RODRIGUEZ:  Mr. Victor did the search, and the vendor did the collection of the e-mails.

THE COURT:  Okay.  So Victor picked out the e-mails.

Mr. Erdman, the only thing so far that raises questions with me -- and I'll now address it with the lawyers -- is you can't just go to your client and say, search these terms and let me know what you find.  You have to do something to monitor that when this individual is not a professional or anything else.  So that means sitting down with him, seeing what he did, and making sure he did it properly.  If that didn't occur, that needs to be redone.

Did that occur, or did you completely rely on what he told you?

MR. RODRIGUEZ:  We relied on what he told us.

THE COURT:  So that needs to be redone for 2019 to 2020, for the six e-mail accounts that he claims he used, all right.

AMM TRANSCRIPTION SERVICE  631.334.1445

And then when you get whatever it is, you need to either give it directly to Mr. Erdman or send it in through the vendor. So I'll give you two weeks to do that, all right? September 20th.

Is there anything else of that ilk, Mr. Erdman?

MR. ERDMAN: I think most of it -- I will have to send the questions for the vendors. If they say they produced everything and it's not on their collection log, I think I need to have someone with knowledge address that.

THE COURT: Well, I'm letting you do some questions for the vendors.

MR. ERDMAN: Yeah.

The other problem is Mr. Rodriguez has been claiming to be reviewing privilege log entries that I had given him a few weeks before our last conference. He said he no longer has access to Relativity through TransPerfect because their bills have gone unpaid.

THE COURT: Is that true?

MR. RODRIGUEZ: That is true. The reinsurer -- well, it was being paid by Travelers. They're the ones that had the original policy. So that limit has been -- has been already used up. So

Chubb, who's the reinsurer, is supposed to be picking up the coverage of the costs. And we're going back and forth with Chubb now because Chubb keeps asking for more information, more information before they go and officially decide to cover the costs.

THE COURT: How much cost are we talking about?

MR. RODRIGUEZ: It's pretty significant. It's --

THE COURT: You have the bill?

MR. RODRIGUEZ: I think it's close to six figures, if I'm not -- or over it. Just over it. I'm not sure, Your Honor, but it's significant. It's a lot.

THE COURT: So did you once have access to Relativity, or only you have access?

MR. RODRIGUEZ: Well, he had access to --

MR. ERDMAN: I have --

MR. RODRIGUEZ: -- production, right? Yeah, that's correct.

MR. ERDMAN: I have my own software. They would give me production. I put it into my own, so it's unrelated to their predicament.

THE COURT: Okay. So you have your own

AMM TRANSCRIPTION SERVICE  631.334.1445

predicament because you need to get to what?

MR. ERDMAN:  They can't --

THE COURT:  No, no, no.

MR. RODRIGUEZ:  What he's referring to, he questions a batch of documents -- actually, three groups of documents.  So for me to be able to go over them and be able to review --

THE COURT:  You can't see the original documents anymore?

MR. RODRIGUEZ:  I cannot see the documents anymore, that's correct, because I don't have access anymore.

THE COURT:  How many documents are there?

MR. RODRIGUEZ:  A couple hundred.  I would say it's about 400, just about.

MR. ERDMAN:  Could be.

MR. RODRIGUEZ:  It's about 400.

MR. ERDMAN:  But I think the bigger issue is, if they're unable to access the e-discovery platform, I don't see how they're producing anything if they can't even review a single one of their own documents.  Nor is TransPerfect likely to be very helpful in anything if their bills are going unpaid.

MR. RODRIGUEZ:  Well, that's a situation we're trying to remedy.  We should be able to remedy

within the next --

THE COURT:  Next what?

MR. POLIZZOTTO:  We don't know.  We don't know the answer to that.  We're working with them --

THE COURT:  He claims you've been trying to do this for years.

MR. POLIZZOTTO:  -- trying to get.

THE COURT:  How long has it been you've been without --

MR. POLIZZOTTO:  Chubb?

THE COURT:  Let me finish.

How long has it been you've been without access?

MR. RODRIGUEZ:  Since the end of -- when was the last conference, Your Honor?  Was it April?  The end of April?

THE COURT:  Probably.

MR. RODRIGUEZ:  That's about when we lost access.

MR. POLIZZOTTO:  After that conference.

MR. ERDMAN:  And Mr. Rodriguez has been claiming he's working on the privilege review multiple times, asked for extensions, and then only recently admitted he could never see any of it the entire time.

THE COURT:  Well, not to me, because I haven't seen him since April.

Well, that's a separate issue right now, is the rereview of the privilege.  So if it impacts something else, then we can talk about, you know, whether Victor needs to be responsible for paying the bill or doing what you need to do to at least -- even if they're not going to host the platform, to get access to the raw documents.  Might be something that wouldn't be unreasonable for me to just order and then you'd have to deal with them without the platform.

Okay.  So we got distracted by the privilege log questioning.

So I think we have something of a track. I'm basically denying your application in terms of requiring them to, you know, undertake acts, other than what I said just now about redoing the e-mail search for the accounts that Victor uses.

I mean, he better be accurate on these, which accounts he used, at least in 2019, because if it turns out that he lied about that, and, in fact, there are other accounts, that's going to be a basis for other sanctions.  So you better make sure those are really his only e-mail accounts where any

AMM TRANSCRIPTION SERVICE  631.334.1445

discoverable information could be located.

MR. RODRIGUEZ:  He was pretty clear on that, Your Honor.

THE COURT:  Well, you better warn him about the potential consequences if some e-mail comes up from someone else that he used, from some other account.  He's going to have a great Rule 37 motion.

MR. ERDMAN:  Your Honor, would we be able to address just some statements they made in their affidavit that seem to be relying on Victor's say rather than facts?

THE COURT:  I'm not sure what that meant, but go ahead.

MR. ERDMAN:  Like, they say he only had a single computer, and that's just false.  He had several this entire --

THE COURT:  I'm not going to go over statements that you think might be incorrect.  What matters to me is, are there documents that you can prove -- actually, let me back that up.

What matters to me is whether there's something I can order at this point that would advance discovery in this matter.  As I keep telling you, if they say X is true about what they have access to, and you think they have access to

AMM TRANSCRIPTION SERVICE  631.334.1445

something else, that doesn't do anything right now because, even if I believed you, what good would it do for me to order them to produce something they say they don't have?

The only way you can get relief for that is if you actually do prove it, then they get a sanction, either spoliation or just regular old 37. It's the same analysis. It's basically the same analysis, spoliation and a complete failure to produce at any time. Under Rule 37, it's the same factors, the same considerations.

So the answer is, no, I don't want to go over statements you think are incorrect.

All right. So we're going to have some reproduction by September 20th. You know, if this privilege thing is still not solved within the next few weeks, Mr. Erdman, you know, you can write to me and -- first, talk to them. Write to me, and then I will -- I don't know what I can order. It's possible I could order TransPerfect to supply them with the raw documents.

You might want to talk to TransPerfect about that, saying that, you know, I'm considering doing that.

Obviously, I'm not -- I'm sorry. Not

AMM TRANSCRIPTION SERVICE   631.334.1445

TransPerfect.  Relativity, right?

MR. RODRIGUEZ:  Yes.

THE COURT:  Those are the people who have the bill.

It's possible, you know, their real expense may be, kind of, the hosting and the bells and whistles.  And they may have some understanding that some raw document you gave to them they have to give back to you.  You understand what I'm saying?

So it may not need an order from me in order for you to just get back the raw document.

Are you both following this?

MR. POLIZZOTTO:  Yes.

THE COURT:  So when he contacts you, you need to talk that out with Relativity.

All right, Mr. Ehrman, I think we've covered what we're going to do today.

MR. ERDMAN:  There's one other really minor issue.  I had ordered a transcript.

THE COURT:  Oh, yes, I remember that.

Did you agree to pay the transcript costs or not?

MR. POLIZZOTTO:  The transcript of?

THE COURT:  The court conference.

MR. ERDMAN:  The prior conference.

MR. POLIZZOTTO:  Yes.

You didn't receive it?

MR. ERDMAN:  You never said that -- never said --

MR. POLIZZOTTO:  I'd be happy to.

THE COURT:  It's in his letter.  You didn't see it?

MR. POLIZZOTTO:  I had told my staff to send out the check.  If it didn't go out, I will personally take care of it.

THE COURT:  Okay.

Anything else, Mr. Erdman?

MR. ERDMAN:  No.

THE COURT:  All right.  I think we're done.  Thank you.

MR. POLIZZOTTO:  Thank you.

MR. RODRIGUEZ:  Thank you, Your Honor.

0o0

AMM TRANSCRIPTION SERVICE   631.334.1445

C E R T I F I C A T E


     I, Adrienne M. Mignano, certify that the

foregoing transcript of proceedings in the case of

Tyler Erdman v. Adam Victor, Docket #20CV4162 was

prepared using digital transcription software and is

a true and accurate record of the proceedings.




Signature  *Adrienne M. Mignano*
           _____

           ADRIENNE M. MIGNANO, RPR


Date:      September 17, 2024